Gabriel Del Virginia, Esq.
LAW OFFICES OF GABRIEL DEL VIRGINIA
30 Wall Street, 12th Floor
New York, New York 10005
Telephone: 212-371-5478
Facsimile: 212-371-0460
Email: gabriel.delvirginia@verizon.net

Hearing Date: September 29, 2016
Hearing Time: 10:00 a.m.

*Attorneys for the Debtor
and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
**In re**

**CITICARE, INC.,**                                    **Chapter 11**


          **Debtor.**                               **Case No. 13-11902 (MEW)**
-------------------------------------------------------------X

**DEBTOR'S AMENDED MOTION FOR ORDER, PURSUANT TO SECTIONS
105(a), 363(b), (f) AND (m) AND 365 OF THE BANKRUPTCY CODE AND
RULES 6004 AND 6006 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE: (I) APPROVING THE SALE OF CERTAIN ASSETS OF THE
DEBTOR FREE AND CLEAR OF ALL LIENS, CLAIMS AND
ENCUMBRANCES AND APPROVING THE ASSOCIATED ASSET
PURCHASE AGREEMENT; (II) AUTHORIZING THE ASSUMPTION AND
ASSIGNMENT OF THE DEBTOR'S NON-RESIDENTIAL REAL PROPERTY
LEASE; AND, (III) GRANTING RELATED RELIEF**

**To:    The Honorable Michael E. Wiles,
          United States Bankruptcy Judge:**

Citicare, Inc., the debtor and debtor in possession (the "Debtor" or "Seller"),

as and for its motion (the "Sale Motion") for the entry of an order (the "Sale Order"),

pursuant to sections 105(a), 363(b), (f) and (m), and 365 of title 11 of the

United States Code §§ 101 *et seq.* (the "Bankruptcy Code") and Rules 6004 and

6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (i)

authorizing and approving the sale (the "Sale") of certain of the Debtor's assets,

specifically the "Assets" described in the proposed Asset Purchase Agreement annexed hereto (the "<u>Assets</u>"), to Urban Health Plan, Inc. ("<u>Urban</u>" or the "<u>Purchaser</u>"), free and clear of all liens, claims and encumbrances and approving the Asset Purchase Agreement (the "<u>APA</u>") executed in connection therewith; (ii) authorizing and approving the assumption and assignment of the Debtor's interest in its lease of non-residential real property located at 154 West 127th Street, New York, New York (the "<u>Lease</u>") as provided in the Plan in the Amendment annexed to the APA, pursuant to § 365 of the Bankruptcy Code; and, (iii) granting related relief.  The Sale Motion is filed as an alternative to the Debtor's *Second Amended Chapter 11 Plan* (the "<u>Plan</u>") pursuant to section 1129 of title 11 of the United Statement Code §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>").   In support of the Sale Motion, the Debtor respectfully sets forth and represents as follows:

### <u>JURISDICTION</u>

1.    This Court has jurisdiction herein pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief sought herein are §§ 105(a), 363(b) and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006.

## CASE BACKGROUND

2.    The Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code on June 9, 2013 (the "Petition Date").  The Debtor continues to manage its property as a debtor and debtor-in-possession.

3.    No trustee or examiner has been appointed in this Bankruptcy Case, and no official committee of unsecured creditors has been appointed.

4.    As the Debtor is in the healthcare business, on September 12, 2013 a patient care ombudsman was appointed under section 333(a)(1) of the Bankruptcy Code. [Docket No. 28].

5.    The Debtor is a New York Corporation providing comprehensive primary and specialty care to medically underserved communities. The Debtor operates from its premises (the "Premises") located at 154 West 127th Street in the borough of Manhattan, City of New York.

6.    The Debtor is a private NYS Article 28 Licensed Diagnostic and Treatment Center operated as a multi-specialty, integrated primary health care professional facility.  The facility has provided services to 5,500 unique patients and generated 25,000 visits in the year ending December 31, 2014.

7.    The Debtor is located in northern Manhattan, one of the five boroughs comprising New York City, and provides services to the West/Central Harlem and Washington Heights minority populations that share the common experience of poverty and are medically underserved. The racial and ethnic composition of the communities is about 75% African-American.  In addition to American-born African

Americans, Harlem has recently experienced an influx of new African immigrants most notably from Senegal. Although public transportation is generally available, accessing services in other parts of Manhattan or other boroughs involves lengthy travel via crowed public transportation – a particular challenge during times of illness. The northern location of the Debtor therefore is critical to the medical well-being of the community.

8.    The Debtor experienced financial difficulty as a result of certain tax disputes and difficulty obtaining financing for a critical expansion planned for the Premises.    The Debtor's need to seek relief was specifically necessitated by a levy placed by the Internal Revenue Service (the "IRS") on the Debtor's bank accounts. Additionally, the New York Department of Health ("DOH") determined that it was owed approximately $955,000 due to retroactive rate adjustments covering February 2010 to February 2013 and, as a result, withheld this amount in installments from both pre ($582,000) and post-bankruptcy ($326,000) reimbursement payments until the matter was resolved. The withholding of the retroactive adjustments from the current payments by the NYDOH, as reflected above, has had an adverse effect on the Debtor's business both pre and post-bankruptcy.    The failure of the Debtor's business would adversely affect the medically-underserved community (5,500 unique patients generating 25,000 visits) in which many residents rely upon the Debtor as their primary source for medical care.

9.     Through extensive efforts, the Debtor's management also has located a purchaser for the Assets, Urban, which will continue to operate and serve the community under new management.   The proposed new owners of the Debtor's Assets also will provide a guaranteed cash infusion of up to $1 million, and up to $3 million, to fund necessary payments under the Debtor's Chapter 11 Plan of Reorganization (the "Plan") submitted contemporaneously with this Sale Motion. Further, while the Debtor is highly confident that Urban will obtain the necessary approvals, it is highly doubtful whether another purchaser could be found in any timely manner that would qualify for the necessary approvals.   As such, the license is not readily obtainable by a new purchaser.   Accordingly, in the event that the Plan is not approved, the Debtor requests that the Court enter an order substantially similar to Exhibit A hereto granting this Sale Motion.

## SUMMARY OF RELIEF SOUGHT

10.    The Debtor seeks the entry of an Order substantially in the form submitted herewith:

    a.    Approving the sale of the Assets free and clear of all liens, claims and encumbrances as set forth in, and pursuant to, the APA annexed hereto as Exhibit B to Urban for the Purchase Price[1], pursuant to § 363 of the Bankruptcy Code; and

    b.    Authorizing the assumption and assignment of the Debtor's interest in the Lease to Urban in accordance with the Lease Amendment attached to the APA as an exhibit.

## TERMS OF SALE

11.    The significant terms of the Asset Purchase Agreement are as follows:

---

[1] Capitalized terms not otherwise defined herein are ascribed the meaning provided in the APA.

| | |
|---|---|
| **Purchaser** | Urban Health Plan, Inc. |
| **Assets** | (a) The Leased Premises as defined in paragraph 1(a) of the APA;<br><br>(b) the equipment, inventory, intellectual property and other personalty owned by the Seller and located at the Leased Premises including the all of the furniture, fixtures and fixed equipment, materials, supplies and inventory located at the Leased Premises (or in transit and being delivered to the Leased Premises) (and including contract deposits), owned by Seller and currently used or usable in the operation of its business as more particularly described on **Exhibit "B"** to the APA (collectively, the "Equipment");<br><br>(c) to the extent assignable, all of the Seller's right, title and interest in and to such contracts and agreements as are identified on **Exhibit "C"** to the APA (collectively, the "Contracts");<br><br>(d) all customer, client, patient and medical records, to the extent assignable (and to the extent not assignable, the Seller shall continue to provide to Purchaser access to such patient and medical records) subject to appropriate privacy and confidentiality restrictions under federal and state applicable HIPAA and similar medical privacy laws, and in accordance with the Seller's Plan of Closure (the "Closure Plan") as approved by the New York State Department of Health (the "DOH");<br><br>(e) all employee and employment related books and records; and<br><br>(f) all operational books and records. |
| **Excluded Assets** | The Seller's claims and causes of action, the Seller's bankruptcy-related financial books and records, cash, and (except as set forth in paragraph 2(c) of the APA) accounts receivable existing as of the Closing, personalty not listed on **Exhibit "B"** to the APA and contracts and agreements other than the Contracts identified on **Exhibit "C"** to the APA. |
| **Purchase Price** | As more fully set forth in the APA, $1 million, and up to $3 million, as reduced by: (a) up to $800,000.00 of any DOH Reimbursement as described in paragraph 3 of the APA; and (b) any Grant Funds as more fully described in paragraph 2(c) of the APA. |

| | |
|---|---|
| **Assignment of the Seller's Lease** | Seller shall assign, and Purchaser shall assume, the Lease subject to the Lease Amendment annexed to the APA as an exhibit.  The Landlord has agreed to accept a sum certain on account of cure. |
| **Sale Not Subject to Higher and Better Offers** | The sale of the Assets to the Purchaser shall not be subject to higher and better offers.  The Debtor has determined in its business judgment that the offer made by the Purchaser is the highest and best offer likely to be obtained by a purchaser who will be capable of complying with all regulatory requirements for the purchase of the Assets.  Further, the Debtor has actively worked to locate a purchaser since the Petition Date and the Purchaser is the only potential purchaser who came forward with the ability both to finance the purchase of the Assets and obtain the necessary regulatory approvals to do so. |
| **No Warranty** | The Purchaser acknowledges that the Purchaser or its designated representative has had an opportunity to inspect the Assets and the Leased Premises, and that (i) the Assets are being transferred in their AS IS condition, and (ii) the Lease is being assumed and assigned subject to the Lease Amendment as described in paragraph 1(a) of the APA. |
| **Closing Date** | The Closing shall take place on the date authorized by the Sale Order subject to the Conditions to Closing enumerated in paragraph 11 of the APA. |
| **Bankruptcy Court Approval** | The APA is the subject to the approval by the Bankruptcy Court on notice to all creditors and parties-in-interest. |

## EXTRAORDINARY PROVISIONS

12.    In accordance with the Guidelines, the following are "extraordinary provisions" of the proposed Sale and the basis therefore:

| | |
|---|---|
| **Private Sale/No Competitive Bidding** | The Assets are being sold to the Purchaser in a private sale and without an auction and, as such, shall not be subject to higher and better offers. After extensively marketing the Assets since the Petition Date, and based upon its extensive knowledge of the industry and of the Debtor's business, the Assets, and its operations, the Debtor has determined in its business judgment that the offer made by the Purchaser is the highest and best offer likely to be obtained for the Assets from any purchaser which will be capable of complying with all regulatory requirements for the purchase of the Assets. The Purchaser is the only potential purchaser who came forward with the ability both to finance the purchase of the Assets and obtain the necessary regulatory approvals to do so. |
| **Use of Proceeds** | As provided in the APA, at the Closing, from the Initial Sale Proceeds, the Debtor shall pay the Landlord up to $669,000.00 such as will satisfy all necessary cure obligations and arrears owing to the Landlord through the Closing. This allocation of funds is necessary as the Purchaser requires delivery of the Lease free of default in any respect, in accordance with the Amendment, as a condition to entering into this transaction. The remaining Initial Sale Proceeds shall be used by the Seller in compliance with the Bankruptcy Code and any orders of the Bankruptcy Court, including the payment of Chapter 11 administrative obligations under any Plan and Confirmation Order (if applicable) and any cure obligations under the Contracts being assumed and assigned by the Seller to the Purchaser. The Installment Proceeds shall be delivered to the Seller or its designee to be used by the Seller in compliance with the Bankruptcy Code and any orders of the Bankruptcy Court. |
| **No Good Faith Deposit** | Due to the type of business, and the necessary approvals required of any potential purchaser, the Debtor had a very limited market in which to market the Assets. As a result of the limited potential purchaser market, the Debtor was unable to obtain any higher or better offer from any other potential purchaser and, indeed, received no offer from any potential purchaser willing to provide a good faith deposit. |

| | |
|---|---|
| **Records Retention** | Pursuant to the APA, the Debtor is transferring certain books and records to the Purchaser. The Debtor will retain, or have reasonable access to, its books and records to enable it to continue to administer this case in compliance with its obligations under the Bankruptcy Code. The parties have entered into the Medical Records Custodial Agreement, a copy of which is annexed to the APA as an **Exhibit D**. |
| **No Successor Liability** | The Sale Order contemplates entry of certain findings as to successor liability. As set forth in additional detail herein, the sale of the Assets contemplates the transfer of the Assets free and clear of all liens, claims and encumbrances. As such, the findings set forth in the Sale Order comply with applicable principles of sales free and clear of claims pursuant to section 363(f) of the Bankruptcy Code. Additionally, the notice of the hearing on this Sale Motion provides specific notice to all recipients entitled to notice that the sale is free and clear of all liens, claims and encumbrances including claims pursuant to any successor or successor in interest liability theory. |
| **Waiver of 14-day stay provided under Bankruptcy Rule 6004(h)** | The Debtor is requesting that the Court waive the 14-day stay provided under Bankruptcy Rule 6004(h). |

## BASIS FOR RELIEF

A.    **Debtor's Sale is an Exercise of the Debtor's Sound Business Judgment, in the Best Interests of the Debtor and meets the fairness standard to an insider**

13.    The sale of the Assets is based upon the sound business judgment of

the Debtor.  *See, e.g., In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992);

*Comm. of Equity Sec. Holders v. Lionel Corp.* (In re Lionel Corp.), 772 F.2d 1063,

1071 (2d Cir. 1983*); In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG) (Bankr.

S.D.N.Y. July 31, 2002). *See also, Official Comm. of Sub. Bondholders v.

Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992),

*appeal dismissed*, 3 F.3d 49 (2d Cir. 1993), *quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985) ("the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company,'" which has continued applicability in bankruptcy). Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(l). Additionally, section 105(a) provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

14.    It is generally understood that "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). The burden of rebutting the presumption that a debtor has acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company, once it has been established, falls upon parties opposing the proposed exercise of a debtor's business judgment. *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

15.     Once a court is satisfied that there is a sound business judgment for the proposed sale, the court must then determine whether: (i) the debtor has provided interested parties with adequate and reasonable notice; (ii) the sale price is fair and reasonable; and (iii) the purchaser is proceeding in good faith. *In re Betty Owens Sch.*, 1997 U.S. Dist. Lexis 5877, *12 (S.D.N.Y. 1997) (*citing In re Delaware & Hudson Ry.*, 124 B.R. 169, 176 (D. Del. 1991)).

16.     In the instant matter, the Debtor believes ample business justification exists to approve the proposed sale of the Assets. The Debtor, with the assistance of its professionals, has been marketing the Assets since the Petition Date. The Purchaser is the only party that has come forward with an interest in continuing to operate the Assets in order to provide uninterrupted service to the community, the financial wherewithal to finance the transaction and the ability to obtain the necessary regulatory approvals in order to continue operations.

17.     The Debtor has proposed the sale of the Assets after thorough consideration of viable alternatives, including that of potentially obtaining new financing and continuing to operate the business itself as a going concern. Ultimately, the Debtor has concluded that the sale to the Purchaser is in the best interests of the creditors of the estate as well as the community served. Accordingly, and for all the foregoing reasons, the Debtor submits that its decision and agreement to sell the Assets pursuant to the terms of the APA is based on its sound business judgment and is in the best interests of its estate and its creditors.

18.    Accordingly, the Debtor respectfully requests that an order be entered

approving and authorizing the sale of the Assets pursuant to the APA.

**B.    The Purchaser is a Good Faith Purchaser and is Entitled to the
Protection of Section 363(m) of the Bankruptcy Code**

19.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization
> under subsection (b) or (c) of this section of a sale or lease of
> property does not affect the validity of a sale or lease under
> such authorization to an entity that purchased or leased
> such property in good faith, whether or not such entity
> knew of the pendency of the appeal, unless such
> authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).

20.    Although the Bankruptcy Code does not define "good faith," the

Second Circuit held in *Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re

Colony Hill Assocs.)*, 111  F.3d 269 (2d Cir. 1997) that:

> The 'good faith' component of the test under §  363(m)
> speaks to the equity of the [bidder's] conduct in the
> course of the sale proceedings. Typically, the misconduct
> that would destroy a purchaser's good faith status at the
> judicial sale involves fraud, collusion between the purchaser
> and other bidders or the trustee, or an attempt to take grossly
> unfair advantage of other bidders.

111 F.3d at 276.

21.    The APA has been negotiated at arm's length and in good faith by

the Debtor and the Purchaser.  Moreover, the executed APA reflects a give-and-

take and negotiated compromises by both sides.  Accordingly, the Purchaser is a

good faith purchaser entitled to the protection afforded by section 363(m) of the

Bankruptcy Code.

C.    **The Assumption and Assignment of the Lease is a Proper Exercise of the Debtor's Business Judgment**

22.    Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the Court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. §365(a). Courts routinely approve motions to assume, assume and assign, or reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment. *See Orion Pictures Corp. v. Showtime Networks Inc. (In re: Orion Pictures Corp.)* 4 F.3d 1095, 1099 (2d Cir. 1993) ("A bankruptcy court reviewing a trustee's or debtor in possession's decision to assume or reject an executory contract should examine a contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it.") *See also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *In re: Gucci*, 193 B.R. 411, 415 (SDNY 1996).

23.    Based on its negotiations with the Purchaser, a key component of the sale of the Assets is the assumption and assignment to the Purchaser of the Lease. In conjunction with the assumption and assignment of the Lease in accordance with the Amendment annexed as an exhibit to the APA, out of the Initial Sale Proceeds the Debtor shall pay the Cure Amount as such has been negotiated with the Landlord sufficient to allow for assumption and assignment of the Lease in accordance with the terms of the Amendment.

24.    Upon information and belief, the Debtor's landlord for the Lease consents to the assumption of the Lease pursuant to the terms of the Amendment annexed to the APA by the Debtor and assignment to the Purchaser.

**D.    <u>The Debtor has Authority to Assume and Assign the Lease</u>**

25.    Bankruptcy Code section 365(b) and (f) sets forth the following requirements that a debtor in possession must satisfy before it may assume an executor contract or unexpired lease:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption or lease, the trustee –
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default …;
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract …, for any actual pecuniary loss to such party resulting from such default; and
> (C) provides adequate assurance of future performance under such contract or lease.
>
> *        *        *
>
> (f)(2) The trustee may assign an executory contract or unexpired lease of the debtor only if –
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

U.S.C. § 365(b)(1), (f)(2); *see also, In re ANC Rental Corp., Inc.*, 277 B.R. 226, 238

(Bankr. D. Del. 2002) ("Having met the threshold requirement of a sound

business purpose, the Debtor must also cure any existing default and provide adequate assurance of future performance of the assigned contracts.").

26.    Section 365 of the Bankruptcy Code authorizes the proposed assumption and assignment of the Lease, provided that any defaults thereunder are cured and adequate assurance of future performance is given. *See generally In re Health Science Prods., Inc.*, 191 B.R. 895 (Bankr. N.D. Ala. 1995) (ability to make current payments on contract combined with projected future financial stability constituted "adequate assurance"; (*In re Mako, Inc.*, 102 B.R. 818 (Bankr. E.D. Okla. 1988) (willingness and ability to cure defaults and projected cash flows sufficient to meet obligations under the contract met the "adequate assurance" requirement).

27.    Because the term "adequate assurance of future performance" is not defined in the Bankruptcy Code, court assesses the facts and circumstances of each case to determine whether there is adequate assurance. *See Chera v. 991 Blvd. Realty Corp. Shoes, Inc.*, 20 B.R. 55, 59 (Bankr. S.D.N.Y. 1982). Adequate assurance is not synonymous with complete and full assurance. *See In re M. Fine Lumber Co.*, 383 B.R. 565, 573 (Bankr. S.D.N.Y. 2008) ("A debtor need not prove it will thrive and make a profit, or provide an absolute guarantee of performance. It must simply appear that the rent will be paid and other lease obligations met.").

28.    With respect to the issue of adequate assurance of future performance necessary to approve the assumption and assignment of the Lease, upon information and belief, the landlord under the Lease has indicated that

the Purchaser would be an acceptable tenant under the Lease should the Sale Motion be granted and the Debtor is authorized to assume and assign the Lease to the Purchaser thus satisfying the adequate assurance requirement.

E.    **The Sale Of The Debtor's Assets Free And Clear Of Liens, Claims and Encumbrances Is Authorized By Section 363(f) Of The Bankruptcy Code**

29.    Pursuant to section 363(f) of the Bankruptcy Code, the Debtor may sell the Assets free and clear of any interest in the property if any one of the following conditions is satisfied: (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. 11 U.S.C. § 363(f).

30.    Section 363(f) of the Bankruptcy Code authorizes the trustee in certain circumstances to sell the estate's interest in property "free and clear of any interest in such property of an entity other than the estate." "Interests in property" as used in section 363(f) include "claims" that arise from the assets being sold. *In re Chrysler LLC,* 576 F.3d 108, 126 (2d Cir.2009), *granting cert. & vacating judgment, Indiana State Police Pension Trust v. Chrysler LLC,* 558 U.S. 1087 (2009); *In re Trans World Airlines, Inc.,* 322 F.3d 283, 289–90 (3d Cir. 2003). Section 363(f) has been interpreted to authorize the bankruptcy court to grant *in personam* relief, similar to the discharge under Bankruptcy Code § 1141(d), that

exonerates the buyer from successor liability. *Motors Liquidation,* 428 B.R. at 57–59.

31.    Courts have noted that extending the "free and clear" provisions to claims stemming from successor liability preserves the priority scheme of the Bankruptcy Code and the principle of equality of distribution by preventing a plaintiff from asserting *in personam* successor liability against the buyer while leaving other creditors to satisfy their claims from the proceeds of the asset sale. *Douglas v. Stamco,* 363 Fed.Appx. 100, 102 (2d Cir.2010); *Trans World Airlines,* 322 F.3d at 292; *In re Grumman Olson Industries, Inc.*, 445 B.R. 243, 249 (Bankr. S.D.N.Y. 2011).   Additionally, extending the "free and clear" provisions to protect purchasers of bankruptcy assets from successor liability maximizes the value of the assets that are sold.   *Douglas,* 363 Fed.Appx. at 102–03 ("[T]o the extent that the 'free and clear' nature of the sale (as provided for in the Asset Purchase Agreement ('APA') and § 363(f) was a crucial inducement in the sale's successful transaction, it is evident that the potential chilling effect of allowing a tort claim subsequent to the sale would run counter to a core aim of the Bankruptcy Code, which is to maximize the value of the assets and thereby maximize potential recovery to the creditors.") *In re Grumman Olson Industries, Inc.*, 445 B.R. at 250.

32.    Upon information and belief, the Debtor has no claims against it whereby the claimant could not be compelled "to accept a monetary satisfaction of its interest."   11 U.S.C. § 363(f)(5).   Accordingly, the standard for transferring the

13-11902-mew    Doc 223    Filed 09/07/16    Entered 09/07/16 14:03:08    Main Document
Pg 18 of 131

property pursuant to section 363(f) free and clear of all liens, claims and encumbrances is met.

**F.    Request for Waiver of the Stay**

33.    The Debtor requests a waiver of any stay of the effectiveness of the order approving the relief requested in this Sale Motion. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property ... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Due to the need to obtain the Initial Sale Proceeds to satisfy the Debtor's obligations under the Lease, the Debtor requests a waiver of the 14-day stay pursuant to 6004(h). Accordingly, the Debtor submits that more than ample cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## NOTICE

34.    Notice of this Sale Motion has been provided to: (a) the U.S. Trustee; (b) the Purchaser and its counsel; (c) all creditors and interested parties in this case; and (d) all parties that have filed and served, pursuant to Bankruptcy Rule 2002, a Notice of Appearance in this case. In light of the nature of the relief requested, the Debtor submits that no other or further notice is necessary.

## NO PRIOR REQUEST

35.    No previous request for the relief sought in this Sale Motion has been made to this or any other Court.

## <u>CONCLUSION</u>

WHEREFORE, the Debtor respectfully requests that this Court enter an order, substantially in the form annexed hereto as <u>Exhibit A</u>, granting the relief requested in this Sale Motion and such other and further relief as may be just and proper.

Dated: New York, New York
      September 7, 2016

                **Law Offices of Gabriel Del Virginia**
                Counsel for the Debtor

            By:   */s/ Gabriel Del Virginia*
                Gabriel Del Virginia
                30 Wall Street, 12th Floor
                New York, New York 10005
                Telephone: 212-371-5478
                Facsimile: 212-371-0460
                Email: gabriel.delvirginia@verizon.net

## **EXHIBIT A**

**Proposed Order Approving Sale**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
In re

CITICARE, INC.,                                 Chapter 11


             Debtor.                            Case No. 13-11902 (MEW)

-----------------------------------------------------------X

**ORDER PURSUANT TO SECTIONS 105(a), 363(b), (f) AND (m) AND 365 OF
THE BANKRUPTCY CODE AND RULES 6004 AND 6006 OF THE FEDERAL
RULES OF BANKRUPTCY PROCEDURE: (I) APPROVING THE SALE OF
CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF ALL LIENS,
CLAIMS AND ENCUMBRANCES AND APPROVING THE ASSOCIATED
ASSET PURCHASE AGREEMENT; (II) AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF THE DEBTOR'S NON-RESIDENTIAL REAL
PROPERTY LEASE; AND, (III) GRANTING RELATED RELIEF**

Upon the motion (the "Sale Motion")[1] of Citicare, Inc. (the "Debtor" or the

"Seller") by and through its counsel, the Law Offices of Gabriel Del Virginia, for the

entry of an Order (the "Sale Order"), pursuant to Sections 105(a), 363(b), (f) and (m),

and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules

6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"): (i) authorizing and approving the sale (the "Sale") of certain of the Debtor's

assets (the "Assets") free and clear of all liens, claims and encumbrances as

described in the Asset Purchase Agreement (the "APA") annexed to the Sale Motion

as **Exhibit B** to Urban Health Plan, Inc. ("Urban" or the "Purchaser"); (ii)

authorizing and approving the assumption and assignment of the Debtor's interest

in its lease of non-residential real property located at 154 West 127th Street, New

---

[1] Capitalized terms not otherwise defined herein are ascribed the meaning provided in the Sale
Motion.

York, New York (the "Lease"), pursuant to section 365 of the Bankruptcy Code in accordance with the Amendment annexed to the APA; and, (iii) granting related relief; and due and sufficient notice of the Sale Motion having been given under the particular circumstances; and it appearing that no other or further notice is necessary; and upon the record of the hearing held by the Court on September 29, 2016 on the Sale Motion; it appearing that the relief requested in the Sale Motion is in the best interests of the Debtor, its estate, its creditors and other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing thereof,

### THE COURT FINDS AND DETERMINES THAT:

A.      Jurisdiction and Venue. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334. Venue of this case and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).

B.      Statutory predicates. The statutory predicates for the relief sought in the Motion and the basis for the approvals and authorizations contained in this Sale Order are Bankruptcy Code sections 105(a), 363(b), (f) and (m), and 365(a), and Bankruptcy Rules 2002, 3012 and 6004 and 6006.

C.      Notice. Due, proper, timely, adequate and sufficient notice of the Sale Motion and the relief requested therein, the Hearing, and the Sale described in the APA has been provided in accordance with section 363 of the Bankruptcy Code and Bankruptcy Rule 2002, and such notice was good and sufficient, and appropriate under the particular circumstances. No other or further notice of the Motion, the

relief requested therein and all matters relating thereto, the Hearing, or entry of this Sale Order is or shall be required.

D.    <u>Opportunity to Object.</u> A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to all interested persons and entities.

E.    <u>Marketing Process.</u> The marketing efforts implemented by the Debtor were fair, proper, and reasonably calculated to result in the best value received for the Assets.

F.    <u>Business Justification.</u> The Debtor has articulated good, sufficient, and sound business reasons for consummating the APA, for the sale of the Assets, and it is a reasonable exercise of the Debtor's business judgment to consummate the transactions contemplated by the APA, including the assumption of the Debtor's interest in its lease of non-residential real property located at 154 West 127th Street, New York, New York (the "<u>Lease</u>") in accordance with the APA and the Amendment.

G.    <u>Private Sale is Warranted.</u> The Debtor has demonstrated that the private sale of the Assets to the Purchaser is appropriate, as the Purchase Price is the highest and best offer for the Assets that the Debtor has received or likely will receive from any purchaser qualified to purchase and run the Assets.

H.    <u>No Good Faith Deposit.</u> Due to the type of business, and the necessary approvals required of any potential purchaser, the Debtor had a very limited market in which to market the Assets.    As a result of the limited potential

purchaser market, the Debtor was unable to obtain any higher or better offer from any other potential purchaser and, indeed, received no offer from any potential purchaser willing to provide a good faith deposit.

I.    Best Interests. Approval of the APA and the consummation of the Sale are in the best interests of the Debtor, its estate, its creditors, and other parties in interest.

J.    Best Offer. The Purchase Price to be paid by the Purchaser pursuant to the APA is fair consideration and constitutes reasonably equivalent value for the Assets under the circumstances, as determined by the Debtor's marketing efforts and knowledge of the industry and the Assets being sold.

K.    Arm's Length Transaction. The APA was negotiated, proposed, and entered into by the Debtor and the Purchaser without collusion, in good faith, and from arm's length bargaining positions. The Purchaser is not an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. Neither the Debtor nor the Purchaser has engaged in any conduct that would cause or permit the APA to be avoided under section 363(n) of the Bankruptcy Code.

L.    Good Faith. The Purchaser is a good faith purchaser of the Assets within the meaning of section 363(m) of the Bankruptcy Code and, therefore, is entitled to all of the protections afforded thereby. The Purchaser has proceeded in good faith in all respects in connection with this proceeding in that: (i) the Purchaser in no way induced or caused the chapter 11 filing of the Debtor; (ii) the Purchaser has recognized that the Debtor was free to deal with any other party

interested in acquiring the Assets; and (iii) the Purchaser has disclosed all payments to be made to it pursuant to the APA or other arrangements entered into by the Purchaser in connection with the Sale.

M.    <u>Free and Clear.</u> The Assets constitute property of the Debtor's estate. The transfer of the Assets to the Purchaser will be a legal, valid, binding and effective transfer of the Assets, and will vest the Purchaser with all right, title, and interest of the Debtor in and to the Assets free and clear of any and all liens, claims (as such term is defined in Section 101(5) of the Bankruptcy Code), including but not limited to claims resulting from transfer of the Assets and claims based on any theory of successor liability, encumbrances, mortgages, pledges, security interests, equity security interests, interests of any kind or nature, charges, actions, title defects, taxes (including liens for taxes), equitable interests, restrictions on transfer, options, conditional sale or other title retention devices or restrictions on the creation of any of the foregoing, whether relating to the Debtor or the Assets, of any kind or nature, whether or not asserted, known or unknown, whether relating to any property or the right or the income or profits therefrom and except as otherwise specifically provided in the APA. Except as specifically provided in the APA, the Purchaser shall have no liability for any claims against the Debtor or its estate or any liabilities or obligations of the Debtor or its estate. Accordingly, the Debtor may sell the Assets free and clear of any and all liens, claims and encumbrances, and adverse claims, except as provided in the APA, because one or more of the standards set forth in sections 363(f)(1) – 363(f)(5) of the Bankruptcy Code has been

satisfied with regard to each such liens, claims and encumbrances or adverse claims. Each person or entity with any lien, claim or encumbrance in the Assets: (i) has, subject to the terms and conditions of this Sale Order, consented to the Sale or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such liens, claims or encumbrances; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code. Those non-debtor parties with liens, claims and encumbrances in or with respect to the Assets who did not object, or who withdrew their objections to the Sale or the Sale Motion are deemed to have consented to the sale of the Assets free and clear of those non-debtor parties' interests in the Assets pursuant to section 363(f)(2) of the Bankruptcy Code.

N.    <u>Assumption/Assignment of Leases.</u>  The Debtor has met all requirements of section 365(b) of the Bankruptcy Code for the Lease. The Lease identified in the APA is an executory contract or unexpired lease of non-residential real property capable of being assumed and assigned pursuant to section 365 of the Bankruptcy Code. The Lease is being transferred to the Purchaser, pursuant to the terms of the APA and the Amendment, free and clear of all liens, claims, and encumbrances against the Debtor. The Purchaser has provided adequate assurance of its future performance under the Lease within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. Pursuant to section 365(f) of the Bankruptcy Code, the Lease to be assumed and assigned shall be assigned and transferred to, and remain in full force and effect, as amended (the "Amended

6

Lease"), for the benefit of, the Purchaser, notwithstanding any provision in the Lease or other restriction prohibiting assignment or transfer of the Lease and pursuant to § 365(k) of the Bankruptcy Code. The Amended Lease is a material term of the Purchaser's agreement to purchase the Assets. The Landord has agreed to the provision of cure in accordance with section 365(b)(1).

O.    <u>Avoidance and Successor Liability.</u> The transfer of the Assets to the Purchaser shall not result in the Purchaser having any liability or responsibility: (i) for any liens, claims or encumbrances against the Debtor or against any insider of the Debtor; (ii) for the satisfaction, in any manner, whether at law, or in equity, whether by payment, setoff or otherwise, directly or indirectly, of any liens, claims or encumbrances; or (iii) to third parties or the Debtor except as otherwise provided in the APA. Without limiting the effect or scope of the foregoing, the transfer of the Assets from the Debtor to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns to any liability whatsoever for any liens, claims or encumbrances against the Debtor or the Debtor's interests in the Assets by reason of the operation of the Debtor's Assets prior to the closing of the Sale or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee, vicarious liability or similar theories. The Purchaser is not a continuation of the Debtor or its estate and there is no continuity between the Purchaser and the Debtor. Nothing in this Sale Order shall be

interpreted to deem, or does deem, the Purchaser as the successor to the Debtor under any state law successor liability doctrine with respect to any liabilities under environmental or other laws.

P.    <u>Compliance with Non-Bankruptcy Law.</u> In satisfaction of sections 363(d) and 541(f) of the Bankruptcy Code, the transfer of the Assets as contemplated by the Sale complies with applicable non-bankruptcy law governing such a transfer.

Q.    <u>WAIVER OF STAY UNDER BANKRUPTCY RULES 6004(h) AND 6006(d).</u> The relief that the Debtor seeks in the Sale Motion is necessary for the Debtor to preserve value for its estate.  Thus, the waiver of the stay pursuant to Bankruptcy Rules 6004(h) and 6006(d) is warranted.

R.    <u>Legal and Factual Bases.</u> The legal and factual bases set forth in the Sale Motion and at the Hearing establish just cause for the relief granted herein.

NOW, THEREFORE, IT IS ORDERED AND ADJUDGED THAT:

1.    The Sale Motion is GRANTED, as further described herein.

2.    <u>Objections.</u> All objections to the Sale Motion and the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are hereby overruled on the merits and denied.

3.    <u>Sale Approval.</u> The Sale and all of the terms, conditions and transactions contemplated by the APA, including but not limited to the Amended Lease and the APA, are hereby authorized and approved pursuant to section 363 of the Bankruptcy Code.  Pursuant to section 363(b) of the Bankruptcy Code, the

Debtor is authorized to consummate the Sale pursuant to and in accordance with the terms and conditions of the APA.  The Debtor is authorized to execute and deliver, and empowered to perform under, consummate, and implement the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and effectuate the provisions of this Sale Order and the transactions approved hereby, and to take all further actions as may be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring the Assets to the Purchaser or reducing to possession, the Lease, or as may be necessary or appropriate to the performance of the obligations as contemplated by the APA.  The failure to specifically include any particular provision of the APA in this Sale Order shall not diminish or impair the efficacy of such provision, it being the intent of this Court that the APA and each and every provision, term and condition thereof be authorized and approved in their entirety; provided, however, that any inconsistency between the terms of the APA (as it may be amended) and the terms of this Sale Order, the terms of this Sale Order shall govern.

4.     Transfer of the Assets. As of the Closing of the Sale, the transactions contemplated by the APA shall effect a legal, valid, enforceable, and effective sale and transfer of the Assets to the Purchaser, and shall vest the Purchaser with all right, title, and interest of the Debtor in and to the Assets.

5.     Free and Clear. Except as provided in the APA, the transfer of the Assets shall vest the Purchaser with all right, title, and interest of the Debtor in the

Assets, pursuant to section 363(f) of the Bankruptcy Code, free and clear of any and all liens, claims and encumbrances, whether arising by statute or otherwise and whether arising before or after the commencement of this Bankruptcy Case, whether known or unknown, including, but not limited to, all liens, claims and encumbrances of, or asserted by, any of the creditors, vendors, employees, suppliers, or lessors of the Debtor, or any other third party. Any and all such liens, claims and encumbrances shall attach to the net proceeds of the Sale with the same priority, validity, force, and effect as they now have against the Assets. Except as provided for in the APA, the Purchaser shall not be liable (as successor entity or otherwise) for any liens, claims and encumbrances, including without limitation, statutory claims, that any of the foregoing parties or any other third party may have against the Debtor. All persons and entities asserting or holding any liens, claims and encumbrances in or with respect to the Debtor (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), howsoever arising, shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing such liens, claims and encumbrances against the Purchaser. Each and every federal, state, and local governmental agency, recording office or department and all other parties, persons or entities is hereby directed to accept this Sale Order for recordation as conclusive evidence of the free and clear and unencumbered transfer of title to the Assets, including but not limited to the Lease, conveyed by the Debtor to the Purchaser.

6.      <u>Surrender of Assets.</u> All entities who are presently, or who as of the Closing may be, in possession of some or all of the Assets, including but not limited to the Lease, hereby are directed to surrender possession of such Assets to the Purchaser as of the Closing.

7.      <u>Good Faith.</u>  The Sale has been undertaken by the Debtor and the Purchaser at arm's length and without collusion, and the Purchaser will acquire the Asset pursuant to the APA in good faith, under section 363(m) of the Bankruptcy Code, and is, and shall be, entitled to all of the protections in accordance therewith. The consideration provided by the Purchaser for the Assets under the APA is fair and reasonable, and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

8.      <u>Required Permits.</u> The Debtor is hereby authorized and directed to assign all state and federal licenses and permits used in connection with the Assets that are capable of transfer to the Purchaser in accordance with the terms of the APA.

9.      <u>Release of Liens.</u> Subject to the occurrence of the Closing, this Sale Order is and shall be effective as a determination that all liens, claims and encumbrances of any kind or nature whatsoever existing as to the Debtor or the Assets prior to the date of the Closing shall be, and are, without further action by any person or entity, unconditionally released, discharged and terminated as to the Assets, the Debtor's interests in the Assets, and the Purchaser as of the date of the Closing.  All persons or entities possessing any liens, claims and encumbrances with

11

respect to the Debtor's interests in the Assets shall deliver to the Debtor and the Purchaser, at the Closing in proper form for filing and executed by the appropriate person or persons, or entity or entities, termination statements, instruments of satisfaction, and/or releases of all such liens, claims and encumbrances which such person or entity has with respect to the Assets.

10.  <u>Use of Proceeds.</u>  As provided in the APA, at the Closing, the Debtor is authorized and directed to pay the Landlord up to $669,000.00 from the Initial Sale Proceeds, which shall satisfy all necessary cure obligations and arrears owing to the Landlord through the Closing.  The remaining Initial Sale Proceeds shall be used by the Seller in compliance with the Bankruptcy Code and any other orders of the Bankruptcy Court, including the payment of Chapter 11 administrative obligations under any Plan and Confirmation Order (if applicable) and any cure obligations under the Contracts being assumed and assigned by the Seller to the Purchaser. The Installment Proceeds shall be delivered to the Seller or its designee, subject to the provisions of the APA and to the extent provided therein, to be used by the Seller in compliance with the Bankruptcy Code and any orders of the Bankruptcy Court.

11.  <u>Authorization to Release Liens, Claims and Encumbrances.</u> If any person or entity shall have failed to deliver such termination statements, instruments of satisfaction, and/or releases at Closing in accordance with paragraph 9 above, then the Debtor and Purchaser shall each be authorized to execute any such termination statements, instruments of satisfaction, and/or releases on behalf

12

of such person or entity, evidencing the release by such person or entity of its liens, claims and encumbrances on the Assets as of the date of the Closing.

12.    <u>Assumption and Assignment of Lease.</u>    The Debtor is hereby authorized to assume the Lease and assign it to the Purchaser pursuant to section 365 of the Bankruptcy Code.  The Purchaser's assumption of the Lease is subject to the Lease Amendment attached to the APA.

13.    <u>Assignment of Executory Contracts and Lease.</u> The Debtor is hereby authorized, in accordance with Bankruptcy Code sections 105 and 365, to assume and assign the Lease in accordance with the APA to Purchaser effective upon the Closing.  Upon the Debtor's assignment of any executory contract or the Lease to the Purchaser under the provisions of this Sale Order, no default shall exist under any such executory contract or Lease, and no counterparty to any such contract or the Lease shall be permitted to declare a default thereunder, or otherwise take action against the Purchaser as a result of the Debtor's financial condition, bankruptcy or failure of the Debtor to perform any of its obligations under the relevant contract or Lease as it relates to the assignment of such contract or Lease to the Purchaser.  Any provision that prohibits or conditions an assignment of such Lease or contract or that allows the counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, modify any term or condition on account of such assignment, constitutes an unenforceable anti-assignment provision in connection with the Sale to the Purchaser that is void and of no force and effect as to the Sale.  The failure of the Debtor or the Purchaser to

enforce at any time one or more terms or conditions of any contract or the Lease shall not be a waiver of such terms or conditions, or of the Debtor's and the Purchaser's rights to enforce each and every term and condition of such contract or the Lease.

14.    <u>Transfer of Books and Records.</u>  The Debtor is authorized to transfer books and records to the Purchaser but must retain, or have reasonable access to, its books and records to enable it to continue to administer this case in compliance with its obligations under the Bankruptcy Code.

15.    <u>WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h) and 6006(d).</u> Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Sale Order shall be effective and enforceable immediately upon entry. The Court waives the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), as the exigent nature of the relief sought herein justifies immediate relief.

16.    <u>Binding Effect of Sale Order.</u> This Sale Order shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Assets.

17.    <u>Binding on Successors and Assigns</u>. The terms and provisions of the APA and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate, the Purchaser, and their respective affiliates, successors and assigns and any affected third parties including, but not limited to, all persons asserting any Claim against the Debtor or the Assets to be sold to the Purchaser, notwithstanding any subsequent appointment of any trustee, responsible person, estate administrator, representative or similar person (a "Responsible Person") for or in connection with the Debtor's estate or affairs in this case or in any subsequent cases under the Bankruptcy Code involving the Debtor, as to which Responsible Person(s) such terms and provisions likewise shall be binding in all respects.

18.    <u>Modifications.</u> The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtor's estate.

19.    <u>Non-Severability.</u> The provisions of this Sale Order are non-severable and mutually dependent.

20.    <u>No Successor Liability.</u> The transfer of the Assets to the Purchaser shall not result in any successor, derivative or vicarious liability or any kind or character, including, but not limited to federal, state or other tax liabilities, pension

15

liabilities, or liabilities based on any theory of successor or transferee liability, labor law, alter ego, continuity or enterprise, mere continuation, *de facto* merger or substantial continuity theories, including but not limited to any liability or obligation of any kind including as a successor to the Seller, including liability for any of the Seller's environmental obligations and pending or threatened environmental claims and/or Internal Revenue Service claims against the  Seller, any obligation under any collective bargaining agreement and obligations under any employer pension or employee health or benefit plan of the Seller,  or any obligation relating to the Seller's liabilities under Medicare or Medicaid.

21.    <u>Retention of Jurisdiction.</u> This Court retains shall jurisdiction on all matters pertaining to the relief granted herein, including to interpret, implement, and enforce the terms and provisions of this Sale Order and the APA, and to adjudicate any dispute relating to the Sale of the Assets or the proceeds thereof.

22.    Headings are included in this Sale Order for ease of reference only.

Dated:  New York, New York
            September __, 2016


_____
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT B

**Asset Purchase Agreement**

# AMENDED AND RESTATED
# ASSET PURCHASE AGREEMENT

THIS AMENDED AND RESTATED[1] ASSET PURCHASE AGREEMENT (this "Agreement") is made as of the _____ day of _____, 2016, by and between:

CITICARE, INC.,
a New York Corporation
with a mailing address of
154 West 127th Street, New York, New York 10027
(the "Seller"),

and

URBAN HEALTH PLAN, INC.,
a New York Not for Profit Corporation
with a mailing address of
1065 Southern Boulevard, Bronx, New York 10459
(the "Purchaser").

WHEREAS, on June 9, 2013, the Seller commenced a case (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which is assigned Case No. 13-11902 (MEW); and

WHEREAS, the Chapter 11 Case is pending in the Bankruptcy Court and the Seller is a debtor in possession; and

WHEREAS, on January 14, 2014, the Bankruptcy Court authorized the Seller to reject its pre-petition lease with 127th St. Properties LLC (the "Landlord") and enter into a post-petition lease (the "Post-Petition Lease") with the Landlord; and

WHEREAS, the Post-Petition Lease was entered into on August 24, 2013; and

WHEREAS, the Purchaser desires to purchase certain assets and assume the Post-Petition Lease, as amended, from the Seller, used in connection with the operation of Seller's health care center located at 154 West 127th Street, New York, New York 10027, and the Seller desires to sell such assets and assign the Post-Petition Lease, as amended, to the Purchaser, all upon the terms and subject to the conditions hereinafter set forth; and

WHEREAS, the Purchaser intends to operate a health care center at the Leased Premises (as defined below) following the Closing (as defined below).

NOW, THEREFORE, in consideration of the mutual promises contained herein and intending to be legally bound hereby, the parties agree as follows:

---

[1] This Agreement supersedes a prior version of this agreement filed on July 1, 2016.

1.    <u>Purchase and Sale of Assets</u>.  The Seller agrees to sell and transfer to the Purchaser, and the Purchaser agrees to purchase from the Seller, at the closing (the "<u>Closing</u>"), subject to the conditions and approvals set forth herein, the following described property and assets (the "<u>Assets</u>"):

(a)    the rights of the Seller as tenant under the Post-Petition Lease, subject to an amendment, in form acceptable to the Purchaser, providing for cure of defaults, assumption and assignment, to be entered into by and between the Landlord, and the Purchaser, as tenant (the "<u>Amendment</u>" and together with the Post-Petition Lease, the "<u>Lease</u>"), for the premises located at 154 West 127th Street, New York, New York 10027, and more particularly described in the Lease attached hereto as **Exhibit "A"** (the "<u>Leased Premises</u>");

(b)    the equipment, inventory, intellectual property and other personalty owned by the Seller and located at the Leased Premises including the all of the furniture, fixtures and fixed equipment, materials, supplies and inventory located at the Leased Premises (or in transit and being delivered to the Leased Premises) (and including contract deposits), owned by Seller and currently used or usable in the operation of its business as more particularly described on **Exhibit "B"** attached hereto (collectively, the "<u>Equipment</u>");

(c)    to the extent assignable, all of the Seller's right, title and interest in and to such contracts and agreements as are identified on **Exhibit "C"** attached hereto (collectively, the "<u>Contracts</u>");

(d)    all customer, client, patient and medical records, to the extent assignable (and to the extent not assignable, the Seller shall continue to provide to Purchaser access to such patient and medical records) subject to appropriate privacy and confidentiality restrictions under federal and state applicable HIPAA and similar medical privacy laws, and in accordance with the Seller's Plan of Closure (the "<u>Closure Plan</u>") as approved by the New York State Department of Health (the "<u>DOH</u>"); in connection with the foregoing, Seller and Purchaser shall enter into that certain medical records custodial agreement substantially in the form annexed as Exhibit "D" hereto;

(e)    all employee and employment related books and records; and

(f)    all operational books and records.

The Assets do not include the following (the "<u>Excluded Assets</u>"):  The Seller's claims and causes of action, the Seller's bankruptcy-related financial books and records, cash, and (except as may be set forth in paragraph 2(c) below) accounts receivable existing as of the Closing, personalty not listed on **Exhibit "B"** and contracts and agreements other than the Contracts identified on **Exhibit "C"** hereto.

2.    <u>Consideration for Sale</u>.

(a)    <u>Consideration</u>:  In consideration of the Seller transferring the Assets to the Purchaser, the Purchaser agrees (a) at the Closing, to pay to the Seller, or its designee, the sum of One Million Dollars ($1,000,000.00) by wire transfer or bank check (the "<u>Initial Sale Proceeds</u>"); and (b) to pay to the Seller, or its designee, up to an additional Two Million Dollars ($2,000,000.00) to be paid in annual installments of up to Five Hundred Thousand Dollars ($500,000.00) beginning on the tenth day of the month following the anniversary of the Closing and on each such date annually thereafter concluding on the tenth day of the month following the fourth anniversary of the

2

Closing (the "<u>Installment Proceeds</u>"), subject to the limitations and adjustments set forth in paragraph 2(b) below.

(b) <u>Limitations and Adjustments</u>:  The following limitations and adjustments shall apply to the Installment Proceeds:

    i.  The Installment Proceeds shall be payable only from the proceeds of operations of the Assets by the Purchaser.  The Installment Proceeds shall not be an obligation of the Purchaser or its affiliates other than as stated herein.  The Purchaser has provided the Seller with projections of operations indicating the feasibility that such Installment Proceeds will be available but such are only projections and may not be predictive of actual results. The Installment Proceeds may be pre-paid in whole or part at any time without penalty; any pre-payment shall not accelerate the due date of any or all other Installment Proceeds nor shall any pre-payment alter the period of the DOH Reimbursement described in paragraph 2(b)(ii) below or the period of the Grant Funds described in paragraph 2(c) below.

    ii.  To the extent that the Seller receives (or receives the benefit of) any of the DOH Reimbursement (as defined below), up to $800,000.00 in aggregate, such DOH Reimbursement (or portion(s) thereof) shall serve as a credit against the Installment Proceeds payment or payments; such credit shall be applied first to the last Installment Proceeds due but shall be reconciled and applied for the entire period of the Installment Proceeds payments.  Only after the fourth anniversary of the Closing, then, to the extent any of the DOH Reimbursement is received, that portion so received shall be property of the Seller, subject to paragraph 2(c) below.  To the extent that the Seller receives any of the DOH Reimbursement (or receives the benefit of), the Seller shall so inform the Purchaser promptly in writing and file a statement to the same effect with the Bankruptcy Court.

(c) In addition to the "limitations and adjustments" provisions set forth in paragraph 2(b) above, any and all grants and/or awards that may be or have been awarded to the Seller from the DOH, or from any other source, and which grants and/or awards are granted or awarded based upon or in connection with the Seller's patient base or its service area and which grant and/or award funds are received after the Closing (the "<u>Grant Funds</u>"), such Grant Funds shall be deemed, as between the Seller and the Purchaser, to be Assets acquired by the Purchaser under this Agreement and delivered to the Purchaser.

    3.  "<u>DOH Reimbursement</u>" shall refer to an account or accounts receivable from the DOH that the Seller anticipates it will receive based upon a facility cost reimbursement retroactive rate adjustment for the years 2012 to 2015.  Based upon the Seller's calculation, by year, of:  (i) the facility costs not previously reported; (ii) the facility cost per patient visit based on all visits; and (iii) the reimbursable costs based on Medicaid visits only, the Seller's conservative estimate is that the value of the DOH Reimbursement is approximately $800,000.00.  The DOH Reimbursement is contingent upon submission by the Seller of an independent accountant's report and is subject to DOH approval, and as such the Seller shall undertake to take all actions with respect to the DOH Reimbursement at its cost and with all due diligence and haste but makes no representations or warranties regarding whether or not it will receive the DOH Reimbursement.

4.    Use of Sale Proceeds.   At the Closing, from the Initial Sale Proceeds, the Seller shall pay the Landlord up to $669,000.00 such as will satisfy all necessary cure obligations and arrears owing to the Landlord through the Closing, and deliver the Lease free of default in any respect, in accordance with the Amendment, with the remaining Initial Sale Proceeds to be used by the Seller in compliance with the Bankruptcy Code and any orders of the Bankruptcy Court, including the payment of Chapter 11 administrative obligations under any plan and confirmation order and any cure obligations under the Contracts being assumed and assigned by the Seller to the Purchaser.   The Installment Proceeds shall be delivered to the Seller or its designee to be used by the Seller in compliance with the Bankruptcy Code and any orders of the Bankruptcy Court.

5.    DOH Medicaid Overpayment Liability Guaranty.   Notwithstanding anything to the contrary in this Agreement, to the extent the Seller's liability to DOH, in respect of Medicaid overpayments to the Seller and/or any assessments, surcharges or fees due through the date of Closing from the Seller to the DOH pursuant to Article 28 of the New York Public Health Law (collectively, the "DOH Medicaid Overpayment Liability"), is unsatisfied by the Seller, the Purchaser has agreed separately and shall make certain payments to the DOH as follows:

a.    Pay DOH the DOH Medicaid Overpayment Liability up to a maximum of $150,000.00 in the aggregate (the "DOH Cap"), as set forth below.

b.    In order to secure the DOH Cap, establish a reserve of $150,000.00 (the "Reserve") upon Closing which shall remain available until exhausted or through the fourth anniversary of the Closing.

c.    The obligation of the Purchaser to pay DOH under the DOH Medicaid Overpayment Liability is in the nature of a limited guaranty to the extent the Seller does not pay its (if any) DOH Medicaid Overpayment Liability to DOH.   To the extent the DOH Medicaid Overpayment Liability is presented for payment as allowed in the Chapter 11 Case and remains unpaid by the Seller, the DOH Medicaid Overpayment Liability shall be paid by the Purchaser as set forth in this paragraph 5 up to the DOH Cap.

d.    To the extent any DOH Medicaid Overpayment Liability is paid by the Purchaser during the first two years after the Closing, the Purchaser shall credit such amount as was paid, against the third Installment Payment.   To the extent any DOH Medicaid Overpayment Liability is paid by the Purchaser during the third and fourth years after the Closing, the Purchaser shall credit such amount as was paid, against the fourth Installment Payment. To the extent it is determined that the Purchaser made any overpayment under the DOH Medicaid Overpayment Liability provision, such amount shall be paid or credited back to the Purchaser.

e.    In no event shall the Purchaser be liable for any DOH Medicaid Overpayment Liability (or any other liability of the Seller to DOH or otherwise) as set forth in this Agreement above or beyond the DOH Cap and the provisions of this section 5 of this Agreement.

f.    To the extent any funds remain in the Reserve (as provided in paragraph 5(b) above), upon the expiration thereof as stated above, then, at that time, such remaining funds shall be released to the Purchaser.

g.    To the extent the description and treatment of the DOH Medicaid Overpayment Liability and any terms related thereto as set forth herein are inconsistent with any agreement

4

between DOH and the Purchaser, if any, such separate agreement between DOH and the Seller shall control as between DOH and the Purchaser.

h.    Notwithstanding the foregoing, the Purchaser shall not be deemed to assume or undertake any liability to or of the Seller or any other party except as specifically provided in this Agreement.

6.    Excluded Liabilities.  Except as specifically provided in this Agreement, and as shall be more particularly defined by the terms of the Sale Order (as defined below), the Purchaser shall not assume, and shall not have, any liability for any pre-existing debts, obligations, liabilities or commitments of the Seller, including, but not limited to the Lease, cure payments on Contracts that are assumed and assigned to the Purchaser, trade payables, non-trade payables, suits or claims or causes of action, liability to employees or contract parties for wages, fringe benefits and/or retirement plans, Medicare and/or Medicaid liabilities, tort or product liabilities, whether fixed, contingent or unascertained, and liabilities for federal, state and local taxes.

7.    Condition of Assets.  The Purchaser acknowledges that the Purchaser or its designated representative has had an opportunity to inspect the Assets and the Leased Premises, and that (i) the Assets are being transferred in their AS IS condition, and (ii) the Lease is being assumed and assigned subject to the Amendment as described in paragraph 1(a) above.  Notwithstanding the foregoing, the parties agree to cooperate with one another to allow the Purchaser to conduct diligence through the date of the Closing; any such diligence shall not be construed as the Purchaser operating or becoming liable in any manner for the activity and operation of the Seller or the Seller's business.

8.    Closing.  The closing of the transactions described herein (the "Closing") shall be held on the date that the sale of the Assets pursuant to this Agreement and assignment of the Lease in accordance with the Amendment is authorized by the Sale Order as defined and as provided in paragraph 12 below, at the offices of the Purchaser's counsel, DiConza Traurig Kadish LLP, in New York, New York, or upon mutual agreement of the parties, at another date, time and location.  At the Closing and upon satisfaction of all conditions thereto:

(a)    The Seller shall deliver to the Purchaser a duly executed Amendment with respect to the Lease, to which the Landlord has agreed and consented, and the Purchaser shall execute the Amendment as set forth therein; and

(b)    The Seller shall deliver a bill of sale for the sale of the Assets and assignment of the Contracts (exclusive of cure, which shall be an obligation of the Seller) in form acceptable to the Purchaser; and

(c)    The parties shall execute and deliver any and all other documents required to effectuate the transactions contemplated by this Agreement, in form acceptable to the Purchaser.

9.    Employees.  As of the Closing, the Seller shall dismiss all employees.  It is the intention of the Purchaser, subject to it appropriate personnel review policies, procedures and processes, to offer employment to substantially all the Seller's employees in their current positions.

10.    <u>The Seller's Warranties and Representations</u>.  The Seller makes the following warranties and representations to the Purchaser as of the Closing with respect to the transactions contemplated by this Agreement:[2]

(a)    The execution and delivery of this Agreement has been fully authorized by all necessary corporate action; and

(b)    The Assets are owned by the Seller and transferred hereunder free and clear of any liens, claims and encumbrances, except as may be disclosed in **Exhibit "B"** hereto.

Except as specifically stated herein, the Seller makes no other warranties or representations, and the Purchaser enters into this Agreement based upon the Purchaser's own diligence, investigation and review of the Assets and the conditions surrounding this transaction.

11.    <u>The Purchaser's Warranties and Representations</u>. The Purchaser makes the following warranties and representations to the Seller as of the Closing with respect to the transactions contemplated by this Agreement:

(a)    The Purchaser is a New York Not for Profit Corporation duly organized and validly existing and in good standing in the State of New York and has full power and authority to carry out its obligations under this Agreement; and

(b)    The execution and delivery of this Agreement has been fully authorized by all necessary corporate action.

12.    <u>Conditions to Closing</u>.  The obligations of the Seller and the Purchaser to consummate the transactions contemplated by this Agreement at the Closing are subject to the following conditions (which may be modified or waived by the Purchaser in its sole discretion but only in writing):

(a)    The Bankruptcy Court shall have issued an order (the "<u>Sale Order</u>") (i) approving the assumption and assignment of the Lease in accordance with the terms of the Amendment, and (ii) approving the sale of the Assets in accordance with this Agreement, free and clear of all liens, encumbrances, claims (including successor liability claims) and interests, which Sale Order shall not have been reversed, vacated or stayed, and with respect to which (i) the time to file an appeal or a motion to reconsider has expired or has not been extended, or (ii) the Bankruptcy Court has entered an order, including, without limitation, under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, providing that the Sale Order is not stayed for the fourteen (14) day period following the entry of the Sale Order.  It is understood and agreed that the Sale Order may be (part of) an order confirming a plan of reorganization pursuant to Section 1129 of the Bankruptcy Code and/or approving a sale and assignment pursuant to Sections 363 and 365 of the Bankruptcy Code.  In addition to the foregoing, the Sale Order shall contain (i) confirmation that the Lease and the Contracts are in full force and that the assumption and assignment thereof shall be free and clear of any liens, claims and encumbrances, (ii) confirmation that the sale of the Assets is free and clear of all liens, claims and encumbrances, (iii) a finding that the Purchaser is in all respects a good faith purchaser

---

[2]To the extent the Seller is not a corporation in good standing or its corporate existence is in any respect impaired as a matter of law, the Sale Order shall authorize this transaction in all respects.

for value, (iv) a release of the Purchaser and any designee of the Purchaser and its members, officers, directors, agents, representatives and affiliates, from any liability or obligation of any kind including as a successor to the Seller, including an express release from liability for any of the Seller's environmental obligations and pending or threatened environmental claims and/or Internal Revenue Service claims against the Seller, any obligation under any collective bargaining agreement and obligations under any employer pension or employee health or benefit plan of the Seller, or any obligation relating to the Seller's liabilities under Medicare or Medicaid, and (v) such other items as may be reasonably required by the Purchaser and its counsel.

(b)      The Purchaser shall have approved the transactions contemplated by this Agreement in accordance with any corporate governance requirements applicable thereto;

(c)      Completion of pre-Closing due diligence to the Purchaser's reasonable satisfaction;

(d)      The DOH shall have approved the Purchaser's Certificate of Need application without contingencies or conditions that have not been satisfied, other than non-material, reasonable contingencies or contingencies that may be reasonably expected to be fully satisfied in accordance with their terms after the Closing;

(e)      The DOH shall have approved the Seller's Closure Plan;

(f)      The New York City Department of Buildings shall have issued an appropriate Certificate of Occupancy to allow the Purchaser to conduct its intended business at the Leased Premises, without contingencies or conditions that have not been satisfied, other than non-material, reasonable contingencies or contingencies that may be reasonably expected to be fully satisfied in accordance with their terms after the Closing; and

(g)      The delivery of the executed Amendment as set forth in paragraph 8(a) above.

13.    <u>Post Closing Undertakings of the Parties</u>.  The parties generally shall cooperate post-Closing to effectuate the agreements and undertakings made herein and, as well, agree to the following specific post-Closing undertakings:

(a)      The Seller shall cooperate with the Purchaser to provide books and records necessary to permit seamless transition of medical care of patients, seamless operation of any systems, and to reconcile any pre- and post-Closing adjustments.  The Purchaser shall cooperate with the Seller to allow access to such books and records as will permit the Seller to complete its duties in the Chapter 11 Case.

(b)      Subject to any HIPAA or Closure Plan requirements, the parties shall mutually cooperate to enable the Purchaser to access patient medical records.

(c)      In connection with the Purchaser's obligation to pay Installment Proceeds (as set forth in paragraph 2 hereof) only from the proceeds of operations of the Assets by the Purchaser, the Purchaser shall remit a summary report of financial operations as of the close of the month prior to the payment date, indicating the extent, if any, of Installment Proceeds due.  If the Installment Proceeds are paid at any given anniversary in the amount of $500,000.00, no reporting shall be

7

necessary.  The Seller (or, its post-Closing estate, fiduciaries and representatives) shall keep such reporting confidential except as necessary to report on post-Closing activities or enforce obligations against the Purchaser in accordance herewith.

14.    <u>Termination</u>.  This Agreement shall terminate if the conditions to Closing set forth in Section 12 are not satisfied on or before October 28, 2016, unless extended by the Purchaser in its sole discretion in writing without contingencies or conditions that have not been satisfied, other than non-material, reasonable contingencies or contingencies that may be reasonably expected to be fully satisfied in accordance with their terms after the Closing.

15.    <u>Entire Agreement</u>.  This instrument and the exhibits hereto and the Sale Order contain the entire agreement between the parties, and all prior agreements and representations in respect to the subject matter of this Agreement are merged herein and superseded hereby.  It is understood and agreed that this Agreement may be submitted to the Bankruptcy Court in connection with obtaining the Sale Order and otherwise filed publicly and provided to parties in interest in the Chapter 11 Case.  This Agreement shall not be modified in any way except by a writing executed by both parties.

16.    <u>Successors and Assigns</u>.  All covenants and agreements herein contained shall extend to, and be obligatory upon, the successors and assigns of the parties.

17.    <u>New York Law</u>.  This Agreement shall be governed by the laws of the State of New York and the Bankruptcy Court shall have jurisdiction to interpret and enforce the terms of this Agreement.

18.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which will be deemed to an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

19.    <u>Notices</u>.  Any notice or communication required or provided hereunder shall be sufficiently given when mailed by registered or certified mail, postage prepaid, or delivered by hand or overnight courier, to

(a)  the Seller, to the attention of Silva Umukoro, Chief Executive Officer, 154 West 127 Street, New York, New York 10027, with a copy to its counsel, Gabriel Del Virginia, Esq., 30 Wall Street, 12th floor, New York, New York 10005; and

(b)  the Purchaser, to the attention of Paloma Izquierdo-Hernandez, Chief Executive Officer, 1065 Southern Boulevard, Bronx, New York 10459, with a copy to its counsel, (i) Brooklyn Legal Services Corporation A, Attention:  Paul J. Acinapura, Esq., 260 Broadway, Suite 2, Brooklyn, New York 11211, and (ii) DiConza Traurig Kadish LLP, Attention:  Allen G. Kadish, Esq., 630 Third Avenue, New York, New York 10017;

or to such other address or designee as any party may designate.  Following the Closing, the Seller shall (a) designate the location of its books and records and office for service and notice hereunder, and (b) file a notice with the Bankruptcy Court to the same effect, and provide same to the Purchaser.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**SELLER**:

CITICARE, INC.

By:_____
        Name:
        Title:

**PURCHASER**:

URBAN HEALTH PLAN, INC.

By:_____
        Name:
        Title:

LIST OF EXHIBITS

Exhibit "A"  -  Lease

Exhibit "B"  -  Equipment

Exhibit "C"  -  Contracts to be Assumed

Exhibit "D"  -  Medical Records Custodial Agreement

EXHIBIT "A"
LEASE

127TH ST PROPERTIES LLC, ("LLC"),

127TH ST PROPERTIES LLC, ("LLC"),
as Landlord

and

**CITICARE INC.,**

as Tenant

**AGREEMENT OF LEASE**

**Premises:**   Specified Space in Building
              154 West 127th Street
              New York, New York 10027

**Dated:**     As of August 28 2013

ALLIB01\182658\2
305217-3017970

## AGREEMENT OF LEASE

**THIS AGREEMENT OF LEASE** ("**Lease**") is made as of August ___, 2013, between **127TH ST PROPERTIES LLC** ("**Landlord**"), a New York limited liability company, having an office at P.O. Box 423 Brooklyn New York 11222__and **Citicare Inc.** ("**Tenant**"), a New York Corporation, having an office at 154 West 127th Street, New York, New York 10027.

Landlord and Tenant hereby covenant and agree as follows:

### ARTICLE 1

### BASIC LEASE PROVISIONS

| | |
|---|---|
| **PREMISES** | The entire amount of leasable space in the Building. As presently existing,, excluding any possible existing air rights |
| **BUILDING** | The building, fixtures, equipment and other improvements and appurtenances now located or here erected, located or placed upon the land known as 154 West 127th Street, New York, New York. |
| **REAL PROPERTY** | The Building, together with the plot of land upon which it stands. |
| **COMMENCEMENT DATE** | The later of (1) the date of this Lease, or (2) the date Landlord obtains legal ownership of the Real Property |
| **EXPIRATION DATE** | August 25, 2033 |
| **TERM** | The period commencing on the Commencement Date and ending on the Expiration Date. |
| **PERMITTED USES** | Medical, general offices and any other legal use other than Prohibited Uses as hereinafter defined. |
| **OPTIONS TO RENEW** | Two (2) option (s) to renew, each for a term of (5) years. In order to exercise this option tenant must give Landlord written notice six (6) months prior to the expiration of the lease. Should Landlord not receive any notice at that time this renewal option shall be null and void. |
| **TENANT'S PROPORTIONATE** | 100.00%. |

**SHARE**

**AREA OF BUILDING**

Approximately 20,001 rentable square feet.

**AREA OF PREMISES**

Approximately 20,001 rentable square feet.

The rentable square footage of the Building and the Premises have been mutually determined and agreed upon by Landlord and Tenant for purposes of this Lease, and Landlord makes no representation whatsoever as to the actual square feet contained in the Premises or the Building or any portions thereof.

**BASE MONTHLY RENT**

The term "Base Monthly Rent" shall mean the following :

| Period | | Monthly Amount |
|---|---|---|
| 08/26/2013- | 011/30/2013 | $30,000 |
| 12/01/2013- | 12/31/2013 | $40,000 |
| 01/01/2014- | 12/31/2014 | $55,000 |
| 01/01/2015- | 12/31/2015 | $55,000 |
| 01/01/2016- | 12/31/2016 | $56,375 |
| 01/01/2017- | 12/31/2017 | $57,784.37 |
| 01/01/18- | 12/31/18 | $59,228.97 |
| 01/01/19- | 12/31/19 | $60,709.69 |
| 01/01/20- | 12/31/20 | $62,227.43 |
| 01/01/21- | 12/31/21 | $63,783.11 |
| 01/01/22- | 12/31/22 | $65,377.68 |
| 01/01/23- | 12/31/23 | $67,012.12 |
| 01/01/24- | 12/31/24 | $68,687.42 |
| 01/01/25- | 12/31/25 | $70,404.60 |
| 01/01/26- | 12/31/26 | $72,164.71 |
| 01/01/27- | 12/31/27 | $73,968.82 |
| 01/01/28- | 12/31/28 | $75,818.04 |
| 01/01/29- | 12/31/29 | $77,713.49 |
| 01/01/30- | 12/31/30 | $79,656.32 |
| 01/01/31- | 12/31/31 | $81,647.72 |
| 01/01/32- | 12/31/32 | $83,688.91 |
| 01/01/33 | 08/25/33 | $85,781.14 |

**TENANT'S EXPENSE SHARE**

The term "Tenant's Expense Share" shall mean the percentage obtained by dividing the rentable square footage of the Premises at the time of calculation by the rentable square footage of the Building. Such percentage is currently 100%. In the event that the rentable square footage of the Premises is changed, Tenant's Expense Share shall be recalculated to equal the percentage

described in the first sentence of this paragraph, so that the aggregate Tenant's Expense Share of all tenants shall equal 100%.

**TENANT'S REQUIRED
INSURANCE**

Owner shall, , keep in full force and effect an Owner's fire insurance policy, which shall include extended coverage provisions, and shall also maintain  liability, rent insurance and umbrella coverage all in amounts consistent with those carried by prudent owners of similar buildings in New York City. Tenant shall be responsible for the cost of said Premiums. The amount of the insurance and the carrier shall be in the sole discretion of the Owner, but in no event less than the replacement value of the Real Property Tenant shall have the option to obtain alternative quotes for insurance coverage in the amount Landlord requests. In the event Tenant obtains a cheaper quote than Landlord provided, Landlord will then have the option to purchase the policy with the cheaper vendor. If, however, Landlord elects not to purchase the less expensive policy, Tenant shall only be obligated to pay the cost of the less expensive premium. .

In addition to the insurance premiums enumerated above, Tenant agrees to obtain and keep in force for its own benefit and for the benefit of Owner general liability insurance in the amount of Four Million ($4,000,000.00) Aggregate, Two Million ($2,000,000.00) Dollars per accident, and Ten Million Dollar ($10,000,000.00) Umbrella coverage and Five hundred and Thousand ($500,000.00) Dollars for property damage. The Owner's name shall be included on all such policies as an additional insured. A copy of such policy or policies shall be delivered to the Owner (or certificate as provided in this lease together with proof of payment of the premium. If it is not delivered or not paid, Owner may, after ten (10) days notice by regular mail to Tenant, procure and pay same, and the amount so paid, together with interest at the rate of twelve (12%) per cent per annum shall be due as additional rent;

**LATE CHARE**

Five Percent (5%) of the Delinquent Amount after the tenth of

the month

None

None

**SECURITY DEPOSIT**          None     None

**BROKER**                    None

          All capitalized terms used in the text of this Lease without definition are defined
in this Article 1 or in **Exhibit C**.

## ARTICLE 2
## LEASED PREMISES, TERM, AND POSSESSION

Section 1.1          **Demise of Leased Premises.**

          Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, the Premises
for the Term and upon all of the terms and conditions hereinafter set forth.

Section 1.2          **Lease Term.**

          The Term of this Lease shall in all events end on the Expiration Date, unless otherwise
extended in writing The Term shall be that period of time commencing on the Commencement
Date and ending on the Expiration Date, unless otherwise extended in writing.

Section 1.3     **Surrender Of Possession.**

          Immediately prior to the expiration or upon the sooner termination of this Lease Tenant
shall remove all of Tenant's signs from the exterior of the Building and shall remove all of
Tenant's removable equipment, trade fixtures, furniture, supplies, and other personal property
from within the Leased Premises, the Building, and shall vacate and surrender the Leased
Premises, the Building, and the Property to Landlord in the same condition, broom clean, as

existed at the Commencement Date, damage by casualty or condemnation (which events shall be governed as written in this lease) and reasonable wear and tear excepted. Except for such reasonable wear and tear, Tenant shall (i) repair all damage to the Leased Premises, the exterior of the Building caused by Tenant's removal of Tenant's property, (ii) patch and refinish, to Landlord's reasonable satisfaction, all penetrations made by Tenant or its employees to the roof, floor, interior or exterior walls or ceiling of the Premises and the Building, whether such penetrations were made with Landlord's approval or not, (iii) repair all damage caused by Tenant to the exterior surface of the Building If the Premises, the Building, the expiration or sooner termination of the Lease, Landlord may, at Tenant's expense, so remove Tenant's signs, property and/or improvements not so removed and make such repairs and replacements not so made or hire, at Tenant's reasonable expense independent contractors to perform such work. Tenant shall be liable to Landlord for all reasonable costs incurred by Landlord in returning the Premises, the Building to the required condition, together with interest on all costs so incurred from the date paid by Landlord at the then maximum rate of interest not prohibited or made usurious by law until paid. Tenant shall pay to Landlord the amount of all costs so incurred plus such interest thereon, within ten (10) days of Landlord's billing Tenant for same..

## ARTICLE 3
## RENT, ADDITIONAL RENT,
### Section 1.1 __Base Monthly Rent.__

Commencing on the Commencement Date and continuing throughout the lease term, Tenant shall pay to landlord, without prior demand therefore, in advance on the first day of each calendar month, the amount set forth as "Base Monthly Rent" in Article 1 (the "Base Monthly Rent")

### Section 1.2 **Additional Rent.**

> Net Lease. the parties agree that during the term of this lease, Tenant shall pay all costs imposed upon the premises and tenant's use and operation thereof, it being the intent of the parties that unless otherwise set forth this be a net, net, net lease for landlord and landlord shall not be required to do any act or thing with respect to the premises except as provided herein. in accordance with the foregoing, Tenant shall pay to or on behalf of landlord, as and when such costs are due as additional rent, one hundred (100%) percent of all carrying costs of the premises other than mortgage expenses including, but not limited to, the following items with respect to the premises:  (i) all real estate and personal property taxes; (ii) all charges for water, sewer, electricity, heat ,gas, sprinkler, meter reading, and all other utilities; (iii)all premiums payable to maintain any insurance coverage relating to the premises, including, but not limited to, fire liability and extended umbrella coverage insurance, as set forth : (iv) tenant's common area expenses including repairs, maintenance, and improvements ; and (vi) any fine, penalty, interest or costs which may be added for non-payment or late

ALLIB01\182658\2
305217-3017970                                   5

payment of any of the foregoing, unless such penalty is caused by the negligence of landlord.

Except for Landlord's obligations as otherwise set forth in this lease, Tenant will be responsible for 100% of the cost of repairs, maintenance, and replacements servicing the premises. tenant shall pay the cost and expense of keeping and maintaining all of the improvements from time to time located thereon and all appurtenants thereof and the sidewalks, passageways, drain ways, sewers and on, adjacent and appurtenant thereto, in good repair and in safe and sanitary condition and will pay for all necessary repairs nonstructural), replacements and renewals, which shall be substantially equal in quality and class to the original work

## ARTICLE 4:

### LANDLORD'S/ TENANT'S REPAIR AND MAINTENANCE.

Section 1.1

Landlord shall at its cost and expense operate, maintain and, except as provided in this lease hereof, make all necessary repairs and replacements to the roof and structural portions and elements of the Building (*i.e.*, all floor slabs and ceiling slabs and bearing walls) and to any element of the sewer or water system serving the Building and located outside the walls of the Building. and to any other portion of the Building or the Premises which would otherwise be Tenant's obligation if damage is caused by Landlord or any employee or representative of Landlord.

a)In the event the damage is caused by Tenants Alteration, improvements or repairs, Landlord will not be responsible to make repairs or replacements as listed in this lease.

b) Tenant at its cost and expense will maintain and repair the Fire alarm system and elevator in good satisfactory working conditions at all times.. Should the fire alarm system or elevator system be worn beyond repair and in need of replacement within the first five year from the commencement date of this lease then Tenant will replace it at its cost and expense. Should the fire alarm system and/or the elevator be worn beyond repair after the last day of the fifth year of commencement of this lease than Landlord will replace it at its cost and expense.

c) If Landlord fails to proceed with due diligence to perform its obligations as set forth above within 60business days after written notice from Tenant (or such lesser period in case of any emergency), Tenant may perform all such work on the accord of Landlord and all costs and expenses incurred by Tenant, , shall be paid by Landlord within 30days of Tenant's request. Failing which Landlord's payment shall include interest thereon at the Interest Rate from the date incurred by Tenant.

Section 1.2   **Tenant's Repair and Maintenance.**

Except for Landlord's repair obligations Tenant shall promptly, at its expense and in compliance with as written in this lease and subject to as written in this Lease, lease make all nonstructural repairs to the Premises/Building and the fixtures, equipment and appurtenances therein including but not limited to elevator ,windows, fire alarm systems, sprinkler system as and when needed to preserve the Premises in good working order and condition. . Without limiting the foregoing, all damage to the Premises or to any other part of the Building, or to any fixtures, equipment and/or appurtenances thereof, whether requiring structural or nonstructural repairs, caused by or resulting from any act, omission, neglect or improper conduct of, or Alterations made by, or the moving of Tenant's fixtures, furniture or equipment into, within or out of the Premises by any Tenant Party, and all damage to any portion of the Building Systems located in the Premises (other than damage caused by Landlord or any employee or representative of Landlord), shall be repaired at Tenant's expense. , Such repairs shall be made by (i) Tenant, at Tenant's expense, if the required repairs are nonstructural in nature and do not affect any Building System or any portion of the Building outside of the Premises, or (ii) Landlord, at Tenant's expense, if the required repairs are structural in nature, involve replacement of exterior window glass (if damaged by Tenant) or affect any Building System or any portion of the Building outside of the Premises (such repairs shall be performed by either Landlord's employees, Landlord's contractor or a contractor approved by Landlord in writing). All Tenant repairs shall be of a quality and shall utilize construction materials at least equal to the original work or construction and shall be made in accordance with this Lease. Tenant shall give Landlord prompt notice of any defective condition of which Tenant is aware in any Building System located in, servicing or passing through the Premises. All Tenant repairs shall be of a quality at least equal to the original work or construction using new construction materials, and shall be made in accordance with this Lease. If Tenant fails to proceed with due diligence to make any repairs required to be made by Tenant, Landlord may, after 30 Business Days notice, make such repairs and all costs and expenses incurred by Landlord on account thereof shall be paid by Tenant as provided in this Lease. as Additional Rent

Section 1.3   **Vermin.**

Tenant shall, at its expense, cause the Premises to be exterminated, from time to time or whenever there is evidence of infestation, by a licensed exterminator. Tenant shall secure from an independent, licensed exterminator ("**Designated Exterminator**") a master extermination agreement providing for available extermination services for the entire Building (the "**Extermination Contract**") on a monthly basis.

Section 1.4   **Interruptions Due to Repairs.**

Landlord reserves the right to make all changes, alterations, additions, improvements, repairs or replacements to the Building, including the Building Systems which provide services to Tenant, as Landlord deems necessary or desirable, provided that in no event shall the level of

any Building service decrease in any material respect from the level required of Landlord in this Lease as a result thereof (other than temporary changes in the level of such services during the performance of any such work by Landlord or as required by any Requirement). Landlord shall use reasonable efforts to minimize interference with Tenant's use and occupancy of the Premises during the making of such changes, repairs, alterations, additions, improvements, repairs or replacements, provided that Landlord shall have no obligation to employ contractors or labor at overtime or other premium pay rates or to incur any other overtime costs or additional expenses whatsoever, except in such cases when the changes, alterations, additions, improvements, repairs or replacements are of a nature that are typically performed during overtime. Except as otherwise provided herein, there shall be no Rent abatement or allowance to Tenant for a diminution of rental value, no actual or constructive eviction of Tenant, in whole or in part, no relief from any of Tenant's other obligations under this Lease, and no liability on the part of Landlord by reason of inconvenience, annoyance or injury to business arising from Landlord, Tenant or others making, or failing to make, any repairs, alterations, additions or improvements in or to any portion of the Building or the Premises, or in or to fixtures, appurtenances or equipment therein. Notwithstanding the foregoing, if such changes, alterations, additions, improvements, repairs, replacements or disruptions of Building Services are ongoing or continuous, and Tenant is prevented from using or entering the Premises and conducting its business operations for more than three (3) Business Days, Rent shall be abated for each day thereafter that Tenant is prevented from using or entering the Premises and conducting its business therein.

**Section 1.5** Commencing on the Commencement Date and continuing throughout the lease term, in addition to the Base Monthly Rent and to the extent not required by Landlord to be contracted for and paid directly by Tenant, Tenant shall pay to Landlord as additional rent (the "Additional Rent") the following amounts:

(a) Landlord will forward invoices or bills for such expenses to tenant on a monthly basis, and Tenant shall, no later than twenty (20) days following receipt of any such invoices or bills, pay such invoices or bills to Landlord.

(b) Any legal fees and costs that tenant is obligated to pay or reimburse to Landlord as written in this lease

(c) Any other charges or reimbursements due Landlord from Tenant pursuant to the terms of this lease.

Notwithstanding the foregoing, Tenant is responsible to pay Real property Taxes or any portion thereof directly to the applicable taxing authority, Tenant shall make such payments and deliver satisfactory evidence of payment to Landlord no later than ten (10) days before such Real Property Taxes are due.

Landlord will provide proof of invoice for each charge listed on the billing for operating or other expenses.

Section 1.6       **Payment of Rent.**

If Tenant shall fail to pay any installment of Fixed Base Monthly Rent after 10 days when
due or any payment of Additional Rent after 20 days when due, then (a) interest of 5% shall
accrue on such installment or payment as a late charge, from the date such installment or
payment became due until the date paid at the interest rate of 5%, and (b) Tenant shall pay
Landlord the Late Charge on the outstanding amount.

## ARTICLE 5

## USE AND OCCUPANCY

### Permitted Uses; Licenses.

Section 1.1

Permitted Uses. Tenant shall use and occupy the Premises for the Permitted Uses and
for no other purpose. Tenant shall not use or occupy or permit the use or occupancy of
any part of the Premises in a manner constituting a Prohibited Use. If Tenant uses or
suffers the use of the Premises for a purpose which constitutes a Prohibited Use or
violates any Requirement, or which causes the Building to be in violation of any
Requirement, then Tenant shall promptly discontinue such use upon notice of such
violation. Tenant's failure to discontinue such use promptly (and, in all events, within
30 days after such notice ) shall be a material default hereunder.

Section 1.2     Licenses and Permits. Tenant, at its expense, shall obtain and at all
times maintain and comply with the terms and conditions of all licenses and permits required
for the lawful conduct of the Permitted Uses in the Premises. Tenant is to obtain at its cost
and expense a CFO permit. Tenant is to comply with all requirements and will remove all
violations.

Section 1.3       **Prohibited Uses.**

Notwithstanding anything in this Lease to the contrary, in no event shall the Premises be
used or occupied by any Person for any Prohibited Use.. as defined in Exhibit C

## ARTICLE 6

## CONDITION OF THE PREMISES;

### Section 1.1    Condition.

Tenant accepts the Premises in its "AS IS" condition and agrees (a) that neither Landlord
nor Landlord's agents have made any representations or warranties with respect to the Premises
or, the, building.

ALLIB01\182658\2
305217-3017970                              9

Section 1.2                **Tenant's Alterations.**

(a) Landlord's Approval.  Tenant shall not make any  alterations, or additions or
other physical changes in or about the Premises which do not require a building permit
(collectively, "**Alterations**"), other than Alterations such as painting, wall coverings, floor
coverings, raised flooring, installation of any equipment relating to voice, video, data or
security, including, without limitation, telephones and furniture, furniture systems or
equipment (including electrical wiring into furniture systems or equipment), trade fixtures
or decorative effects (such as pictures) or office equipment or such other alterations that
will not require a building permit (collectively, "**Decorative Alterations**"), without
Landlord's prior written  consent, which shall not be unreasonably withheld or delayed.
Alterations that are cosmetic and non structural and do not require a permit shall be
permitted without Landlord consent. Any alteration that requires a permit shall require
Landlords' prior written consent and approval. Notwithstanding the foregoing, Landlord
shall not unreasonably withhold, delay or condition its consent to Alterations so long as
such Alterations (i) do not affect the exterior of the building or materially affect the
Building Structure or Building Systems, provided, that, (ii)affect only the Premises and
are not visible from outside of the Premises or the Building, (iii) do not affect the
Certificate of Occupancy issued for the Building or the Premises, (iv) are consistent with
the design, construction and equipment of the Building, (v) do not adversely affect or
increase the cost of any service furnished by Landlord to Tenant or to any other tenant of
the Building, (vi) do not violate or adversely affect any landmark designation affecting the
Building (including, without limitation, insuring conformance with the Secretary of
Interior's Standards for Rehabilitation as interpreted by the State Historic Preservation
Office and the National Park Service and any and all New York City landmark
regulations), and (vii) do not violate any Requirement or cause the Premises or the
Building to be non-compliant with any Requirement. ,

(b) Plans and Specifications.  Prior to making any Alterations which require a
building permit and Landlord's approval, Tenant, at its expense, shall (i) submit to
Landlord for its approval, which shall not be unreasonably withheld or delayed except as
set forth herein, detailed plans and specifications (including layout, architectural,
mechanical, electrical, plumbing, sprinkler and structural drawings) of each proposed
Alteration (other than Decorative Alterations), and with respect to any Alteration affecting
any Building System, Tenant shall submit proof that the Alteration has been designed by,
or reviewed and approved by, Landlord's designated engineer for the affected Building
System, (ii) obtain all permits, approvals and certificates required by any Governmental
Authorities and (iii) furnish to Landlord duplicate original policies or certificates of
worker's compensation (covering all persons to be employed by Tenant, and Tenant's
contractors and subcontractors in connection with such Alteration), comprehensive public

liability (including property damage coverage) insurance and Builder's Risk coverage (issued on a completed value basis) all in such form, with such companies, for such periods and in such amounts as Landlord may reasonably require, naming Landlord, Landlord's Agent, and their respective employees and agents, any Lessor and any Mortgagee as additional insured's and (iv) furnish to Landlord such other evidence of Tenant's ability to complete and to fully pay for such Alterations (other than Decorative Alterations) as is reasonably satisfactory to Landlord, however, in the event the aggregate cost of such Alterations (other than Decorative Alterations) exceeds $50,000.00, then Tenant shall deliver to Landlord an irrevocable letter of credit in form, an amount and from an issuing bank with principal offices in the United States and local offices in the State of New York, each reasonably satisfactory to Landlord, as security for Tenant's ability to pay for such Alterations. The amount of the letter of credit may be reduced by corresponding amounts on account of lien waivers from Tenant's contractors. In connection with any submission to Landlord pursuant to clause (i) above, Landlord shall advise Tenant whether or not any of the Alterations described in the submitted plans and specifications constitute Specialty Alterations, and, if so, whether or not Landlord requires that such Specialty Alterations be removed at the end of the Term. Tenant shall give Landlord not less than 5 Business Days notice prior to performing any Decorative Alteration which notice shall contain a description of such Decorative Alteration. The review/alteration of Tenant drawings and/or specifications by Landlord and any of its representatives is not intended to verify Tenant's engineering or design requirements and/or solutions. Notwithstanding the foregoing, Landlord may withhold consent for any Alteration or Decorative Alteration that is inconsistent and not reasonably in conformance with aesthetic standards applicable to comparable buildings in Manhattan.

(c) Permits. Upon Tenant's request, Landlord shall reasonably cooperate with Tenant in obtaining any permits, approvals or certificates required to be obtained by Tenant in connection with any permitted Alteration (if the provisions of the applicable Requirement require that Landlord join in such application), provided that Tenant shall reimburse Landlord for any cost, expense or liability in connection therewith. Tenant shall indemnify, defend and hold harmless Landlord for any Losses (as defined in this lease) arising out of Tenant's Alterations or related to any applications or other filings related to such permits, approvals or certificates required for any of Tenant's Alterations.

(d) Governmental Approvals. Upon completion of any Alteration, Tenant, at its expense, shall promptly obtain certificates of final approval of such Alterations required by any Governmental Authority and shall furnish Landlord with copies thereof.

(e) Filed Plans. Within 30 days after completion of any Alteration which required Landlord's approval, Tenant, at its expense, shall deliver to Landlord one reproductive set of the "as-built" plans and specifications for such Alterations (other than Decorative Alterations) and either a diskette copy of such "as-built" plans and specifications prepared on an AutoCAD Computer Assisted Drafting and Design system (or such other system or medium as Landlord may accept) using naming conventions issued by the American Institute of Architects in June, 1990 (or such other naming convention as Landlord may accept) or magnetic computer media of such record drawings and specifications, translated in DXF format or such other format as shall be required or acceptable to Landlord. Tenant

may, as an alternative, provide Landlord with marked drawings specifically illustrating such Alterations.

Section 1.3          **Manner and Quality of Alterations.**

All Alterations shall be performed (a) in a good and workmanlike manner and free from defects, (b) substantially in accordance with the plans and specifications as required under Section 5.1, and by contractors reasonably approved by Landlord, (c) under the supervision of a licensed architect reasonably satisfactory to Landlord (other than Decorative Alterations), and (d) in compliance with all Requirements, the terms of this Lease, and all standard procedures and regulations then prescribed by Landlord for all work performed in the Building, and the Rules and Regulations. All materials and equipment to be used in the Premises shall be of first quality and at least equal to the applicable standards for the Building then established by Landlord, and no such materials or equipment (other than Tenant's Property) shall be subject to any lien, security interest or other encumbrance. Any Tenant renovations must be compatible with Building Class E System and other common systems, etc.

Section 1.4  **Removal of Tenant's Property.**

(a)     Tenant's removable Property shall be and remain the property of Tenant and Tenant may remove the same at any time on or before the Expiration Date. On or prior to the Expiration Date or sooner termination of the Term, Tenant shall, at Tenant's expense, remove all Tenant's removable Property, except for such Tenant's Property which Landlord had previously indicated in writing may remain on the Premises.

(b) Specialty Alteration; Slab Penetrations. On or prior to the Expiration Date or sooner termination of the Term, Tenant shall, at Tenant's expense, and, unless otherwise directed by Landlord: (i) provided that Landlord shall have advised Tenant of the request to remove same in accordance with  as written in this lease remove any Specialty Alteration and (ii) close up any slab penetrations in the Premises. At least 30 days prior to commencing the removal of any Specialty Alterations or effecting such closings, Tenant shall notify Landlord of its intention to remove such Specialty Alterations or effect such closings, and if Landlord notifies Tenant within such 30 day period, Tenant shall not remove such Specialty Alterations or close such slab penetrations, and the Specialty Alterations not so removed shall become the property of Landlord upon the Expiration Date or sooner termination of the Term.

(c)     Intentionally Deleted.

(d)     Damage. Tenant shall repair, in a good and workmanlike manner, any damage to the Premises or the Building caused by Tenant's removal of any Specialty Alterations or Tenant's Property or by the closing by Tenant of any slab penetrations, and upon default thereof, Tenant shall reimburse Landlord, on demand, for Landlord's cost of repairing such damage.

(e)     Abandonment. Any Specialty Alterations or Tenant's Property not removed on or before the Expiration Date or sooner termination of the Term shall be deemed abandoned and

Landlord may either retain the same as Landlord's property or, if Tenant is obligated to remove the same hereunder, remove and dispose of same, and repair and restore any damage caused thereby, at Tenant's cost and without accountability to Tenant. This Section 6.3 shall survive the expiration or earlier termination of this Lease.

Section 1.5    **Mechanic's Liens.**

Tenant shall, in due course, pay in cash all amounts due in respect of any Alteration undertaken by Tenant. Tenant, at its expense, shall discharge any lien or charge filed against the Premises or the Real Property in connection with any work claimed or determined in good faith by Landlord to have been done by or on behalf of, or materials claimed or determined in good faith by Landlord to have been furnished to, Tenant, within 15 days after Tenant's receipt of notice thereof by payment, filing the bond required by applicable Requirements or otherwise in accordance with applicable Requirements.

MECHANICS AND OTHER LIENS IMPOSED BY TENANT. TENANT shall keep the Leased Premises and the improvements at all times during the term free of mechanics and material men's liens and other liens of like nature, other than liens created and claimed by reason of any work done by or at the instance of Landlord , and at all times shall fully protect and indemnify Landlord  against all such liens or claims and against all attorneys' fees and other costs and expenses growing out of or incurred by reason or on account of any such liens or claims. Should TENANT fail to fully discharge or bond any such lien or claim, Landlord, at its option, may pay the same or any part thereof.

All amounts so paid by Landlord, together with interest the maximum legal rate from the time of payment by Landlord until repayment by TENANT, shall be paid by TENANT upon demand, and if not so paid, shall continue to bear interest at the aforesaid rate, interest payable monthly, and attorney's fees, as Additional rent.. In the event of any suit or action to enforce any provision or recover damages arising out of breach of this Lease, the prevailing party shall be entitled to recover the reasonable fees and costs of attorneys in addition to any other relief afforded.

Section 1.6    **Labor Relations.**

Tenant shall not employ, or permit the employment of, any contractor, mechanic or laborer, or permit any materials to be delivered to or used in the Building, if, in Landlord's sole judgment, such employment, delivery or use will interfere or cause any conflict or disharmony with other contractors, mechanics or laborers engaged in the construction, maintenance or operation of the Building by Landlord, Tenant or others, or the use and enjoyment of the Building by other tenants or occupants. In the event of such interference, conflict or disharmony, upon Landlord's request, Tenant shall cause all contractors, mechanics or laborers causing such interference or conflict to leave the Building immediately.

Section 1.7    **Tenant's Costs.**

Tenant shall pay to Landlord or its designee, within thirty (30) days after demand, all reasonable out-of-pocket costs actually incurred by Landlord in connection with Tenant's Alterations, including costs incurred in connection with (a) Landlord's review of the Alterations (including review of requests for approval thereof) and (b) the provision of Building personnel during the performance of any Alteration required by trade union policy or otherwise, to operate elevators or otherwise to facilitate Tenant's Alterations.

Section 1.8      **Tenant's Equipment.**

Tenant shall not move any heavy machinery, heavy equipment, freight, bulky matter or fixtures (collectively, "**Equipment**") into or out of the Building without Landlord's prior consent (which consent shall not be unreasonably withheld or delayed) and payment to Landlord of any reasonable out-of-pocket costs incurred by Landlord in connection therewith. If such Equipment requires special handling, Tenant agrees (a) to employ only persons holding a Master Rigger's License to perform such work, (b) all work performed in connection therewith shall comply with all applicable Requirements and (c) such work shall be done only during hours reasonably designated by Landlord in accordance with the Building practices and procedures.

Section 1.9      **Legal Compliance.**

The approval of plans or specifications, or consent by Landlord to the making of any Alterations, does not constitute Landlord's agreement or representation that such plans, specifications or Alterations comply with any Requirements or the Certificate of Occupancy issued for the Building. Landlord shall have no liability to Tenant or any other party in connection with Landlord's approval of any plans and specifications for any Alterations, or Landlord's consent to Tenant's performing any Alterations. If as the result of any Alterations made by or on behalf of Tenant, Landlord is required to make any alterations or improvements to any part of the Building in order to comply with any Requirements, whether or not in or near the Premises, Tenant shall pay all costs and expenses incurred by Landlord in connection with such alterations or improvements as provided in this lease.

## ARTICLE 7

## FLOOR LOAD

Tenant shall not place a load upon any floor of the Premises that exceeds the maximum "live load" permitted by the Certificate of Occupancy for the Building issued by NYC Department of Buildings, pounds per square foot "live load". Landlord reserves the right to reasonably designate the position of all Equipment which Tenant wishes to place within the Premises, and to place limitations on the weight thereof.

## ARTICLE 8

## TAXES

Section 1.1   **Definitions.**

For the purposes of this Article , the following terms shall have the meanings set forth below:

(a)      "**Assessed Valuation**" shall mean the amount for which the Real Property is assessed pursuant to applicable provisions of the City Charter and of the Administrative Code of the City of New York for the purpose of imposition of Taxes.

(b)      "**Tax Year**" shall mean the 12-month period from July 1 through June 30 (or such other period as hereinafter may be duly adopted by the City of New York as its fiscal year for real estate tax purposes).

(c)      "**Taxes**" shall mean (i) all real estate taxes, assessments (including assessments made as a result of the Building being within a business improvement district and giving effect to all abatements, including, without limitation, those received under the New York Industrial and Commercial Incentive Program ("**ICIP**") and any increases as a result of the diminution or expiration of any deferral or abatement in real estate taxes in connection with such ICIP), sewer and water rents, rates and charges and other governmental levies, impositions or charges, whether general, special, ordinary, extraordinary, foreseen or unforeseen, which may be assessed, levied or imposed upon all or any part of the Real Property, and (ii) all expenses (including reasonable attorneys' fees and disbursements and experts' and other witnesses' fees) incurred in contesting any of the foregoing or in connection with any application for a reduction of the Assessed Valuation of all or any part of the Real Property or for a judicial review thereof. Taxes shall not include (x) interest or penalties incurred by Landlord as a result of Landlord's late payment of Taxes, except for interest payable in connection with the installment payment of assessments pursuant to the next sentence, or (y) franchise, income, transfer, inheritance, gross receipts, payroll or stamp or other similar taxes imposed upon Landlord. If Landlord elects to pay any assessment in annual installments, then for the purposes of this Article 8, (A) such assessment shall be deemed to have been so divided and to be payable in the maximum number of installments permitted by law, and (B) there shall be deemed included in Taxes for each Tax Year the installments of such assessment becoming payable during such Tax Year, together with interest payable during such Tax Year on such installments and on all installments thereafter becoming due as provided by applicable Requirements, all as if such assessment had been so divided. If at any time the methods of taxation prevailing on the date hereof shall be altered so that in lieu of or as an addition to the whole or any part of Taxes, there shall be assessed, levied or imposed (1) a tax, assessment, levy, imposition or charge based on the franchise, income, gross receipts, payroll or stamp or other similar taxes or rents received from the Real Property whether or not wholly or partially as a capital levy or otherwise, (2) a tax, assessment, levy, imposition or charge measured by or based in whole or in part upon all or any part of the Real Property and imposed upon Landlord, (3) a license fee measured by the rents, or (4) any other tax, assessment, levy, imposition, charge or license fee however described or imposed, then all such taxes, assessments, levies, impositions, charges or license fees or the part thereof so measured or based shall be deemed to be Taxes, provided that any tax, assessment, levy, imposition or charge imposed on income from the Real Property shall be calculated as if the Real Property were the only asset of Landlord.

Section 1.2          **Tenant's Tax Payment.**

          (a)          Tenant shall pay all taxes immediately when due to the proper governmental or
city agency.

              b. Occupancy or Rent Tax.  Tenant shall be responsible for any applicable
              occupancy or rent tax now in effect or hereafter enacted and applicable to
              Tenant's occupancy of the Premises, regardless of whether imposed by its
              terms upon Landlord or Tenant and, if such tax is payable by Landlord, Tenant
              shall promptly pay (without duplication) such amounts to Landlord, upon
              Landlord's demand, as Additional Rent.

              c. Certiorari Proceedings.  Tenant shall have the right by appropriate proceedings,
              to protest or contest any assessment, reassessment or allocation of Real Property
              taxes or any change therein or any application of any Law to the leased premises
              or tenant's use thereof. Landlord will reasonably cooperate with tenant in the
              contest or proceedings. If tenant does not pay the Real Property tax when due
              which are the subject of such protest or contest, Tenant shall post a bond in lieu
              thereof in an amount reasonably determined by Landlord but not less than one
              hundred and twenty five percent (125%) of the amount demanded by the taxing
              authorities which holds landlord  and the property harmless from any damages
              arising out of the contest and the ensuring payment of any judgment that may be
              rendered in connection with such contest or protest. Any protest or contest
              conducted by tenant under this paragraph shall be at tenant's expense and if
              interest or late charges become payable as a result of such contest or protest,
              Tenant shall pay the same. Tenant shall receive a proportionate share of any
              refund applicable to the lease term based on the amount of Real Property Taxes
              paid by tenant as tenant's Property Share (if the refund is applicable to the land) or
              tenant Expense share (if the refund is applicable to the Building or other
              improvements in the Outside areas)

              d. Apportionment - Lease Term.  If the Expiration Date shall occur on a date
              other than the last day of a Tax Year, any Additional Rent payable by Tenant to
              Landlord under this Section for the Tax Year in which such Expiration Date occurs
              shall be apportioned on the basis of the number of days in the period from such last
              day to the Expiration Date shall bear to the total number of days in such Tax Year.
              In the event of the expiration or earlier termination of this Lease, any Additional
              Rent under this Section shall be paid or adjusted within 30 days after such
              Additional Rent becomes due.  Notwithstanding anything to the contrary herein, in
              no event shall Fixed Rent ever be reduced by operation of this Section.

Section 1.3          **No Reduction in Rent.**

ALLIB01\182658\2
305217-3017970                              16

Anything in this lease to the contrary notwithstanding, under no circumstances shall any decrease in Taxes in any Tax Year below the Base Taxes result in a reduction in the Fixed Rent or any other component of Additional Rent payable hereunder

## ARTICLE 9

### REQUIREMENTS OF LAW

Section 1.1   **Compliance.**

(a)   Tenant's Compliance.   Tenant, at its expense, shall comply (or cause to be complied) with all Requirements applicable to the Premises, regardless of whether imposed by their terms upon Landlord or Tenant; provided, however, that Tenant shall not be obligated to comply with any Requirement which would require any structural alteration, repair or replacement or other change to structural portions of the Building, (or for compliance after the fifth year of the Lease to the fire alarm system . or the elevator,all of which shall be performed by the Landlord except if the cost of compliance work to the elevator exceeds \$50,000,or the cost of compliance to fire alarm exceeds \$50,000 then Tenant is obligated to pay the first \$50,000 and Landlord shall pay all costs in excess of \$50,000 )unless the application of such Requirement or elevator and fire alarm compliance.arises from (i) Tenant's particular manner of use or occupancy of the Premises (as distinguished from the use or occupancy of the Premises for office purposes and medical center generally), (ii) any cause or condition created by or on behalf of any Tenant Party (including any Alterations), (iii) the breach of any of Tenant's obligation under this Lease, (iv) the Americans with Disabilities Act or New York City Local Law #58 (as each of the same may be amended from time to time and any Requirements of similar import) except if they relate to a structural portion of the Building, provided that Tenant shall only be responsible for any Requirement as written in this lease) arising out of Tenant's use or occupancy of the Premises, or (v) any Hazardous Materials having been brought into the Building or affected by any Tenant Party. All repairs and alterations to the Premises, required to be made by Tenant as provided above to cause the Premises to comply with any Requirements shall be made by (i) Tenant, at Tenant's expense, if the required repairs are nonstructural in nature and do not affect any Building System or any portion of the Building outside of the Premises, or (ii) Landlord, at Tenant's expense, if the required repairs are structural in nature, involve replacement of exterior window glass (if damaged by Tenant) or affect any Building System or any portion of the Building outside of the Premises (such repairs shall be done by Landlord's employees, Landlord's contractor or a contractor approved by Landlord in writing). If Tenant obtains knowledge of any failure to comply with any Requirements applicable to the Premises, Tenant shall give Landlord prompt written notice thereof. Should there ever be a city requirement that a sprinkler system be installed on floors one, two, and three (excluding

ALLIB01\182658\2
305217-3017970                                17

basement(which has an existing sprinkler) or any additional  floors) then the cost of the installation and sprinkler will be paid by 50% of the invoice by Tenant and 50% of the invoice by Landlord.

(b)    Hazardous Materials.    Tenant shall not (i) cause or permit any Hazardous Materials to be brought into the Building, (ii) cause or permit the storage or use of Hazardous Materials in any manner not permitted by any Requirements, or (iii) cause or permit the escape, disposal or release of any Hazardous Materials within or in the vicinity of the Building. Nothing herein shall be deemed to prevent Tenant's use of any Hazardous Materials customarily used in the ordinary course of office work, provided such use is in accordance with all Requirements. Tenant shall be responsible, at its expense, for all matters directly or indirectly based on, or arising or resulting from the actual or alleged presence of Hazardous Materials in the Premises or in the Building that is caused or permitted by Tenant or any Tenant Party.  Tenant shall provide to Landlord copies of all communications received by Tenant with respect to any Requirements relating to Hazardous Materials, and/or any claims made in connection therewith. Landlord or its agents may perform environmental inspections of the Premises; provided, that, Landlord shall use reasonable efforts (not including overtime) to minimize interference with Tenant's use and occupancy of the Premises during such interference.  The covenants contained in this subsection shall survive the expiration or earlier termination of this Lease.

If at any time during the Term or within  one hundred twenty days (120) following the termination, an environmental investigation finds hazardous wastes or hazardous materials on, in or under the Premises (other than those stored on the premises in accordance with applicable laws and regulations then in effect, which will be removed in accordance with applicable laws upon departure from the premises) which were either not present on the occupancy date, or were present on the occupancy date due to the action of TENANT, then TENANT shall be obligated at its sole cost and expense to remove, remediate or take such required action with regards to the new findings in accordance with applicable laws at the time LANDLORD requests it from TENANT.  TENANT agrees to defend, indemnify, and hold LANDLORD harmless from and against any and all claims, lawsuits, losses, liabilities, damages, and expenses, including without limitation cleanup costs and reasonable attorneys' and consultants' fees arising by reason of same. If, however, the hazardous wastes or hazardous materials were not caused by Tenant then such removal, remediation or required action in accordance with applicable laws shall be performed by OWNER and OWNER agrees to defend, indemnify, and hold TENANT harmless from and against any and all claims, lawsuits, losses, liabilities, damages, and expenses, including without limitation cleanup costs and reasonable attorney's fees...

(c)    Landlord's Compliance.  In addition to the provisions set forth above, Landlord shall comply with (or cause to be complied with) all Requirements applicable to the Building and the Building Systems which are not the obligation of Tenant; provided, however, that Landlord may contest the legality or applicability of any such Requirement and may defer compliance therewith during the pendency of such contest.

(d)    Landlord's Insurance.  Tenant shall not cause or permit any action or condition that would (i) invalidate or conflict with Landlord's insurance policies, (ii) violate applicable rules, regulations and guidelines of the Fire Department, Fire Insurance Rating Organization or any other authority having jurisdiction over the Building, or (iii) cause an increase in the premiums for fire insurance then covering the Building over that payable with respect to

ALLIB01\182658\2
305217-3017970                          18

comparable office buildings or (iv) result in insurance companies of good standing refusing to insure the Building or any property therein in amounts and against risks as reasonably determined by Landlord. If the fire insurance premiums increase as a result of Tenant's failure to comply with the provisions of this Article, Tenant shall promptly cure such failure and shall reimburse Landlord, as Additional Rent, for the increased fire insurance premiums paid by Landlord as a result of such failure by Tenant. In any action or proceeding to which Landlord and Tenant are parties, a schedule or "make up" of rates for the Building or the Premises issued by the appropriate Fire Insurance Rating Organization, or other body fixing such fire insurance rates, shall be conclusive evidence of the fire insurance rates then applicable to the Building ..

Section 1.2          **Fire Alarm System.**

The parties acknowledge that a fire-alarm and life-safety system has been installed at the Premises. Alteration undertaken by Tenant requiring any modification to such systems shall be installed by Tenant, at Tenant's sole cost. Tenant shall maintain in good order and repair all fire-alarm and life-safety systems installed at the Premises. Tenant's installation and maintenance shall be performed in accordance with this Lease, the Rules and Regulations and all Requirements. If the Fire Insurance Rating Organization or any Governmental Authority requires –any modifications and/or Alterations be made or any additional equipment be supplied in connection with the fire alarm and life-safety system serving the Building or the Premises by reason of Tenant's particular business or use of the Premises or any Alteration performed by Tenant or the location of the partitions, trade fixtures, or other contents of the Premises, (to the extent such modifications or Alterations are structural, affect any Building System or involve the performance of work outside of the Premises) or (to the extent such modifications or Alterations are nonstructural, do not affect any Building System and do not involve work outside the Premises Tenant shall make such modifications and/or Alterations, and supply such additional equipment, in either case at Tenant's expense.. Tenant at its cost and expense will maintain and repair the Fire alarm system in good satisfactory working conditions at all times.. Should the fire alarm system be worn beyond repair and in need of replacement within the first five year from the commencement date of this lease then Tenant will replace it at its cost and expense. Should the fire alarm system be deemed beyond repair after the last day of the fifth year of commencement of this lease than Landlord will replace it at its cost and expense.

Section 1.3          **Limitations on Rent :**

If at any time during the Term by reason of any Requirement the Rent is not fully collectible, Tenant shall take such other steps (without additional expense to Tenant) as Landlord may request, and as may be legally permissible, to permit Landlord to collect the maximum rents which may during the continuance of such restriction be legally permissible (but not in excess of the Rent reserved under this Lease). Upon the termination of such restriction during the Term, Tenant shall pay to Landlord, in addition to the Rent for the period following such termination of the restriction, if legally permissible, the portion of Rent which would have been paid pursuant to

ALLIB01\182658\2
305217-3017970                                      19

this Lease but for such legal restriction less the Rent paid by Tenant to Landlord while such restriction was in effect, together with interest thereon at the Base Rate

## ARTICLE 10

## SUBORDINATION

### Section 1.1    Subordination and Attornment.

(a)    Subordination.    This Lease and Tenant's rights hereunder are subject and subordinate to all Mortgages and Superior Leases, and, at the request of any Mortgagee or Lessor, Tenant shall attorn to such Mortgagee or Lessor, its successors in interest or any purchaser in a foreclosure sale.

(b)    Attornment. If a Lessor or Mortgagee or any other Person shall succeed to the rights of Landlord under this Lease, whether through possession, foreclosure action, the delivery of a new lease or deed, a bankruptcy proceeding or otherwise then at the request of the successor landlord and upon such successor landlord's written agreement to accept Tenant's attornment and to recognize Tenant's interest under this Lease, Tenant shall be deemed to have attorned to and recognized such successor landlord as Landlord under this Lease. The provisions of this Article are self-operative and require no further instruments to give effect hereto; provided, however, that Tenant shall promptly execute and deliver any instrument that such successor landlord may reasonably request (x) evidencing such attornment, (y) setting forth the terms and conditions of Tenant's tenancy, and (z) containing such other terms and conditions as may be required by such Mortgagee or Lessor, provided such terms and conditions do not materially increase Tenant's obligations or materially and adversely affect the rights of Tenant under this Lease. Upon such attornment this Lease shall continue in full force and effect as a direct lease between such successor landlord and Tenant upon all of the terms, conditions and covenants set forth in this Lease except that such successor landlord shall not be:

(i)    Liable for any previous act or omission of Landlord under this Lease;

(ii)    subject to any credit, demand, claim, counterclaim, offset or defense which theretofore accrued to Tenant against Landlord;

(iii)    Bound by any previous modification of this Lease, or by any previous prepayment of more than one month's Fixed Rent or Additional Rent;

(iv)    Bound by any covenant or obligation of Landlord to perform, undertake or complete any work in the Premises or to prepare the Premises for Tenant's occupancy or to make any payment in regard thereto;

(v)    required to account for any security deposit of Tenant other than any security deposit actually delivered to Mortgagee, Lessor or any successor landlord by Landlord;

(vi)      bound by any obligation to make any payment to Tenant or grant any credits, except for services, repairs, maintenance and restoration provided for under this Lease to be performed by Landlord after the date of such attornment, and

(vii)     responsible for any monies (other than overpayments of Tenant's Tax Payment for the then current Tax Year) owing by Landlord to Tenant.

(c)      Non-Disturbance Agreement. Landlord shall use its best efforts to obtain for Tenant from any current and future Lessor or Mortgagee a non-disturbance and attornment agreement in such Lessor's or Mortgagee's standard form (a "**Non-Disturbance Agreement**"). Notwithstanding the foregoing, this Lease and Tenant's obligations hereunder shall not be affected or impaired in any respect should any such Lessor or Mortgagee decline to enter into such a Non-Disturbance Agreement. If such Lessor or Mortgagee executes and delivers to Landlord a Non-Disturbance Agreement and Landlord delivers the same to Tenant in a form reasonably satisfactory to Tenant, and Tenant either fails or refuses to execute and deliver said Non-Disturbance Agreement within 10 days following Landlord's delivery of such Non-Disturbance Agreement to Tenant, this Lease shall be subject and subordinate to such Superior Lease or Mortgage and Tenant shall automatically be deemed to be subject to and subordinate to such Lessor or Mortgagee and Landlord shall have no further obligation to obtain a Non-Disturbance Agreement for Tenant from such Lessor or Mortgagee.

Section 1.2      **Mortgage or Superior Lease Defaults.**

Tenant shall not cause a default under any Superior Lease or Mortgage, or omit to do anything that Tenant is obligated to do under the terms of this Lease so as to cause Landlord to be in default under any applicable Superior Lease or Mortgage. Any Mortgagee may elect that this Lease shall have priority over the Mortgage that it holds and, upon notification to Tenant by such Mortgagee, this Lease shall be deemed to have priority over such Mortgage, regardless of the date of this Lease. In connection with any financing of the Real Property, the Building or of the interest of the lessee under any Superior Lease, Tenant shall consent to any reasonable modifications of this Lease requested by any lending institution, provided such modifications do not materially increase the obligations, or materially and adversely affect the rights, of Tenant under this Lease.

**ARTICLE 11**

Section 1.1      **Cleaning.**

(a)      General Cleaning. Tenant shall cause the Premises to be cleaned, substantially in accordance with the standards accepted with commercial properties of this kind.

Section 1.2      **Water:** TENANT is responsible for all water and sewer charges to the Premises.

Section 1.3            **Refuse and Rubbish Removal** .Tenant, at its own expense, shall provide refuse
and rubbish removal services at the Premises . In addition, Tenant shall provide medical waste
removal services pursuant to the rules and regulations of the Department of Health..

        Section 1.4    Service Interruptions: Landlord reserves the right to suspend any
service when necessary, by reason of Unavoidable Delays, accidents or emergencies, or for
repairs, alterations or improvements which, in Landlord's reasonable judgment, are necessary
or appropriate until such Unavoidable Delay, accident or emergency shall cease or such
repairs, alterations or improvements are completed, and, except as provided herein, Landlord
shall not be liable to Tenant for any interruption, curtailment or failure to supply services.
Landlord shall use industry standard reasonable efforts (for comparable buildings in
Manhattan) to restore such service, remedy such situation and minimize any interference with
Tenant's business.  Except as otherwise provided herein, the exercise of any such right or the
occurrence of any such failure by Landlord shall not (a) constitute an actual or constructive
eviction, in whole or in part, (b) entitle Tenant to any compensation, abatement or diminution
of Rent, (c) relieve Tenant from any of its obligations under this Lease or (d) impose any
liability upon Landlord by reason of inconvenience to Tenant, or interruption of Tenant's
business, or otherwise.

        Subject to the terms of this Lease, Tenant shall have access into the Building and the
Premises twenty-four hours a day, three hundred and sixty-five days a year.

Section 1.5 **No Other Services.**

        Landlord shall not be required to provide any services to the Premises.

## ARTICLE 12:

## INSURANCE; PROPERTY LOSS OR DAMAGE; REIMBURSEMENT

Section 1.1    **Insurance.**

a) Tenant at its expense, shall obtain and keep in full force and effect during the Term
   and prior to having access to the Premises:

        (i)        insurance against loss or damage by fire, and such other risks and
hazards as are insurable under then available standard forms of "all risk" property
insurance policies with extended coverage, insuring Tenant's Property, and all Specialty
Alterations for the full insurable value thereof or replacement cost value thereof, having a
deductible amount, if any, as reasonably determined by Landlord;

        (ii)        during the performance of any Alteration, until completion thereof,
Builder's risk insurance on an "all risk" basis and on a completed value form including a
Permission to Complete and Occupy endorsement,

ALLIB01\182658\2
305217-3017970                                          22

for full replacement value covering the interest of Landlord and Tenant (and their respective contractors and subcontractors), any Mortgagee and any Lessor in all work incorporated in the Building and all materials and equipment in or about the Premises;

(iii)  Workers' Compensation Insurance, as required by applicable Requirements;

(iv)  New York State disability benefits as required by law;

(v)  Business Interruption Insurance; and

(vi)  such other insurance in such amounts as Landlord, any Mortgagee and/or any Lessor may reasonably require from time to time.

(b)  Required Provisions. All insurance required to be carried by Tenant pursuant to the terms of this Lease (i) shall contain a provision that (A) no act or omission of Tenant shall affect or limit the obligation of the insurance company to pay the amount of any loss sustained, (B) the policy shall be noncancellable and/or no material change in coverage shall be made thereto unless Landlord, Lessors and Mortgagees shall have received 30 days' prior notice of the same, by certified mail, return receipt requested, and (C) Tenant shall be solely responsible for the payment of all premiums under such policies and Landlord, Lessors and Mortgagees shall have no obligation for the payment thereof, and (ii) shall be effected under valid and enforceable policies issued by reputable and independent insurers permitted to do business in the State of New York and rated in Best's Insurance Guide, or any successor thereto (or if there be none, an organization having a national reputation) as having a Best's Rating of "A-" and a "Financial Size Category" of at least "X" or, if such ratings are not then in effect, the equivalent thereof or such other financial rating as Landlord may at any time consider appropriate.

c)  Evidence. On or prior to the Commencement Date, Tenant_shall deliver to Landlord appropriate policies of insurance, including evidence of waivers of subrogation required to be carried by each party pursuant to this Lease. Evidence of each renewal or replacement of a policy shall be delivered by Tenant to Landlord at least 10 days prior to the expiration of such policy. In lieu of the policies of insurance required to be delivered to Landlord pursuant to this Article (the "Policies"), Tenant may deliver to Landlord a certification from Tenant's insurance company (on the form currently designated "Acord 27", or the equivalent, rather than on the form currently designated "Acord 25-S", or the equivalent) which shall be binding on Tenant's insurance company, and which shall expressly provide that such certification (i) conveys to Landlord and any other named insured and/or additional insured's thereunder (the "Insured Parties") all the rights and privileges afforded under the applicable Policies as primary insurance and (ii) contain an unconditional obligation of the insurance company to advise all Insured Parties in writing by certified mail, return receipt requested, at least 30 days in advance of any termination or change to the applicable Policies that would affect the interest of any of the Insured Parties. On or Prior to Commencement Date Landlord shall deliver to Tenant evidence of appropriate policies of insurance.

ALL1B01\182658\2
305217-3017970      23

Section 1.2          **Waiver of Subrogation.**

    Landlord and Tenant shall each procure an appropriate clause in or endorsement to any property insurance covering the Premises, the Building and personal property, fixtures and equipment located therein, wherein the insurance companies shall waive subrogation or consent to a waiver of right of recovery, and Landlord and Tenant agree not to make any claim against, or seek to recover from, the other for any loss or damage to its property or the property of others resulting from fire and other hazards to the extent covered by such property insurance provided, however, that the release, discharge, exoneration and covenant not to sue contained herein shall be limited by and coextensive with the terms and provisions of the waiver of subrogation or waiver of right of recovery. If the payment of an additional premium is required for the inclusion of, or consent to, a waiver of subrogation, each party shall advise the other, in writing, of the amount of any such additional premiums and the other party may pay such additional premium. If such other party shall not elect to pay such additional premium, then the first party shall not be required to obtain such waiver of subrogation or consent to waiver. Tenant acknowledges that Landlord shall not carry insurance on, and shall not be responsible for, (a) damage to any Decorative Alterations, (b) Tenant's Property and (c) any loss suffered by Tenant due to interruption of Tenant's business.

## ARTICLE 13

## DESTRUCTION - FIRE OR OTHER CAUSE

Section 1.1    **Restoration.**

    If the Premises are damaged by fire or other casualty, or if the Building is damaged such that Tenant is deprived of reasonable access to the Premises, Tenant shall give prompt notice to Landlord, and the damage shall be repaired by Landlord, at its expense, to substantially the condition of the Premises prior to the damage  subject to the provisions of any Mortgage or Superior Lease, but Landlord shall have no obligation to repair or restore (a) Tenant's Property or (b) any Decorative Alterations –Until such time as the restoration of the Premises is Substantially Completed or would have been Substantially Completed but for Tenant Delay, Fixed Rent and Tenant's Tax Payment shall be reduced in the proportion by which the area of the part of the Premises (excluding any portion thereof then used principally for storage) which is not usable (or accessible) and is not used by Tenant bears to the total area of the Premises (excluding any such portion).

Section 1.2          **Landlord's Termination Right.**

ALLIB01\182658\2
305217-3017970                                              24

Notwithstanding anything to the contrary contained in As written in this Lease , if the Premises are totally damaged or are rendered wholly untenantable, or if the Building is so damaged that, in Landlord's reasonable opinion, substantial alteration, demolition, or reconstruction of the Building is required whether or not the Premises are so damaged or rendered untenantable), Or if 50% or more of the Premises is totally damaged and are thereby rendered substantially untenantable, then in either of such events, Landlord may, not later than 120 days following the date of the damage, give Tenant a notice terminating this Lease, (i) the Term shall expire upon the date set forth in Landlord's notice, which shall not be less than 30 days after such notice is given, and Tenant shall vacate the Premises and surrender the same to Landlord no later than the date set forth in the notice, (ii) Tenant's liability for Rent shall cease as of the date of the damage and (iii) any prepaid Rent for any period after the date of the damage shall be refunded by Landlord to Tenant.

### Section 1.3 **Tenant's Termination Right**.

If more than 50% of the Premises is totally damaged and are thereby rendered substantially untenantable, or in the case of damage or destruction to the public portions of the Building necessary for access to the Premises, and- if Landlord elects to restore the Premises, Landlord shall, within 75 days following the date of the damage, cause a contractor or architect selected by Landlord to give notice (the "**Restoration Notice**") to Tenant of the date by which such contractor or architect estimates the restoration of the Premises shall be Substantially Completed. If such date, as set forth in the Restoration Notice, is more than 7 months from the date of such damage (the "**Outside Repair Date**"), then Tenant shall have the right to terminate this Lease by giving notice (the "**Termination Notice**") to Landlord not later than 30 days following Tenant's receipt of the Restoration Notice. In addition, if Tenant elects not to terminate this Lease in the manner set forth above and the restoration of the Premises is not completed by the Outside Repair Date (as such date may be extended due to adjustment of insurance claims, Unavoidable Delay or Tenant Delay) and provided Landlord is not diligently proceeding with the restoration of the Premises, Tenant shall have the right to terminate this Lease by a Termination Notice given to Landlord not later than 30 days after the Outside Repair Date (as so extended). If Tenant delivers to Landlord a Termination Notice, this Lease shall be deemed to have terminated as of the date of the giving of the Termination Notice, in the manner set forth in the second sentence of Section 14.2.

### Section 1.4 **Damage During Final 18 Months.**

Notwithstanding anything set forth to the contrary in this lease, in the event that any damage rendering the Premises wholly untenantable occurs during the final 18 months of the Term, either Landlord or Tenant may terminate this Lease by notice to the other party within 30 days after the occurrence of such damage and this Lease shall expire on the 30th day after the date of such notice. For purposes of this Section 14.4, the Premises shall be deemed wholly untenantable if due to such damage, Tenant shall be precluded from using more than 50% of the Premises for the conduct of its business and Tenant's inability to so use the Premises is reasonably expected to continue until at least the earlier of (a) the Expiration Date and (b) the 90th day after the date when such damage occurs.

### Section 1.5 **Waiver of Real Property Law § 227.**

This Article 14 constitutes an express agreement governing any case of damage or destruction of the Premises or the Building by fire or other casualty, and Section 227 of the Real Property Law of the State of New York, which provides for such contingency in the absence of an express agreement, and any other applicable Requirement of like nature and purpose now or hereafter in force, shall have no application in any such case.

Section 1.6         :

    **Landlord's Liability** Any Building employee to whom any property shall be entrusted by or on behalf of Tenant shall be deemed to be acting as Tenant's agent with respect to such property and neither Landlord nor any of the Indemnities shall be liable for any damage to such property, or for the loss of or damage to any property of Tenant by theft or otherwise. No penalty shall accrue for delays that may arise by reason of adjustment of fire insurance on the part of Landlord or Tenant, or Unavoidable Delays, in connection with any repair or restoration of any portion of the Premises or of the Building. Landlord shall use reasonable efforts to minimize interference with Tenant's use and occupancy of the Premises during the performance of any such repair or restoration, provided, however, that Landlord shall have no obligation to employ contractors or labor at overtime or other premium pay rates or to incur any other overtime costs or additional expenses whatsoever. Nothing in this Section shall affect any right of Landlord to be indemnified by Tenant under as written in this lease for payments made to compensate for losses of third parties.

## ARTILCE 14

## EMINENT DOMAIN

### Section 1.1   **Taking.**

    (a)    Total Taking. If all or substantially all of the Premises, the Building or the Real Property shall be acquired or condemned for any public or quasi-public purpose, this Lease shall terminate and the Term shall end as of the date of the vesting of title, with the same effect as if such date were the Expiration Date, and Rent shall be prorated and adjusted as of such date.

    (b)    Partial Taking. If only a part of the Premises, the Building or the Real Property shall be acquired or condemned, this Lease and the Term shall continue in full force and effect, provided that from and after the date of the vesting of title, the Fixed Rent, Tenant's Tax Payment and Tenant's Proportionate Share shall be modified to reflect the reduction of the Premises and/or the Building as a result of such acquisition or condemnation.

    (c)    Landlord's Termination Right. , Landlord/Tenant may give to Tenant/Landlord, within 60 days following the date upon which Landlord receives notice that all or a portion of the Building or the Real Property has been acquired or condemned, a notice of termination of this Lease, provided 50% of the rentable area of the Building is impacted by the condemnation. Apportionment of Rent. Upon any termination of this Lease pursuant to the provisions of this

Lease, Fixed Rent and Tenant's Tax Payment shall be apportioned as of, and shall be paid or refunded up to and including, the date of such termination.

(d)    Applicability. The provisions of Sections 15.1 and 15.2 shall not apply to any acquisition or condemnation of all or any part of the Premises for a period of 18 months or less.

Section 1.2        **Awards.**

Upon any acquisition or condemnation of all or any part of the Real Property, Landlord shall receive the entire award for any such acquisition or condemnation, however Tenant shall have the right to claim against the condemning authority for the value of any unexpired portion of the Term, Tenant's Alterations or improvements; Nothing contained in this Article shall be deemed to prevent Tenant from making a separate claim in any condemnation proceedings for the then value of any Tenant's Property or Specialty Alteration included in such taking and for any moving expenses, provided any such award is in addition to, and does not result in a reduction of, the award made to Landlord.

Section 1.3        **Temporary Taking.**

## ARTICLE 15

## ASSIGNMENT AND SUBLETTING

### Section 1.1    **Assignment or Subletting.**

(a)    No Assignment or Subletting.(Other than the Permitted Sublets)  Except as expressly set forth herein, Tenant shall not- have the right to , directly or indirectly, assign, mortgage, pledge, encumber, or otherwise transfer this Lease, whether by operation of law or otherwise, and shall not sublet (or underlet), license. franchise, permit or suffer the Premises or any part thereof to be used or occupied by others (whether for desk space, mailing privileges or otherwise), without obtaining Landlord's prior written consent in each instance. Landlord shall not unreasonably withhold, delay or condition consent. Landlord shall be required to give his decision of consent within 10 business days of written request Any assignment, sublease, license, franchise, mortgage, pledge, encumbrance or transfer in contravention of the provisions as written in this lease shall be null and void. If Tenant seeks to assign any interest in this Lease to another tenant or sublet any interest in the Premises, then in each such instance Tenant shall seek Landlord's prior written approval which shall not be unreasonably withheld, conditioned or delayed. Tenants right to assign or sublet shall not be available in the event it is in default of this lease beyond applicable notice and cure period.

(b)    Collection of Rent. If, without Landlord's consent, this Lease is assigned, or the entire Premises is sublet, Landlord may collect rent from the assignee or subtenant, and apply the net amount collected to the Rent herein reserved until consent is obtained. No such collection of rent shall be deemed to be (i) a waiver of the provisions of this as written in this lease(ii) an acceptance of the assignee, subtenant as tenant, or (iii) a release of Tenant from the performance

ALLIB01\182658\2
305217-3017970                                    27

of any of the terms, Tenant's covenants and conditions to be performed by hereunder. Tenant shall remain fully liable for the obligations under this Lease, including the payment of Rent.

(c)   Further Assignment/Subletting.   Landlord's consent to any assignment or subletting shall not relieve Tenant from the obligation to obtain Landlord's express consent to any further assignment or subletting. In no event shall any permitted subtenant assign or encumber its sublease or further sublet any portion of its sublet space, or otherwise suffer or permit any portion of the sublet space to be used or occupied by others without Landlord's consent. If payment for Rent or Additional Rent payment is not received by Landlord from Tenant on the tenth (10th) day of the month, than after notice to Tenant and failure to cure as provided in the Default provisions of this Lease, Landlord shall have the right to collect rent due under the sublease from subtenant. This provision is to be added to any sublease agreement that tenant may enter, so as to obligate subtenant to pay Landlord all rents due under its sublease in the event Tenant does not pay his Rent or Additional Rent on the tenth day of the month as set forth above A copy of all sublease agreement must be executed by landlord and tenant will provide such copy of lease upon execution.

Section 1.2          **Tenant's Notice.**

If Tenant desires to assign this Lease or sublet all or any portion of the Premises and consent is required, Tenant shall give notice thereof to Landlord (the "Assignment/Sublet Notice Date"), which shall be accompanied by (i) the date Tenant desires the assignment or sublet to be effective (the "Assignment/Sublet Start Date"), and (ii) (A) the material business terms on which Tenant would offer to assign or sublet such premises, and (B) a description of the portion of the Premises to be sublet or assigned.

Section 1.3          **Conditions to Assignment/Subletting.**

(a)   Consent.   Landlord   may give consent   to the tenant provided the following conditions: receipt of (i) a true and complete statement reasonably detailing the identity of the proposed assignee or subtenant, the nature of its business and its proposed use of the Premises, or sublet space, as the case may be, (ii) current financial information with respect to the proposed assignee or subtenant, including its most recent financial statements, and (iii) any other information Landlord may reasonably request, provided that:

(i)   in Landlord's reasonable judgment, the proposed assignee or subtenant is engaged in a business or activity, and the Premises, or sublet space, as the case may be, will be used in a manner, which does not violate any restrictions set forth in this Lease, negative covenant as to use of the Premises required by any other lease in the Building;

(ii)   the proposed assignee or subtenant is a reputable Person or entity in good standing with sufficient financial means to perform all of its obligations under this Lease or the sublease, as the case may be, and Landlord has been furnished with reasonable proof thereof, and Landlord or any managing member of Landlord is not litigating against or has been threatened with litigation by such proposed assignee of subtenant or its Affiliates within the prior 12 months;

(iii)   the proposed assignee or subtenant shall not be entitled, directly or

indirectly, to diplomatic or sovereign immunity, regardless of whether the proposed assignee or subtenant agrees to waive such diplomatic or sovereign immunity, and shall be subject to the service of process in, and the jurisdiction of the courts of, the City and State of New York;

(iv)     if the proposed subtenant or assignee is an entity organized under the laws of any jurisdiction other than the United States or any state thereof, or is not a United States citizen, if an individual, such Person shall waive any immunity to which it may be entitled, and shall be subject to the service of process in, and the jurisdiction of the courts of, the City and State of New York;

(b)     In the event of a sublease, tenant must include a clause in the Sub Lease agreement, giving the Landlord the right to collect monthly rent and additional rent directly from subtenant should the tenant pay it's rent or additional rent after the tenth day of the month in which it is due. The sublease agreement should state "that should Tenant fail to pay his rent on 10th of the month, after notice to tenant and failure to cure period as provided in Default provision in this lease then subtenant is obligated to pay all rents due under its sublease directly to Landlord.

(c)     Other Requirements. With respect to each and every subletting and/or assignment authorized by Landlord under the provisions of this Lease, it is further agreed that

(i)     the form of the proposed assignment or sublease and the form of Landlord's consent shall be reasonably satisfactory to Landlord and shall comply with the provisions of th$^{is}$ Article;

(ii)     no sublease shall be for a term ending later than one day prior to the Expiration Date of this Lease;

(iii)     no subtenant shall take possession of any part of the Premises, until an executed counterpart of such sublease has been delivered to Landlord and approved by Landlord as provided in this Lease.

(iv)     if an Event of Default beyond any applicable cure period shall occur at any time prior to the effective date of such assignment or subletting, then Landlord's consent thereto, if previously granted, shall be immediately deemed revoked without further notice to Tenant, and if such assignment or subletting , such permission shall be void and without force and effect, and in either such case, any such assignment or subletting shall constitute a further Event of Default hereunder ; and

(v)     each sublease shall be subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate, it being the intention of Landlord and Tenant that Tenant shall assume and be liable to Landlord for any and all acts and omissions of all subtenants and anyone claiming under or through any subtenants which, if performed or omitted by Tenant, would be a default

under this Lease; and Tenant and each subtenant shall be deemed to have agreed that upon the occurrence and during the continuation of an Event of Default hereunder, Tenant has hereby assigned to Landlord, and Landlord may, at its option, accept such assignment of, all right, title and interest of Tenant as sublandlord under such sublease, together with all modifications, extensions and renewals thereof then in effect, and such subtenant shall, at Landlord's option and upon notice from Landlord, attorn to Landlord pursuant to the then executory provisions of this Lease other than the monetary terms of this Lease, which monetary terms shall be governed by the terms of such sublease, except that Landlord shall not be (A) liable for any previous act or omission of Tenant under such sublease, (B) subject to any counterclaim, offset or defense, which theretofore accrued to such subtenant against Tenant, (C) bound by any previous modification of such sublease not consented to by Landlord, or by any prepayment of more than one month's rent and additional rent under such sublease, (D) bound to return such subtenant's security deposit, if any, except to the extent that Landlord shall receive actual possession of such deposit and such subtenant shall be entitled to the return of all or any portion of such deposit under the terms of its sublease, or (E) obligated to make any payment to or on behalf of such subtenant, or to perform any work in the subleased space or the Building, or in any way to prepare the subleased space for occupancy, beyond Landlord's obligations under this Lease. The provisions of as written in this lease)(v) shall be self-operative, and no further instrument shall be required to give effect to this provision, provided that the subtenant shall execute and deliver to Landlord any instruments Landlord may reasonably request to evidence and confirm such subordination and attornment.

(vi)    Nothing contained herein to the contrary, if Tenant sublets 2,500 square feet or less Landlord's consent is not required, provided that Tenant must inform Landlord of its sublet and supply copy of lease and contact information("Permitted Sublets")

Section 1.4          **Binding on Tenant; Indemnification of Landlord.**

Notwithstanding any assignment or subletting or any acceptance of Rent by Landlord from any assignee or subtenant, Tenant shall remain fully liable for the payment of all Rent due and for the performance of all other terms, covenants and conditions contained in this Lease on Tenant's part to be observed and performed, and any default under any term, covenant or condition of this Lease by any subtenant or assignee or anyone claiming under or through any subtenant or assignee shall be deemed to be a default under this Lease by Tenant. In connection with the foregoing, Tenant waives any defenses that at law or in equity would limit or release its liability under the preceding sentence. Tenant shall indemnify, defend, protect and hold harmless Landlord from and against any and all Losses resulting from any claims that may be made against Landlord by the proposed assignee or subtenant or anyone claiming under or through any subtenant or by any brokers or other Persons claiming a commission or similar compensation in connection with the proposed assignment or sublease, irrespective of whether Landlord shall give or decline to give its consent to any proposed assignment or sublease, or if Landlord shall exercise any of its options as written in this lease

Section 1.5          **Transfers; Applicability; Takeover Agreements.**

(a)     The following shall each be deemed a voluntary assignment of this Lease for the
purposes of this as written in this lease each of the following may not be undertaken without
Landlord's prior consent

        (i)     Corporation. If Tenant is a corporation, either (1) the
        transfer by one or more transfers, directly or indirectly, by operation of
        law or otherwise, of a majority of the stock of Tenant or (2) the
        issuance of new stock or treasury stock which results in a majority of
        the stock of Tenant being held by a Person or Persons that do not hold a
        majority of the stock of Tenant on the date hereof, except in each
        instance to an  immediate family member or to a trust or otherwise for
        estate planning purposes owned  by or for the benefit of Silva Umukoro
        or  his immediate family members

        (ii)    Partnership. If Tenant is a partnership, the transfer by one or more
transfers, directly or indirectly, by operation of law or otherwise, of Control or a majority
interest in such partnership in such partnership or otherwise in violation of the provisions
of this lease

        (iii)   Limited Liability Company or Other Legal Entity. If Tenant is a
limited liability company, trust, or any other legal entity, the transfer by one or more
transfers, directly or indirectly, by operation of law or otherwise, of or beneficial interests
in such entity.

        (b)     Permitted Assignments. Notwithstanding anything to the contrary set forth in as
written in this lease ) above, the following shall each be deemed not to constitute a voluntary
assignment of this Lease (and thus the terms of as written in this lease, are not applicable thereto
and each of the following may be undertaken without Landlord's prior consent):

        (i)     Publicly Traded Ownership Interests. Transfers of shares of stock,
partnership units or limited liability membership interests (or other ownership interest)
(collectively, "**Ownership Interests**") of Tenant if and so long as Tenant is publicly
traded on a nationally recognized exchange or through the "over-the-counter" market.

        (ii)    Death of Transferor. Transfers of Ownership Interests in connection
with the death of a shareholder, partner, member or

> other equity-holder (as applicable) of Tenant or to a trust or otherwise for the
> estate planning purposes owned by or for the benefit of Silva or his immediate
> family members.

Section 1.6        **Assumption of Obligations.**

Any assignment or transfer, made with Landlord's required consent , if and to the extent
permitted hereunder, shall not be effective unless and until the assignee executes, acknowledges
and delivers to Landlord (a) an agreement in form and substance reasonably satisfactory to
Landlord whereby the assignee (i) assumes Tenant's obligations under this Lease and (ii) agrees
that, notwithstanding such assignment , the provisions of Section 16.1 hereof shall be binding
upon it in respect of all future assignments and transfers and (b) certificates or policies of
insurance as required under as written in this lease.

Section 1.7        **Listings in Building Directory.**

The listing of any name other than that of Tenant on the doors of the Premises, any
Building directory or elsewhere shall not vest any right or interest in this Lease or in the
Premises, nor be deemed to constitute Landlord's consent to any assignment or transfer of this
Lease or to any sublease of the Premises or to the use or occupancy thereof by others. Any such
listing shall constitute a privilege revocable in Landlord's discretion by notice to Tenant.

Section 1.8        **Electric Service Disruption.**

Landlord shall not be liable in any way to Tenant for any failure, defect or interruption of,
or change in the supply, character and/or quantity of, electric service furnished to the Premises
for any reason except if attributable solely to the gross negligence or willful misconduct of
Landlord (but in no event shall Landlord be responsible for any consequential damages), nor
shall there be any allowance to Tenant for a diminution of rental value, nor shall the same
constitute an actual or constructive eviction of Tenant, in whole or in part, or relieve Tenant from
any of its Lease obligations, and no liability shall arise on the part of Landlord by reason of
inconvenience, annoyance or injury to business, whether electricity is provided by public or
private utility or by any electricity generation system owned and operated by Landlord. In
addition to Landlord's obligations hereunder, Landlord shall use reasonable efforts to minimize
interference with Tenant's use and occupancy of the Premises as a result of any such failure,
defect or interruption of, or change in the supply, character and/or quantity of, electric service,
provided that Landlord shall have no obligation to employ contractors or labor at overtime or
other premium pay rates or to incur any other overtime costs or additional expenses whatsoever.

## ARTICLE 16

## ACCESS TO PREMISES

Section 1.1        **Access.**

(a)     Right to Inspect and Show.  Subject to Landlord's obligation to use reasonable efforts to minimize interference with Tenant's occupancy, Landlord, any Lessor or Mortgagee and any other party designated by Landlord and their respective agents shall have the right to enter the Premises at all reasonable times, upon reasonable notice (which notice may be oral) except in the case of emergency, (i) to examine the Premises, (ii) to show the Premises to prospective purchasers, Mortgagees or Lessors of the Building and their respective agents and representatives or others, and during the last 18 months of the Term to prospective lessees of premises in the Building and (iii) to make such repairs, alterations or additions to the Premises or the Building (A) as Landlord may deem necessary or appropriate, including the right to modify or change the facade of and the windows in the Building and to install solar film on the windows, (B) which Landlord may elect to perform following Tenant's failure to perform or (C) to comply with any Requirements, and Landlord shall be allowed to take all material into the Premises that may be required for the performance of such work without the same constituting an actual or constructive eviction of Tenant in whole or in part and without any abatement of Rent only within the last 90 days of tenant's lease.

(b)     Right to Use and Access for Purpose of Building Operation.  All parts (except surfaces facing the interior of the Premises) of all walls, windows and doors bounding the Premises, including exterior Building walls, exterior core corridor walls, and doors and entrances (other than doors and entrances solely connecting areas within the Premises), all balconies, terraces and roofs adjacent to the Premises, all space in or adjacent to the Premises used for shafts, stacks, risers, fan rooms, electrical and communication closets, stairways, mail chutes, conduits and other mechanical facilities, Building Systems and Building facilities are not part of the Premises, and Landlord shall have the use thereof and access thereto through the Premises for the purposes of Building operation, maintenance, alteration and repair.

Section 1.2          **Intentionally Deleted.**

Section 1.3          **Alterations to Building.**

. Landlord has the right at any time to (a) change the name, number or designation by which the Building is commonly known, (b) repair, modify, improve and alter the Building r excluding interior space(including, without limitation, to change the arrangement or location of entrances or passageways, concourses, plazas, doors and doorways, and corridors, elevators, stairs, toilets or other public parts of the Building) without any such acts constituting an actual or constructive eviction and without incurring any liability to Tenant, so long as same does not deny Tenant access to the Premises nor materially diminish the character of the Building and Landlord shall use reasonable efforts to minimize interference with Tenant's use and occupancy of the Premises during the making of any such changes or alterations, provided that Landlord shall have no obligation to employ contractors or labor at overtime or other premium pay rates or to incur any other overtime costs or additional expenses, except to the extent the changes or alterations are of a nature that are typically performed at overtime Notwithstanding the above Landlord shall have the right to build additional space at the Building/Premises at its own cost and expense and said additional space shall not be a part of this lease. Provided in no event shall any such alteration or construction impose any obligations or restrictions on Tenant or diminish or impair its use and occupancy of or the Premises and all of its rights as set forth in this Lease. Prior to finalizing any plans to construct additional space, Landlord shall provide Tenant with

ALLIB01\182658\2
305217-3017970                          33

copies of all plans and specifications and give Tenant the opportunity to comment and make changes to any portion thereof (provided such changes shall not exceed 5% of the total cost of the project)which would impact on Tenant as provided above and to further shall coordinate with Tenant during any construction so that at all times Tenant's access to and use of the Premises shall not be impaired.

## ARTICLE 17

## DEFAULT

### Section 1.1 **Tenant's Defaults.**

Each of the following events shall be an "**Event of Default**" hereunder:

(a)     Failure to Pay. Tenant fails to pay when due any installment of (i) Fixed Rent and such default continues for 10 Business Days after notice from Landlord to Tenant of such default, and (ii) Additional Rent after such default continues for 20 Business Days after notice from Landlord to Tenant of such default or

(b)     Breach of Covenant or Condition. Tenant defaults in the observance or performance of any other term, covenant or condition of this Lease to be observed or performed by Tenant (other than a default of the type described in this lease and such default continues for more than 30 days after notice by Landlord to Tenant of such default; or if such default is of such a nature that it can be remedied but cannot be completely remedied within 30 days, Tenant fails to commence to remedy such default within 30 days after such notice or, with respect to any such default, Tenant, having commenced such remedy within 30 days after such notice, fails to diligently prosecute to completion all steps necessary to remedy such default or Tenant fails to complete such remedy within 90 days, or such longer reasonable time, provided, Tenant is diligently undertaking efforts to remedy such condition

(c)     Tenant's Interest Shall Devolve. Tenant's interest in this Lease shall devolve upon or pass to any Person, whether by operation of law or otherwise, except as expressly permitted under as written in this lease hereof; or

(d)     Voluntary Bankruptcy Petition; Insolvency. Tenant files a voluntary petition in bankruptcy or insolvency, or is adjudicated a bankrupt or insolvent, or files any petition or answer seeking any reorganization, liquidation, dissolution or similar relief under any present or future federal bankruptcy act or any other present or future applicable Requirements, or makes an assignment for the benefit of creditors or seeks or consents to or acquiesces in the appointment of any trustee, receiver, liquidator or other similar official for Tenant or for all or any part of Tenant's property; or

(e)     Involuntary Bankruptcy Petition. If, within 90 days after the commencement of any proceeding against Tenant, whether by the filing of a petition or otherwise, seeking bankruptcy, insolvency, reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy act or any other present or future applicable Requirements, such proceeding shall not have been dismissed, or if, within 60 days after the appointment of any trustee, receiver, liquidator or other similar official

for Tenant or for all or any part of Tenant's property, without the consent or acquiescence of Tenant, such appointment shall not have been vacated or otherwise discharged, or if any lien, execution or attachment or other similar filing shall be made or issued against Tenant or any of Tenant's property pursuant to which the Premises shall be taken or occupied or attempted to be taken or occupied by someone other than Tenant; or

(f)   Recourse to Security Deposit.   If Landlord applies or retains any part of the Security Deposit, and Tenant fails to deposit with Landlord the amount so applied or retained by Landlord, or to provide Landlord with a replacement Letter of Credit (as defined herein), if applicable, within 10 days after notice by Landlord to Tenant stating the amount applied or retained.

(g)   Tenant does not include provision in a sublease agreement  as required under the Assignment and Subletting provisions "if payment for Rent or Additional Rent payment is not received by Landlord from Tenant on the tenth (10th) day of the month, after notice to Tenant and failure to cure as provided in the Default provisions of this Lease Landlord shall have the right to collect rent due under the sublease from subtenant

(h)   Upon the occurrence of any one or more of such Events of Default, Landlord may, at its sole option, give to Tenant 3 days notice of cancellation of this Lease, in which event this Lease and the Term shall come to an end and expire (whether or not the Term shall have commenced) upon the expiration of such three day period with the same force and effect as if the date set forth in the notice was the Expiration Date stated herein; and Tenant shall then quit and surrender the Premises to Landlord, but Tenant shall remain liable for damages as provided in this lease

## ARTICLE 18

## REMEDIES AND DAMAGES

### Section 1.1   **Remedies; Tenant's Waiver; Other Remedies.**

(a)   Landlord's Remedies.   If any Event of Default occurs, or this Lease and the Term terminates as provided in this lease

(i)   Surrender of Possession.   Tenant shall quit and surrender the Premises to Landlord, and Landlord and its agents may immediately, or at any time after such Event of Default, re-enter the Premises or any part thereof, without notice, either by summary proceedings, or by any other applicable action or proceeding, or by force (to the extent permitted by applicable Requirements) or otherwise in accordance with applicable legal proceedings (without being liable to indictment, prosecution or damages therefor), and may repossess the Premises and dispossess Tenant and any other Persons from the Premises and remove any and all of their property and effects from the Premises.

(ii)   Landlord's Reletting.   Landlord, at Landlord's option, may relet all or any part of the Premises from time to time, either in

the name of Landlord or otherwise, to such tenant or tenants, for any term ending before, on or after the Expiration Date, at such rental and upon such other conditions (which may include concessions and free rent periods) as Landlord, in its sole discretion, may determine. Landlord shall have no obligation to and shall not be liable for refusal or failure to relet or, in the event of any such reletting, for refusal or failure to collect any rent due upon any such reletting; and no such refusal or failure shall relieve Tenant of or otherwise affect, any liability under this Lease, except to the extent required by law. Landlord, at Landlord's option, may make such alterations, decorations and other physical changes in and to the Premises as Landlord, in its sole discretion, considers advisable or necessary in connection with such reletting or proposed reletting, without relieving Tenant of any liability under this Lease or otherwise affecting any such liability. In the event Landlord relets the Premises, Landlord shall credit Tenant with the net rents received by Landlord from such reletting, such net rents to be determined by first deducting from the gross rents as and when received by Landlord from such reletting the expenses incurred or paid by Landlord in terminating this Lease or in re-entering the Premises and in securing possession thereof, as well as the expenses of reletting, including altering and preparing the Premises or any portion thereof for new tenants, brokers' commissions, advertising expenses, and all other expenses properly chargeable against the Premises and the rental therefrom; it being understood that any such reletting may be for a period shorter or longer than the remaining Term but in no event shall Tenant be entitled to receive any excess or such net rents other than sums payable by Tenant to Landlord hereunder, nor shall Tenant be entitled in any suit for the collection of damages pursuant to this subsection to a credit in respect of any net rents from a reletting, except to the extent that such net rents are actually received by Landlord.

(b)   Tenant's Waiver. Tenant, on its own behalf and on behalf of all persons claiming through or under Tenant, including all creditors, hereby waives all rights which Tenant and all such Persons might otherwise have under any Requirement (i) to the service of any notice of intention to re-enter or to institute legal proceedings, (ii) to redeem, or to re-enter or repossess the Premises, or (iii) to restore the operation of this Lease, after (A) Tenant shall have been dispossessed or ejected by judgment or by warrant of any court or judge, (B) any re-entry by Landlord, or (C) any expiration or early termination of the term of this Lease, whether such dispossession, re-entry, expiration or termination shall be by operation of law or pursuant to the provisions of this Lease. The words "re -enter", "re-entry" and "re-entered" as used in this Lease shall not be deemed to be restricted to their technical legal meanings.

(c)   Other Remedies. Upon the breach or threatened breach by Tenant, or any persons claiming through or under Tenant, of any term, covenant or condition of this Lease, Landlord shall have the right to enjoin such breach and to invoke any other remedy allowed by applicable Requirements or in equity as if re-entry, summary proceedings and other special remedies were not provided in this Lease for such breach. The rights to invoke the remedies set forth above are cumulative and shall not preclude Landlord from invoking any other remedy allowed at law or in equity.

Section 1.2      **Landlord's Damages: Reletting.**

(a)     Landlord's Damages. If this Lease and the Term expire and come to an end as provided in this Lease, or by or under any summary proceeding or any other action or proceeding, or if Landlord shall re-enter the Premises as provided in this Lease then, in any of such events:

Tenant shall pay to Landlord all Rent payable under this Lease by Tenant to Landlord up to the Expiration Date or to the date of re-entry upon the Premises by Landlord, as the case may be on the date upon which such rent would have otherwise been due unless the Landlord exercised its right to accelerate the rent. in which case Landlord agrees that it shall endeavor to mitigate damages after the tenant vacates the space pursuant to the terms of the Lease, by reletting the Premises at market rents and upon such reletting, Tenant shall only be responsible for a) payment of lost rent during the period in time in which the Premises were not leased plus b) an amount, if any, equal to the difference between the payable Rent under this Lease and the rent payable by the subsequent tenant(s), plus c) any damage caused to the Premises .

        (i)     Landlord shall be entitled to retain all monies, if any, paid by Tenant to Landlord, whether as prepaid Rent, any security deposit or otherwise, and to draw upon any letter of credit or other security deposited by Tenant hereunder and retain the proceeds thereof, which monies, to the extent not otherwise applied to amounts due and owing to Landlord, shall be credited by Landlord against any damages payable by Tenant to Landlord.  Notwithstanding the foregoing, if the amount of the security deposit is greater than the damages or any other amount owed to Landlord, the excess amount shall be returned to Tenant;

        (ii)    Tenant shall pay to Landlord, in monthly installments, on the days specified in this Lease for payment of installments of Fixed Rent, any Deficiency; it being understood that Landlord shall be entitled to recover the Deficiency from Tenant each month as the same shall arise, and no suit to collect the amount of the Deficiency for any month, shall prejudice Landlord's right to collect the Deficiency for any subsequent month by a similar proceeding; and

b)              Reletting. If the Premises, or any part thereof, shall be relet together with other space in the Building, the rents collected or reserved under any such reletting and the expenses of any such reletting shall be equitably apportioned for the purposes of this lease.  Tenant shall not be entitled to any rents collected or payable under any reletting, whether or not such rents exceed the Fixed Rent reserved in this Lease.  Nothing contained in this paragraph shall be deemed to limit or preclude the recovery by Landlord from Tenant of the maximum amount allowed to be obtained as damages under applicable Requirements, or of any sums or damages to which Landlord may be entitled in addition to the damages set forth in this lease.

                Section 1.3   **Default Interest; Other Rights of Landlord**.

        Any damages payable under this Lease and not paid when due shall bear interest at the Interest Rate from the due date until paid, and the interest shall be deemed Additional Rent. If

ALLIB01\182658\2
305217-3017970                              37

Tenant fails to pay any Additional Rent when due, Landlord, in addition to any other right or remedy, shall have the same rights and remedies as in the case of a default by Tenant in the payment of Fixed Rent. If Tenant is in arrears in the payment of Rent, Tenant waives Tenant's right, if any, to designate the items against which any payments made by Tenant are to be credited, and Landlord may apply any payments made by Tenant to any items Landlord sees fit, regardless of any request by Tenant.

## ARTICLE 19

## LANDLORD'S RIGHT TO CURE; FEES AND EXPENSES

### Section 1.1   Landlord's Right to Cure.

If Tenant defaults in the performance of its obligations under this Lease after notice and opportunity to cure, Landlord, without thereby waiving such default, may perform such obligation for the account and at the expense of Tenant: (a) immediately or at any time thereafter and without notice, in the case of emergency or in the case the default (i) materially interferes with the use by any other tenant of any space in the Building, (ii) materially interferes with the efficient operation of the Building, (iii) will result in a violation of any Requirement, (iv) will result in a cancellation of any insurance policy maintained by Landlord, or (v) will result in a breach of or default under any Superior Lease or Mortgage, and (b) in any other case if such default continues after 30Business Days from the date Landlord gives notice of Landlord's intention so to perform the defaulted obligation if Tenant does not cure within such 30 Business Day period. Landlord at its sole discretion may choose to extend this cure period if Tenant is diligently working on the repairs  Notwithstanding the foregoing, Landlord shall use its reasonable efforts to notify Tenant of Landlord's intent to perform any Tenant obligation, provided, however, that a failure of Landlord to provide such notice shall not prevent Landlord from collecting its costs from Tenant nor of calling a default with respect to such Tenant obligation. All actual costs and expenses incurred by Landlord in connection with any such performance by it for the account of Tenant and all costs and expenses, including reasonable counsel fees and disbursements, incurred by Landlord in any action or proceeding (including any summary dispossess proceeding) brought by Landlord to enforce any obligation of Tenant under this Lease and/or right of Landlord in or to the Premises, shall be paid by Tenant to Landlord on demand, with interest thereon at the Interest Rate from the date incurred by Landlord. Except as expressly provided to the contrary in this Lease, all out-of-pocket costs and expenses which, pursuant to this Lease (including the Rules and Regulations) are incurred by Landlord and payable to Landlord by Tenant, and all charges, amounts and sums payable to Landlord by Tenant for any property, material, labor, utility or other services which, pursuant to this Lease or at the request and for the account of Tenant, are provided, furnished or rendered by Landlord, shall become due and payable by Tenant to Landlord in accordance with the terms of the bills rendered by Landlord to Tenant. Failing which Tenant's payment shall include interest thereon at the Interest Rate from the date incurred by Tenant.

If Landlord defaults in doing its -repairs or replacements as required in this lease, and if such default continues after 30Business Days from the date Tenant gives written notice of Tenant's intention so to perform the defaulted obligation (or such shorter period in the event of an emergency), Tenant may perform such obligation for the account and at the expense of Landlord. Tenant may choose to extend this cure period if Landlord is diligently working on the repairs. All out-of-pocket costs and expenses which, pursuant to this Lease (including the Rules and Regulations) are incurred by Tenant shall be payable to Tenant by Landlord, and hall become due and payable to Tenant by Landlord within 30 business day from the date of the invoice.: Failing which Landlord's payment shall include interest thereon at the Interest Rate from the date incurred by Tenant.

Section 1.2          **Reimbursement For Tenant's Default.**

Tenant shall reimburse Landlord, within 10 days after demand, for all actual expenditures (including reasonable attorney fees and disbursements) made by, or damages, costs or fines sustained or incurred by, Landlord due to any default by Tenant under this Lease, with interest thereon at the Interest Rate, from the date such expenditures were made, or damages, costs or fines incurred, until the date reimbursed by Tenant.

## ARTICLE 20

## NO REPRESENTATIONS BY LANDLORD: LANDLORD'S APPROVAL

### Section 1.1   No Representations.

Except as expressly set forth herein, Landlord and Landlord's agents have made no warranties, representations, statements or promises with respect to (i) the rentable and usable areas of the Premises or the Building, (ii) the amount of any current or future Taxes or Wage Rate, (iii) the compliance with applicable Requirements of the Premises or the Building, or (iv) the suitability of the Premises for any particular use or purpose. No rights, easements or licenses are acquired by Tenant under this Lease by implication or otherwise. Tenant is entering into this Lease after full investigation and is not relying upon any statement or representation made by Landlord not embodied in this Lease.

Section 1.2          **Consents; Approvals.**

All references in this Lease to the consent or approval of Landlord mean the written consent or approval of Landlord, duly executed by Landlord not unreasonably withheld, conditioned or delayed.. unless specifically provided to the contrary in this Lease.

Section 1.3          **No Money Damages.**

Wherever in this Lease Landlord's consent or approval is required, if Landlord refuses to grant such consent or approval, whether or not Landlord expressly agreed that such consent or approval would not be unreasonably withheld, Tenant shall not make, and Tenant hereby waives,

any claim for money damages (including any claim by way of set-off, counterclaim or defense) based upon Tenant's claim or assertion that Landlord unreasonably withheld or delayed its consent or approval. Tenant's sole remedy shall be an action or proceeding to enforce such provision, by specific performance, injunction or declaratory judgment. In no event shall Landlord be liable for, and Tenant, on behalf of itself and all other Tenant Parties, hereby waives any claim for, any indirect, consequential or punitive damages, including loss of profits or business opportunity, arising under or in connection with this Lease, even if due to the gross negligence or willful misconduct of Landlord of its agents or employees. Notwithstanding the foregoing, and solely with respect to a dispute over Landlord's refusal to grant any consent or approval under this Lease where Landlord's consent or approval is expressly required not to be unreasonably withheld, Tenant shall be entitled and Landlord agrees to submit such dispute to expedited arbitration before the American Arbitration Association

Miscellaneous.

Notwithstanding the foregoing, Landlord represents and warrants that, as of the date hereof, Landlord is the sole owner of fee title to the Building subject to no ground leases.

## ARTICLE 21

### END OF TERM

#### Section 1.1 **Expiration.**

Upon the expiration or other termination of this Lease, Tenant shall quit and surrender the Premises to Landlord, vacant, broom clean and in good order and condition, ordinary wear and tear and damage for which Tenant is not responsible under the terms of this Lease excepted, and Tenant shall remove all of Tenant's Property and Tenant's Specialty Alterations as may be required pursuant to as written in this Lease provided same are removable. The foregoing obligation shall survive the expiration or sooner termination of the Term. If the last day of the Term or any renewal thereof falls on Saturday or Sunday, this Lease shall expire on the immediately preceding Business Day.

Section 1.2 **Holdover Rent.**

Landlord and Tenant recognize that the damage to Landlord resulting from any failure by Tenant to timely surrender possession of the Premises may be substantial, may exceed the amount of the Rent theretofore

payable hereunder, and will be impossible to measure accurately. Tenant therefore agrees that if possession of the Premises is not surrendered to Landlord on or before the Expiration Date or sooner termination of the Term, in addition to any other rights or remedies Landlord may have hereunder or at law, Tenant shall (a) pay to Landlord for each month (or any

portion thereof) during which Tenant holds over in the Premises after the Expiration Date or
sooner termination of the Term, a sum equal to the one and three-quarters (1 ¾) times the Rent
payable under this Lease for the last full calendar month of the Term No holding-over by Tenant,
nor the payment to Landlord of the amounts specified above, shall operate to extend the Term
hereof. Nothing herein contained shall be deemed to permit Tenant to retain possession of the
Premises after the Expiration Date or sooner termination of this Lease (including, without
limitation, pursuant to any month-to-month or other periodic tenancy) and no acceptance by
Landlord of payments from Tenant after the Expiration Date or sooner termination of the Term
shall be deemed to be other than on account of the amount to be paid by Tenant in accordance
with the provisions of this Article 23. All of Tenant's obligations under this Article shall survive
the expiration or earlier termination of the Term of this Lease.

Section 1.3          **Waiver of Stay.**

            Tenant expressly waives, for itself and for any Person claiming through or under Tenant,
any rights which Tenant or any such Person may have under the provisions of Section 2201 of
the New York Civil Practice Law and Rules and of any successor law of like import then in
force, in connection with any holdover summary proceedings which Landlord may institute to
enforce the foregoing provisions of this Article

## ARTICLE 22

## QUIET ENJOYMENT

            Provided this Lease is in full force and effect and no Event of Default then exists, Tenant
may peaceably and quietly enjoy the Premises without hindrance by Landlord or any Person
lawfully claiming through or under Landlord subject to the terms and conditions of this Lease
and to all Superior Leases and Mortgages

## ARTICLE 23

## NO SURRENDER; NO WAIVER

Section 1.1          **No Surrender or Release.**

            No act or thing done by Landlord or Landlord's agents or employees during the Term
shall be deemed an acceptance of a surrender of the Premises, and no provision of this Lease
shall be deemed to have been waived by Landlord, unless such waiver is in writing and is signed
by Landlord, and any such waiver shall be effective only for the specific purpose and in the

ALLIB01\182658\2
305217-3017970                        41

specific instance in which given. If Tenant at any time desires to have Landlord sublet the Premises for Tenant's account, Landlord or Landlord's agents are authorized to receive Tenant's keys to the Premises for such purpose without releasing Tenant from any of the obligations under this Lease, and Tenant hereby relieves Landlord of any liability for loss of or damage to any of Tenant's effects in connection with such subletting.

Section 1.2 **No Waiver.**

The failure of either party to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Lease, or any of the Rules and Regulations, shall not be construed as a waiver or relinquishment of the future performance of such obligations of this Lease or the Rules and Regulations, or of the right to exercise such election but the same shall continue and remain in full force and effect with respect to any subsequent breach, act or omission. The receipt by Landlord of any Rent payable pursuant to this Lease or any other sums with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver of such breach. No payment by Tenant or receipt by Landlord of a lesser amount than the monthly Fixed Rent or Additional Rent herein stipulated shall be deemed to be other than a payment on account of the earliest stipulated Fixed Rent or Additional Rent, or as Landlord may elect to apply such payment, nor shall any endorsement or acceptance of any check or other payment in the face of a statement on such check or any letter accompanying such check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Fixed Rent or Additional Rent or pursue any other remedy provided in this Lease. The existence of a right of renewal or extension of this Lease, or the exercise of such right, shall not limit Landlord's right to terminate this Lease in accordance with the terms hereof.

## ARTICLE 24

### WAIVER OF TRIAL BY JURY

LANDLORD AND TENANT HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER ON ANY MATTERS IN ANY WAY ARISING OUT OF OR CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, OR THE ENFORCEMENT OF ANY REMEDY UNDER ANY REQUIREMENT. If Landlord commences any summary proceeding against Tenant, Tenant will not interpose any counterclaim of any nature or description in any such proceeding (unless failure to impose such counterclaim would preclude Tenant from asserting in a separate action the claim which is the subject of such counterclaim), and will not seek to consolidate such proceeding with any other action which may have been or will be brought in any other court by Tenant.

### INABILITY TO PERFORM

42

Landlord shall use reasonable efforts to promptly notify Tenant of any Unavoidable Delay that prevents Landlord from fulfilling any of its obligations under this Lease.

## ARTICLE 25

### NOTICES

Except as otherwise expressly provided in this Lease, consents, notices, demands, requests, approval or other communications given under this Lease shall be in writing and shall be deemed sufficiently given or rendered if delivered by hand (provided a signed receipt is obtained) or if sent by registered or certified mail (return receipt requested) or by a nationally recognized overnight delivery service making receipted deliveries or by facsimile transmission (provided confirmation of such transmission is obtained and a copy of the notice is sent by one of the other permitted means), addressed as follows:

If to Tenant:

Citicare Inc.
154 West 127th Street
New York, New York 10005
Attention:Silva Umukoro
PN# 212-749-3508
Fax No.: (212) 666-1679

with a copy to:

Evelyn S. Leonard, Esq.
P.O. Box 213
West Hurley. New York 12491 phone
No.: (917)270-4822

If to Landlord:

127TH ST PROPERTIES LLC, ("LLC")
POB 423
BROOKLYN, NY 11222
7186362004
_180 Classon Ave.
Brooklyn, NY 11205

With a copy to:

Tratner & Molloy

551 FIFTH AVENUE

NEW YORK, NY 10176

## ARTICLE 26

### RULES AND REGULATIONS

Tenant and all Tenant Parties shall observe and comply with the existing Rules and Regulations and any Rules and Regulations that are hereinafter enacted and universally applied to all office tenants of the Building, as supplemented or amended from time to time, provided that in case of any conflict or inconsistency between the provisions of this Lease and any of the Rules and Regulations as originally promulgated or as supplemented or amended from time to time, the provisions of this Lease shall control. Landlord reserves the right, from time to time, to adopt additional Rules and Regulations and to amend the Rules and Regulations then in effect. Nothing contained in this Lease shall impose upon Landlord any obligation to enforce the Rules and Regulations or terms, covenants or conditions in any other lease against any other Building tenant, and Landlord shall not be liable to Tenant for violation of the Rules and Regulations by any other tenant, its employees, agents, visitors or licensees, except that Landlord shall not enforce any Rule or Regulation against Tenant in a discriminatory fashion.


## ARTICLE 27

### VAULT SPACE

Notwithstanding anything contained in this Lease or indicated on any sketch, blueprint or plan, no vaults, vault space or other space outside the boundaries of the Real Property are included in the Premises. Landlord makes no representation as to the location of the boundaries of the Real Property. All vaults and vault space and all other space outside the boundaries of the Real Property that Tenant may be permitted to use or occupy are to be used or occupied under a revocable license. If any such license shall be revoked, or if the amount of such space shall be diminished as required by any Governmental Authority or by any public utility company, such revocation, diminution or requisition shall not (i) constitute an actual or constructive eviction, in whole or in part, (ii) entitle Tenant to any abatement or diminution of Rent, (iii) relieve Tenant from any of its obligations under this Lease, or (iv) impose any liability upon Landlord. Any fee, tax or charge imposed by any Governmental Authority for any such vaults, vault space or other space occupied by Tenant shall be paid by Tenant.


## ARTICLE 28

### BROKER

Each of Landlord and Tenant represents and warrants to the other that it has not dealt with any broker in connection with this Lease other than the Broker and that, to the best of its knowledge and belief, no other broker, finder or like entity procured or negotiated this Lease or is entitled to any fee or commission in connection herewith. Each of Landlord and Tenant shall indemnify, defend, protect and hold the other party harmless from and against any and all Losses

ALLIB01\182658\2
305217-3017970                                    44

which the indemnified party may incur by reason of any claim of or liability to any broker, finder or like agent (other than the Broker) arising out of any dealings claimed to have occurred between the indemnifying party and the claimant in connection with this Lease, or the above representation being false. Landlord shall be responsible for the commission due and payable to the Broker pursuant to a separate agreement.

## ARTICLE 29

## INDEMNITY

### Section 1.1    **Indemnity.**

(a)    Indemnification. Tenant or any Tenant Party shall  not do or permit to be done any act or thing upon the Premises or the Building which may subject  Landlord to any liability or responsibility for injury, damages to persons or property or to any liability by reason of any violation of law or of any Requirement, and shall exercise such control over the Premises as to fully protect the Indemnities against any such liability.  Tenant shall indemnify, defend, protect and hold harmless each of the Indemnities from and against any and all Losses, resulting from any claims (i) against the Indemnities arising from any act, omission or negligence of any Tenant or any accident, injury or damage whatsoever in or about the Premises (except to the extent caused by or arising out of the willful misconduct or gross negligence of Landlord or any of the Indemnities) caused to any person or to the property of any person and occurring during the Term or during the period of time, if any, prior to the commencement or following the expiration of the Term that any Tenant Party may have been given access to any portion of the Premises for the purpose of performing work or otherwise, in or about the Premises, and (ii) against the Indemnities resulting from any breach, violation or nonperformance of any covenant, condition or agreement of this Lease on the part of Tenant to be fulfilled, kept, observed and performed.

(b)    Indemnity Inclusions. As used in this Lease, the term "**Losses**" means any and all losses, liabilities, damages, claims, judgments, fines, suits, demands, costs, interest and expenses of any kind or nature (including reasonable attorneys' fees and disbursements) incurred in connection with any claim, proceeding or judgment and the defense thereof, and including all costs of repairing any damage to the Premises or the Building or the appurtenances of any of the foregoing to which a particular indemnity and hold harmless agreement applies.

### Section 1.2              **Defense and Settlement.**

If any claim, action or proceeding is made or brought against any Indemnitee, then upon demand by an Indemnitee, Tenant, at its sole cost and expense, shall resist or defend such claim, action or proceeding in the Indemnitee's name (if necessary), by attorneys approved by the Indemnitee, which approval shall not be unreasonably withheld. Attorneys for the Tenant's insurer shall hereby be deemed approved for purposes of as written in this lease Notwithstanding the foregoing, an Indemnitee may retain its own attorneys to participate or assist in defending any claim, action or proceeding involving potential liability of $750,000 or more, provided that the Tenat shall control the defense and the Tenant shall pay the reasonable fees and disbursements of such attorneys. Notwithstanding anything herein contained to the contrary, the

Tenant may direct the Indemnitee to settle any claim, suit or other proceeding, provided that (a) such settlement shall involve no obligation on the part of the Indemnitee other than the payment of money, (b) any payments to be made pursuant to such settlement shall be paid in full exclusively by the Tenant at the time such settlement is reached, (c) such settlement shall not require the Indemnitee to admit any liability, and (d) the Indemnitee shall have received an unconditional release from the other parties to such claim, suit or other proceeding.   The provisions of this Article  shall survive the expiration or earlier termination of this Lease.

———Section 1.3 Landlord shall indemnify, defend, protect and hold harmless Tenant and each of the Tenant Indemnitees from and against any and all Losses, resulting from any claims against the Tenant and Tenant Indemnitees arising from damages caused by Landlord, Landlord's agents, or Landlord's contractor's entry upon the premises, or negligence of Landlord Landlord's agents, or Landlord's contractor or against the Tenant Indemnities resulting from any breach, violatioin or nonperformance of any convenant, condition or agreement fo this Lease on the part of Landlord to be fulfilled, kept observed and performed. The provisions of sections 1.1 (b) and 1.2 of this article shall be applicable.;

## ARTICLE 30

## ADJACENT EXCAVATION; SHORING

If an excavation shall be made, or shall be authorized to be made, upon land adjacent to the Real Property, Tenant shall, upon notice, afford to the Person causing or authorized to cause such excavation license to enter upon the Premises for the purpose of doing such work as such Person shall deem necessary to preserve the wall or the Building from injury or damage and to support the same by proper foundations.  In connection with such license, Tenant shall have no right to claim any damages or indemnity against Landlord, or diminution or abatement of Rent, provided that Tenant shall continue to have access to the Premises.

## ARTICLE 31

## MISCELLANEOUS

Section 1.1   **Delivery.**

This Lease shall not be binding upon Landlord unless and until Landlord shall have executed and delivered a fully executed copy of this Lease to Tenant.

Section 1.2       **Transfer of Real Property.**

ALLIB01\182658\2
305217-3017970                                          46

Landlord's obligations under this Lease shall not be binding upon the Landlord named herein after the sale, conveyance, assignment or transfer or lease of Landlord's interest (collectively a "**Transfer**") by Landlord (or upon any subsequent landlord after the Transfer by such subsequent landlord) of its interest in the Building or the Real Property, as the case may be, and in the event of any such Transfer, Landlord (and any such subsequent landlord) shall be entirely freed and relieved of all covenants and obligations of Landlord hereunder, and the transferee of Landlord's interest (or that of such subsequent landlord) in the Building or the Real Property, as the case may be, shall be deemed to have assumed all obligations under this Lease.

Section 1.3          **Limitation on Liability.**

The liability of Landlord for Landlord's obligations under this Lease shall be limited to Landlord's interest from time to time in the Real Property and Tenant and any Tenant Party shall not look to any other property or assets of Landlord or the property or assets of any Indemnitees in seeking either to enforce Landlord's obligations under this Lease or to satisfy a judgment for Landlord's failure to perform such obligations; and none of the Indemnitees shall be personally liable for the performance of Landlord's obligations under this Lease.

Section 1.4          **Rent.**

Notwithstanding anything to the contrary contained in this Lease, all amounts payable by Tenant to or on behalf of Landlord under this Lease, whether or not expressly denominated Fixed Rent, Tenant's Tax Payment, Tenant's Operating Payment, ("if paid by Landlord based on the failure of Tenant to pay same")Additional Rent or Rent, shall constitute rent for the purposes of as written in this lease of the United States Bankruptcy Code and other Requirements.

Section 1.5          **Entire Agreement.**

This Lease (including any Schedules and Exhibits referred to herein and all supplementary agreements provided for herein) contains the entire agreement between the parties and all prior negotiations and agreements are merged into this Lease. All of the Schedules and Exhibits attached hereto are incorporated in and made a part of this Lease, provided that in the event of any inconsistency between the terms and provisions of this Lease and the terms and provisions of the Schedules and Exhibits hereto, the terms and provisions of this Lease shall control. All Article and Section references set forth herein shall, unless the context otherwise requires, be deemed references to the Articles and Sections of this Lease.

Section 1.6          **Governing Law.**

This Lease shall be governed in all respects by the laws of the State of New York applicable to agreements made and to be performed wholly within the State.

Section 1.7          **Unenforceability.**

ALLIB01\182658\2
305217-3017970                                    47

If any provision of this Lease, or its application to any Person or circumstance, shall ever be held to be invalid or unenforceable, then in each such event the remainder of this Lease or the application of such provision to any other Person or any other circumstance (other than those as to which it shall be invalid or unenforceable) shall not be thereby affected, and each provision hereof shall remain valid and enforceable to the fullest extent permitted by applicable Requirements.

Section 1.8          **Consent to Jurisdiction; Waiver of Immunity.**

(a)    Consent to Jurisdiction. Except as expressly provided to the contrary in this Lease, Tenant and any Tenant Party agree that all disputes arising, directly or indirectly, out of or relating to this Lease, and all actions to enforce this Lease, shall be dealt with and adjudicated in the state courts of the State of New York or the federal courts for the Southern District of New York; and for that purpose Tenant and any Tenant Party expressly and irrevocably submit themselves to the jurisdiction of such courts. Tenant and any Tenant Party agree that so far as is permitted under applicable Requirements, this consent to personal jurisdiction shall be self-operative and no further instrument or action, other than service of process in one of the manners specified in this Lease, or as otherwise permitted by applicable Requirements, shall be necessary in order to confer jurisdiction upon it in any such court. Tenant and any Tenant Party further agree that judgment against them in any such action or proceeding shall be conclusive and, to the extent permitted by applicable Requirements, may be enforced in any other jurisdiction within or outside the United States of America by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and of the amount of its indebtedness.

(b)    Waiver of Immunity. To the extent that Tenant and any Tenant Party have or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, Tenant irrevocably waives such immunity in respect of its obligations under this Lease.

Section 1.9          **Landlord's Agent.**

Unless Landlord shall render written notice to Tenant to the contrary, Landlord's Agent is authorized to act as Landlord's agent in connection with the performance of this Lease, and Tenant shall direct all correspondence and requests to, and shall be entitled to rely upon correspondence received from, Landlord's Agent, as agent for Landlord. Tenant acknowledges that Landlord's Agent is acting solely as agent for Landlord in connection with the foregoing; and neither Landlord's Agent nor any of its direct or indirect partners, officers, shareholders, directors, employees, principals, agents or representatives shall have any liability to Tenant in connection with the performance of this Lease, and Tenant waives any and all claims against any and all of such parties arising out of, or in any way connected with, this Lease, the Building or the Real Property.

Section 1.10 _____ **Estoppels. And SNDA** Tenant agrees Within 7 days following request from Landlord, any Mortgagee or any Lessor Tenant, shall deliver to Landlord a written statement  Estoppel and SNDA executed and acknowledged by Tenant, in form satisfactory to Landlord;

(a) stating the Commencement Date, and the Expiration Date, and that this Lease is then in full force and effect and has not been modified (or if modified, setting forth all modifications) and, if requested, certifying as to a copy of this Lease, as it may have been amended;

(b) setting forth the date to which the Fixed Rent and any Additional Rent have been paid, together with the amount of monthly Fixed Rent and Tenant's Tax Payment then payable;

(c) stating whether or not, to the best of Tenant's knowledge, Landlord is in default under this Lease, and, if Tenant asserts that Landlord is in default, setting forth the specific nature of any such defaults;

(d) stating whether Landlord has failed to complete any work required to be performed by Landlord under this Lease;

(e) stating whether there are any sums payable to Tenant by Landlord under this Lease;

(f) stating the amount of the Security Deposit, if any, under this Lease;

(g) stating whether there are any subleases or assignments affecting the Premises;

(h) stating the address of Tenant to which all notices and communications under the Lease shall be sent; and

(i) responding to any other matters reasonably requested by Landlord, such Mortgagee or such Lessor.

Tenant acknowledges that any statement delivered pursuant to this Lease may be relied upon by (i) any proposed purchaser of all or any portion of Landlord's interest in the Real Property, the Building or any Superior Lease, (ii) any proposed lender of any such purchaser, (iii) any owner of the Real Property, the Building or all or any portion of Landlord's interest in the Real Property, the Building or any Superior Lease, (iv) any proposed or existing Mortgagee, or assignee thereof, (v) any proposed or existing Lessor, or assignee thereof

Section 1.11

## Certain Rules of Interpretation.

For purposes of this Lease, whenever the words "include", "includes", or "including" are used, they shall be deemed to be followed by the words "without being limited to" and, whenever the circumstances or the context requires, the singular shall be construed as the plural, the masculine shall be construed as the feminine and/or the neuter and vice versa. This Lease

49

shall be interpreted and enforced without the aid of any canon, custom or rule of law requiring or suggesting construction against the party drafting or causing the drafting of the provision in question.

Section 1.12        **Captions.**

The captions in this Lease are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Lease or the intent of any provision hereof.

Section 1.13        **Parties Bound.**

The terms, covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and, except as otherwise provided in this Lease, to their respective legal representatives, successors, and assigns.

Section 1.14        **Counterparts.**

This Lease may be executed in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument.

Section 1.15 **Memorandum Of lease:**

Neither this Lease nor a memorandum in respect of this Lease shall be recorded.

Section 1.16 **Survival.**

All obligations and liabilities of Landlord or Tenant to the other which accrued before the expiration or other termination of this Lease, and all such obligations and liabilities which by their nature or under the circumstances can only be, or by the provisions of this Lease may be, performed after such expiration or other termination, shall survive the expiration or other termination of this Lease. Without limiting the generality of the foregoing, the rights and obligations of the parties with respect to any indemnity under this Lease, and with respect to Fixed Rent, Tenant's Tax Payment and any other amounts payable under this Lease, shall survive the expiration or other termination of this Lease.

Section 1.17

Citicare, Inc is in possession of the Premises pursuant to a lease
dated May 16, 2007, which Lease includes a right of first refusal
and an option to purchase the Premises. Citicare inc hereby
agree to waive said right of first refusal and option to Purchase on
behalf of Citicare Inc. The aforementioned Lease shall be void
and terminated with no further force and effect upon the date this
Lease is in full force and effect with 127TH ST PROPERTIES
LLC.

**SECTION 1.18**

THE PARTIES ACKNOWLEDGE THAT ON JUNE___, 2013 TENANT FILED FOR
BANKRUPTCY PROTECTION AND AS SUCH THIS LEASE IS SUBJECT TO THE
APPROVAL OF THE BANKRUPTCY COURT.  AFTER THIS LEASE IS FULLY
EXECUTED, TENANT AGREES TO OBTAIN BANKRUPTCY COURT APPROVAL
OF THIS LEASE AT ITS OWN COST AND EXPENSE WITHIN  90 DAYS OF THE
EXECUTION OF THIS LEASE IF SAID BANCKRUPCY COURT APPROVAL IS NOT
FORTHCOMING ON A TIMELY BASIS THIS LEASE SHALL BE NULLITY AND IN
NO FURTHER FORCE AND EFFECT.  IRRESPECTIVE OF THE DATES OF
BANKRUPTCY APPROVAL RENT SHOULD BE PAID ACCORDING TO THE
SCHEDULE AS PROVIDED FOR IN THIS LEASE.

IN WITNESS WHEREOF, LANDLORD AND TENANT

HAVE EXECUTED THIS AGREEMENT OF LEASE AS OF

THE DAY AND YEAR FIRST ABOVE WRITTEN.

### LANDLORD

127TH ST PROPERTIES LLC, ("LLC") ,
a New York limited liability company

By:

Name: Sam Markowitz

### TENANT

**CITICARE INC.,**
a New York Corporation

By:

Name: Silva Umukoro
Title: President

Tenant's Federal Identification
Number: 13394205

## TENANT ACKNOWLEDGMENT FORM

STATE OF NEW YORK        )
                         ) ss:
COUNTY OF NEW YORK       )


           On August ___, 2013, before me, the undersigned, personally appeared
_____, personally known to me or proved to me on the basis of
satisfactory evidence to be the individual whose name is subscribed to within instrument and
acknowledged to me that he executed the same in his capacity, and that by his signature on the
instrument, the individual, or the person upon behalf of which the individual acted, executed the
instrument.

    Notary Public
    (Affix Stamp & Seal)

## EXHIBIT A

## FLOOR PLAN

The floor plan which follows is intended solely to identify the general location of the Premises, and should not be used for any other purpose. All areas, dimensions and locations are approximate, and any physical conditions indicated may not exist as shown.

12.Ownership of Tenant Improvements. All of the Tenant Improvements which were constructed by Tenant prior to the date of this Lease shall be the property of Tenant  . ,. Tenant shall have the right to depreciate and claim and collect investment tax credits in such improvements; provided, however, that (i) Tenant shall not remove or alter such improvements except in accordance with the terms of the Lease; (ii) such improvements shall be surrendered to Landlord, and title to such improvements shall vest in Landlord, at the expiration or earlier termination of the Lease Term; and (iii) in no event shall Landlord have any obligation to pay Tenant for the cost of the value of such improvements.

## EXHIBIT C

## DEFINITIONS

**Affiliate:** With respect to any Person, any other Person that, directly or indirectly (through one or more intermediaries), Controls, is Controlled by, or is under common Control with, such first Person.

**Rate:** The annual rate of interest publicly announced from time to time by Citibank, N.A., or its successor, in New York, New York as its "base rate" (or such other term as may be used by Citibank, N.A., from time to time, for the rate presently referred to as its "base rate").

**Building Systems: Business Days:** All days, excluding Saturdays, Sundays and all days observed, without duplication, by either the State of New York, the Federal Government or the labor unions servicing the Building as holidays.

**Condenser Water System:** The water tower, piping loop, pumps and connection valves designed to provide condenser water to the Building's central system and any Supplemental HVAC System, expressly excluding any Supplemental HVAC System and its connection to the Condenser Water System.

**Consumer Price Index:** shall mean the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the United States Department of Labor, New York, N.Y.-Northeastern N.J. Area, All Items (1982-84=100), or any successor index thereto appropriately adjusted. In the event that the Consumer Price Index is converted to a different standard reference base or otherwise revised, the determination of adjustments provided for herein shall be made with the use of such conversion factor, formula or table for converting the Consumer Price Index as may be published by the Bureau of Labor Statistics, or, if said Bureau shall not publish the same, then with the use of such conversion factor, formula or table as may be published by Prentice-Hall, Inc., or any other nationally recognized publisher of similar statistical information. If the Consumer Price Index ceases to be published, and there is no successor thereto, such other index as Landlord and Tenant shall agree upon in writing shall be substituted for the Consumer Price Index. If Landlord and Tenant are unable to agree as to such substituted index, such matter shall be submitted to the American Arbitration Association or any successor organization for determination in accordance with the regulations and procedures thereof then obtaining for commercial arbitration.

**Cost Per Kilowatt Hour:** (a) The total cost for electricity incurred by Landlord to service the Building during a particular billing period (including energy charges, demand charges, surcharges, time-of-day charges, fuel adjustment charges, rate adjustment charges, taxes, rebates and any other factors used by the public utility company in computing its charges to Landlord), divided by (b) the total kilowatt hours purchased by Landlord to provide electricity to the Building during such period.

**Deficiency:** The difference between (a) the Fixed Rent and Additional Rent for the period which otherwise would have constituted the unexpired portion of the Term (assuming the Additional Rent for each year thereof to be the same as was payable for the year immediately

ALLIB01\182658\2
305217-3017970                                        C - 1

preceding such termination or re-entry), and (b) the net amount, if any, of rents collected under any reletting effected pursuant to the provisions of this Lease for any part of such period (after first deducting from such rents all expenses incurred by Landlord in connection with the termination of this Lease, Landlord's re-entry upon the Premises and such reletting, including repossession costs, brokerage commissions, attorneys' fees and disbursements, and alteration costs).

**Governmental Authority (Authorities):**   The United States of America, the City, County or State of New York, or any political subdivision, agency, department, commission, board, bureau or instrumentality of any of the foregoing, or any landmarks preservation agency (or other entity designated or accepted for such purpose by any Governmental Authority or landmarks preservation agency), now existing or hereafter created, having jurisdiction over the Real Property or any portion thereof or the curbs, sidewalks, and areas adjacent thereto.

**Hazardous Materials:**   Any substances, materials or wastes currently or in the future deemed or defined in any Requirements as "hazardous substances", "toxic substances", contaminants", "pollutants" or words of similar import.

**HVAC:**  Heating, ventilation and air-conditioning.

**Indemnities:**  Landlord, Landlord's Agent, each Mortgagee and Lessor, and each of their respective direct and indirect partners, officers, shareholders, managers, directors, members, trustees, beneficiaries, employees, principals, contractors, licensees, invitees, servants, agents and representatives.

**Lessor:**  A lessor under a Superior Lease.

**Mortgage(s):**  Any mortgage, trust indenture or other financing document (including any assignment of leases and rents) which may now or hereafter affect the Premises, the Real Property, the Building or any Superior Lease and the leasehold interest created thereby, and all renewals, extensions, supplements, amendments, modifications, consolidations and replacements thereof or thereto, substitutions therefor and advances made thereunder.

**Mortgagee(s):**  Any mortgagee, trustee or other holder of a Mortgage.

**Person:**  Any individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, estate, trust, unincorporated association, business trust, tenancy-in-common or other entity, or any Governmental Authority.

**Prohibited Use:**  Any use or occupancy of the Premises that would: (a) cause material damage to the Building, the Premises or any equipment, facilities or other systems therein or; (b) violate the Certificate of Occupancy issued for the Premises or the Building . c) "Prohibited Use" also includes the use of any part of the Premises for the sale of illegal drugs or any illegal purpose: d) violates the requirements of the insurance carrier

. **Requirements:** All present and future laws, rules, orders, ordinances, regulations, statutes, requirements, codes and executive orders, extraordinary and ordinary, of (i) all Governmental Authorities, including the Americans With Disabilities Act, 42 U.S.C. § 12101 (et seq.), New York City Local Law 58 of 1987, and any law of like import, and all rules, regulations and government orders with respect thereto, and any of the foregoing relating to Hazardous Materials, environmental matters, public health and safety matters and landmarks preservation, (ii) any applicable fire rating bureau or other body exercising similar functions, affecting the Real Property or the maintenance, use or occupation thereof, or any street, avenue or sidewalk comprising a part of or in front thereof or any vault in or under the same and (iii) all requirements of all insurance bodies affecting the Premises.

**Rules and Regulations:** The rules and regulations annexed to and made a part of this Lease as **Exhibit D**, as they may be modified from time to time by Landlord.

**Soft-Costs:** Collectively, any and all architectural fees, engineering fees, legal fees and other consultant fees and other so-called "soft-costs".

**Specialty Alterations:** Alterations consisting of kitchens, pantries, executive bathrooms, computer installations, safe deposit boxes, vaults, libraries or file rooms requiring reinforcement of floors, internal staircases, conveyors, dumbwaiters, other Alterations of a similar character.

**Superior Lease(s):** Any ground or underlying lease of the Real Property or any part thereof heretofore or hereafter made by Landlord and all renewals, extensions, supplements, amendments, modifications, consolidations, and replacements thereof.

**Tenant Party:** Any of Tenant, any Affiliate of Tenant, any subtenant or any other occupant of the Premises, or any of their respective direct or indirect partners, officers, shareholders, directors, members, trustees, beneficiaries, employees, principals, contractors, sub-contractors, licensees, invitees, visitors, servants, agents, or representatives, including, without limitation, any architect or engineer employed or consulted in connection with the Design Drawings, Constructions Documents or the Premises.

**Tenant's Property:** Tenant's movable fixtures and movable partitions, telephone and other equipment, computer systems, trade fixtures, furniture, furnishings, and other items of personal property that are removable without material damage to the Premises or Building.

## EXHIBIT D

## RULES AND REGULATIONS

1.      The sidewalks, entrances, passages, courts, elevators, vestibules, stairways, corridors or halls shall not be obstructed or encumbered by Tenant or used for any purpose other than ingress or egress to and from the Premises and for delivery of merchandise, equipment and other personal property in prompt and efficient manner, using elevators and passageways designated for such delivery by Landlord.

2.      Except in those areas designated by Tenant as "security areas" (being all areas that contain prescription drugs and other medical supplies), all locks or bolts of any kind shall be operable by the Grand Master Key or via card key.  No locks shall be placed upon any of the doors or windows by Tenant, nor shall any changes be made in locks or the mechanism thereof that shall make such locks inoperable by said Grand Master Key or card key.  Tenant shall, upon the termination of its tenancy, turn over to Landlord all keys/cards of stores, offices and toilet rooms, either furnished to or otherwise procured by Tenant and in the event of the loss of any keys/cards furnished by Landlord, Tenant shall pay to Landlord the cost thereof.

3.      Tenant shall keep the entrance door to the Premises closed at all times.

4.      None of Tenant's employees, visitors or contractors shall be permitted to have access to the Building's roof without permission from Landlord.

5.      Tenant shall not make, or permit to be made, any unseemly or disturbing noises or disturb or interfere with occupants of this or neighboring Buildings or premises or those having business with them.

6.      Neither Tenant nor any of Tenant's servants, employees, agents, visitors or licensees shall at any time bring or keep upon the Premises any hazardous material, inflammable, combustible or explosive fluid, chemical or substance except such minimal quantities as are incidental to normal office occupancy, provided however that Tenant may keep prescription and other drugs and medical supplies on the Premises in those quantities reasonably necessary to conduct its business.

7.      Tenant shall not use or keep, or permit to be used or kept, any hazardous or toxic materials or any foul or noxious gas or substance in the Premises, permit or suffer the Premises to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Building by reason of noise, odors, vibrations or interfere in any way with other tenants or those having business therein.

ALLIB01\182658\2
305217-3017970                                              D - 1

8.Except as specifically provided in the Lease, Tenant shall not do any cooking or conduct any restaurant, the sale or service of food or beverages to its employees or to others.

9.Tenant may, at its sole cost and expense and subject to compliance with all applicable requirements of the Lease, install and maintain vending machines for the exclusive use by Tenant, its officers, employees and business guests, provided that each machine, where necessary, shall have a waterproof pan thereunder and be connected to a drain. Tenant shall not permit the delivery of any food or beverage to the Premises, except by persons approved by Landlord, which approval shall not be unreasonably withheld or delayed.

10.Tenant shall store all its trash, garbage and recyclables within its Premises. No material shall be disposed of which may result in a violation of any Requirement or ordinance governing such disposal. All garbage and refuse disposal shall be made only through entranceways and elevators. The water and wash closets and other plumbing fixtures shall not be used for any purposes other than those for which they were constructed and no sweepings, rubbish, rags, acids or other substances shall be deposited therein. All damages resulting from any misuse of the fixtures shall be borne by Tenant, if Tenant's servants, employees, agents, visitors or licensees shall have caused the same.

11.    Tenant, before closing and leaving the Premises at any time, shall see that all lights, water, faucets, etc., are turned off. All entrance doors in the Premises shall be left locked by Tenant when the Premises are not in use.

12.    Canvassing, soliciting and peddling in the Building is prohibited and Tenant shall cooperate to prevent the same.

13.    The Premises shall not be used for lodging or sleeping or for any immoral or illegal purpose.

14.    Tenant shall not occupy or permit any portion of the Premises as an office for a the possession, storage, manufacture or sale of narcotics, dope or tobacco in any form or as a barber or manicure shop or as an employment bureau. Tenant shall not engage or pay any employees on the Premises, except those actually working for Tenant on the Premises, nor advertise for labor giving an address at the Premises.

15.    Tenant shall not accept barbering or boot blacking services in the Premises, from any company or persons not approved by Landlord, which approval shall not be unreasonably withheld, and at regulations other than as reasonably fixed by Landlord.

16.    The requirements of Tenant will be attended to only upon written application at the office of the building, except in the event of any emergency condition. Employees of Landlord or Landlord's agents shall not perform any work or do anything outside of the regular

ALLIB01\182658\2
305217-3017970                          D - 2

duties, unless under special instructions from the office of Landlord or in response to an emergency condition.

17.     Tenant shall be responsible for the delivery and pick up of all mail from the United States Post Office.

18.     Landlord may waive any one or more of these Rules and Regulations for the benefit of any particular tenant or tenants, but no such waiver by Landlord shall be construed as a waiver of such Rules and Regulations in favor of any other tenant or tenants, nor prevent Landlord from thereafter enforcing any such Rules and Regulations against any or all of the tenants of the Building.

19.     Landlord shall not be responsible to Tenant or to any other person for the non-observance or violation of these Rules and Regulations by any other tenant or other person. Tenant shall be deemed to have read the Rules and Regulations and to have agreed to abide by them as a condition to its occupancy of the Premises.

20.     These Rules and Regulations are in addition to, and shall not be constructed to in any way modify or amend, in whole or in part, the terms, covenants, agreements and conditions of the Lease.

## EXHIBIT E


**Rider to lease dated _____ from Citicare Properties LLC (landlord) to Citicare Inc. (tenant)**

**Premises:**    **154 West 127th Street, New York NY 10027**

## NOTICE TO NYS DEPARTMENT OF HEALTH


(1)    The landlord acknowledges that his right of reentry into the premises set forth in this lease do not confer on him the authority to operate a hospital as defined in the Article 28 of the Public Health Law on the premises and agrees that he will give the New York State Department of Health Tower Building Empire State Plaza Albany NY 12237, notification by certified mail of its intent to reenter the premises or to initiate disposes proceedings or the lease is due to expire at least 30 days prior to the date on which the landlord intends to exercise the right of reentry or to initiate such proceedings or at least 60 days before expiration of the lease. "Upon receipt of from the landlord of its intent to exercise the right of reentry or upon the service of process in disposes proceedings and 60 days prior to the expiration of lease the tenant shall immediately notify by certified mail the New York State department of Health Corning Tower Building Empire State Plaza Albany NY 12237 of the receipt of such process or that the lease is about to expire.


(2)    Assignment, Subletting, Mortgaging:

If tenant shall desire to assign or sublet any all or any portion of its demise premises then tenant shall give notice thereof to landlord and in such notice shall set forth all pertinent business terms of the proposed assignment or subletting as well as the name and address of the proposed assignee or sub lessee , information as to financial condition of such assignee or sublease and the proposed use which assignee or sub lessee desires to make of the demise premises. Such notice shall bear the signature of the proposed assignee or sub lessee attesting to its accuracy. Tenant shall in addition at Landlord's request shall furnish all other further information as landlord may reasonably request concerning such proposed assignment or subletting. As a

ALLIB01\182658\2
305217-3017970                                    F - 1

condition to the landlords consent, to any assignment or subletting, it shall be necessary to:

(i)    That tenant at the time of requesting consent shall not be in default under the lease.

(ii)    That such assignee of this lease shall assume all the terms covenants and conditions of this lease on the part of the tenant hereunder to be performed and observed,

(iii)    That the original or duplicate original of the instrument of the assignment and assumption of the sublease of the agreement shall be delivered to landlord within 10 days following the making thereof and,

(iv)    That the instrument of sublease shall specifically state that such sublease is subject to all of the covenants and condition of this lease.

## TABLE OF CONTENTS

ARTICLE 1 Basic Lease Provisions                          Page 1
ARTICLE 2 Leased Premises, Term and Possession Page 4
ARTICLE 3   Rent, Additional Rent                         Page 5
ARTICLE 4   Repairs and Maintenance                       Page 6
ARTICLE 5   Use & Occupancy                               Page 9
ARTICLE 6   Condition of Premises                         Page 9
ARTICLE 7   Floor Load                                    Page 14
ARTICLE 8   Taxes                                         Page 14
ARTICLE 9   Requirement of Law                            Page 17
ARTICLE 10  Subordination                                 Page 19
ARTICLE 11 Cleaning                                       Page 21
ARTICLE 12 Insurance, Property Loss                       Page 22
ARTICLE 13 Destruction Fire or other cause                Page 24
ARTICLE 14 Eminent Domain                                 Page 26
ARTICLE 15 Assignment and Subletting                      Page 27
ARTICLE 16  Access to Premises                            Page 33
ARTICLE 17 Default                                        Page 34
ARTICLE 18 Remedies and Damages                           Page 36
ARTICLE 19 Landlords Right to Cure                        Page 38
ARTICLE 20  No Representation by Landlord                 Page 39
ARTICLE 21  End of Term                                   Page 40
ARTICLE 22 Quiet Enjoyment                                Page 41
ARTICLE 23 No Surrender, No Waiver                        Page 42
ARTICLE 24 Waiver of Trial by Jury                        Page 42
ARTICLE 25 Notices                                        Page 43
ARTICLE 26 Rules and Regulation                           Page 44
ARTICLE 27 Vault Spaces                                   Page 44
ARTICLE 28 Broker                                         Page 45
ARTICLE 29 Indemnity                                      Page 45
ARTICLE 30 Adjacent Excavation,                           Page 46
ARTICLE 31 Miscellaneous                                  Page 47
Exhibit:
A  - Floor Plans
C  - Definition
D - Rules and Regulations

# AMENDMENT TO LEASE

Dated as of

_____ ____, 2016

Between

**127TH ST PROPERTIES LLC,**

as Landlord

and

**URBAN HEALTH PLAN, INC.,**

as Tenant

Premises:    154 West 127th Street
New York, New York 10027

## AMENDMENT TO LEASE

THIS AMENDMENT (this "Amendment") is made as of _____ ___, 2016 (the "Effective

Date"), between 127TH ST PROPERTIES LLC ("Landlord"), a New York limited liability company,

having an office at P.O. Box 423, Brooklyn, New York 11222, as landlord, and URBAN HEALTH

PLAN, INC. ("Tenant"), a New York Not For Profit corporation, having an office at 1065 Southern

Boulevard, Bronx, New York 10459, as tenant.

Landlord and Tenant hereby covenant and agree as follows:

## ARTICLE 1

## THE LEASE

This Amendment amends that certain lease (the "Lease") dated as of August 26, 2013, between

the Landlord and Citicare, Inc. ("Prior Tenant").  A true copy of the Lease (together with all amendments

and attachments) is attached as **Exhibit "A"** hereto and made a part hereof.  The Landlord represents and

warrants that the Lease is the only, and the only applicable, lease with respect to the premises governed

thereby, 154 West 127th Street, New York, New York 10027 (the "Premises"), and that the prior lease

between the parties for the Premises dated as of May 16, 2007, was rejected, terminated and superseded in

favor of the Lease, by order of the United States Bankruptcy Court.

## ARTICLE 2

## ASSIGNMENT

The Lease be, and hereby is, assigned by Prior Tenant to Tenant, effective as of the Effective

Date, in accordance with an Order (the "Sale Order") of the United States Bankruptcy Court for the

Southern District of New York in the case styled *In re Citicare Inc.*, debtor, Chapter 11 Case No. 13-

11902 (MEW) (the "Chapter 11 Case"), a true copy of which Sale Order (with any papers on which it

relies) is annexed hereto as **Exhibit "B."**  The Lease be, and hereby is, assumed and assigned, as follows:

1.    All terms of the Lease remain in full force and effect except as set forth in this

Amendment.

2

2.      The Stipulation and Order dated December 22, 2015 [Docket No. 179], entered in the Prior Tenant's Chapter 11 Case with respect to the Lease, is hereby superseded and deemed null, void and of no effect as of the commencement date hereof.

3.      All other stipulations and orders entered in the Prior Tenant's Chapter 11 Case with respect to the Lease, are hereby superseded and deemed null, void and of no effect with respect to the Lease as of the commencement date hereof.

4.      The Lease as amended hereby is assigned by the Prior Tenant to the Tenant on consent of the Landlord.

5.      As of the Effective Date, there are no arrears due and owing in respect of the Lease.

6.      As of the Effective Date, there are no defaults of any kind existing under the Lease and the Lease is deemed in full force and effect.

7.      The following terms of the Lease are amended:

i.      Preamble:  The Tenant is as identified as above.

ii.      Notices:  If to Tenant, notice shall be provided to:

Urban Health Plan, Inc.
Attention:  Chief Executive Officer
1065 Southern Boulevard
Bronx, New York 10459

With a copy to its counsel:

Brooklyn Legal Services Corporation A
Attn:  Paul J. Acinapura, Esq.
260 Broadway, Suite 2
Brooklyn, New York 11211.

iii.      Section 1.17 (page 51) and Section 1.18 (page 52) shall be deemed, and are hereby, superseded and voided by this Lease and the Sale Order.

iv.      Section 1.2 (page 9) is hereby amended and replaced by a new Section 1.2 to read as follows:

"Section 1.2  Licenses and Permits.  Tenant, at its expense, shall at all times comply with the terms and conditions of all licenses and permits required for the lawful conduct of the Permitted Uses in the Premises.

3

Landlord is to supply a Certificate of Occupancy issued by the New York City Department of Buildings for the Premises authorizing Tenant to use the Premises consistent with the Permitted Uses. Tenant is to comply with all requirements and will remove all violations associated with its use and occupancy of the Premises, which violations arise on or after the Effective Date.

8.     This Amendment is effective only upon (i) the effectiveness of that certain Asset Purchase Agreement between Tenant and Prior Tenant in the Prior Tenant's Chapter 11 Case, which shall be effective only upon its terms and conditions; and (ii) the effectiveness of the Sale Order.

IN WITNESS WHEREOF, LANDLORD AND TENANT HAVE EXECUTED THIS AMENDMENT AS OF THE DAY AND YEAR FIRST ABOVE WRITTEN; AND PRIOR TENANT HAS INDICATED ITS CONSENT.

**LANDLORD**

127TH STREET PROPERTIES, LLC

By:_____
   Name:
   Its:

**TENANT**

URBAN HEALTH PLAN, INC.

By:_____
   Name:  Paloma Hernandez
   Its:  President/Chief Executive Officer

Consented to:

**PRIOR TENANT**

CITICARE, INC.

By:_____
   Name:
   Its:

4

EXHIBIT "B"
EQUIPMENT

## Citicare, Inc. Inventory List 2016

**Room 111**
- ☐ 1 Desk
- ☐ 1 Table
- ☐ 1 Book Shelf
- ☐ 1 Chair
- ☐ 2 Filing Cabinets

**Room 113**
- ☐ 2 Exam Tables
- ☐ 1 Welch Allyn 767 Transformer
- ☐ 1 GYN Light
- ☐ 1 Magnifying Instrument

**Room 114**
- ☐ 1 Centrifuge

**Room 115**
- ☐ Welch Allyn 767 Transformer
- ☐ 2 Refrigerators
- ☐ 1 Printer
- ☐ 2 Chairs
- ☐ 1 Stool
- ☐ 1 Telephone
- ☐ 1 Computer

**Room 116**
- ☐ 1 Autoclave
- ☐ 1 Exam Table
- ☐ 1 Welch Allyn 767 Transformer

**Room 123**
- ☐ 1 Telephone
- ☐ 1 Exam Table
- ☐ 1 Scale
- ☐ 1 Computer
- ☐ 1 Stool
- ☐ 1 Chair
- ☐ 1 Curtain
- ☐ 1 Welch Allyn 767 Transformer

**Room 124**
- ☐ 1 Exam Table
- ☐ 1 Chair
- ☐ 1 Welch Allyn 767 Transformer
- ☐ 1 Computer
- ☐ 1 Telephone
- ☐ 1 Echo Machine

**Room 130**
- ☐ 1 Exam Table
- ☐ 1 Computer
- ☐ 1 Stool
- ☐ 1 Chair
- ☐ 1 Curtain
- ☐ 1 Welch Allyn 767 Transformer

**Room 131**
- ☐ 3 Refrigerators
- ☐ 1 Exam Table
- ☐ 1 Stool
- ☐ 1 Welch Allyn 767 Transformer
- ☐ Ekg
- ☐ 1 Chair
- ☐ 1 Computer
- ☐ 1 Oxygen Tank
- ☐ 1 Curtain

**Room 136**
- ☐ 1 Scale
- ☐ 1 Computer
- ☐ 1 Exam Table
- ☐ 1 Stool
- ☐ 1 Chair
- ☐ 1 Telephone
- ☐ 1 Welch Allyn 767 Transformer

12

**Room 138**
- [ ] 1 Chair
- [ ] 1 Stool
- [ ] 1 Exam Table
- [ ] 1 Telephone
- [ ] 1 Welch Allyn 767 Transformer

**Room 311**
- [ ] 1 Desk
- [ ] Stress Machine

**Room 313**
- [ ] 1 Desk
- [ ] 1 Computer
- [ ] 3 Chairs
- [ ] 1 Cabinet

**Room 314**
- [ ] 3 Exam Tables
- [ ] Curtains
- [ ] 1 Filing Cabinet
- [ ] Physical Therapy Equipment

**Room 315**
- [ ] 1 Telephone
- [ ] 1 Filing Cabinet
- [ ] 1 Computer
- [ ] 1 Desk
- [ ] 2 Chairs
- [ ] 1 Small Book Shelf

**Room 316**
- [ ] 1 Desk
- [ ] 1 Computer
- [ ] 2 Chairs

**Room 317**
- [ ] 1 Desk
- [ ] 1 Computer
- [ ] 2 Chairs

**Room 318 (Operations)**
- [ ] 2 Copy Machines
- [ ] 2 Fax Machines
- [ ] 1 Book Case
- [ ] 2 Rolling Chairs
- [ ] 3 Scanners

- [ ] 3 Desks
- [ ] Lockers
- [ ] Mailboxes
- [ ] 2 Computers
- [ ] 2 Telephones

**Elsa's Office**
- [ ] 2 Chairs
- [ ] 1 Computer
- [ ] 1 Telephone
- [ ] 1 Desk
- [ ] Toys

**Cubicle Area**
- [ ] 4 Filing Cabinets

**Front Desk (Security)**
- [ ] Desk
- [ ] Monitor (Camera)

**1st Floor Waiting Area**
- [ ] 20 Chairs

**1st Floor Waiting Area #2**
- [ ] 4 Chairs
- [ ] 1 Television

**1st Floor Reception**
- [ ] 4 Computers
- [ ] 4 Chairs
- [ ] 3 Printers
- [ ] 1 Copy Machine
- [ ] 2 Telephones
- [ ] 2 Filing Cabinets (Small)

**3rd Floor Reception**
- [ ] 2 Computers
- [ ] 1 Printer
- [ ] 2 Telephones

**Conference Room**
- [ ] 1 Telephone
- [ ] 5 Chairs
- [ ] 1 Rolling Chair
- [ ] 1 Conference Table

**Triage Area**

- ☐ 1 Scale
- ☐ 1 Curtain
- ☐ 1 Scanner
- ☐ 1 Welch Allyn 767 Transformer
- ☐ 1 Clock
- ☐ 1 Stool
- ☐ 1 Computer
- ☐ 1 Chair

*All other personalty not listed.*

EXHIBIT "C"
CONTRACTS

**Employment**
Namsi Healthcare Consulting
Absylom Nyamekye, Family Practice
Alvin Lindsay, Internal Medicine
Apryl Mcneil, Family Practice
Cecelia Williams, Registered Dietitian
Marc Alerte, Internal Medicine
Myo Maw. Cardiology
Oscar Okoli, Physician Assistant
Tanya Sullivan, Nurse Practitioner
Lloyd Bailey, Internal Medicine
       (HIV Specialist)
Icilima Fergus, Cardiologist
Jobin Danesh, Podiatry
Victor Igbuya, Diagnostic Technician
Antonio Richardson
       Licensed Clinical Social Worker
Cynthia Grace, PhD Psychologist
Daphney Garrison
       Licensed Clinical Social Worker
Harland Kessaris, PhD Psychologist
James Mcknight, MD, Psychiatrist
Jeffrey Gardere, PhD Psychologist
Victor Brown, Licensed Clinical Social Worker
Dwayne Seymour-Poole, PhD Psychologist
Daniel Sharir,
       Licensed Mental Health Counselor

**Insurance**
Paris Kirwan Malpractice

**Equipment**
Not Applicable

**Purchasing**
Not Applicable

**Warranties**
Not Applicable

**Licenses**
CLIA
Operating

**Supply**
Not Applicable

**Maintenance**
PM&JS
Advanced Pest Control

**Software**
eCW

**Technology**
Not Applicable

**Managed Care Contracts**
Aetna
Amerigroup
BCBS
Beacon
Center light
Elder plan
Emblem health
Fidelis
Health first
Hhh choices
HIP
Liberty health
Value options
VNS
Wellcare

EXHIBIT "D"
MEDICAL RECORDS CUSTODIAL AGREEMENT

urban health-citicare\apa\asset purchase agreement v6.docx

## <u>MEDICAL RECORDS CUSTODY</u>
## <u>AGREEMENT</u>

**THIS MEDICAL RECORDS CUSTODY AGREEMENT** (this **"<u>Agreement</u>"),** is made and entered into as of _____, 2016 (the **"Closing Date"**) by and between Urban Health Plan, Inc., 1065 Southern Boulevard, Bronx NY (the **"<u>Buyer</u>"**) and Citicare, Inc. 154 W. 127th Street, New York, NY 10027 (together with its designee(s) or successors, including any bankruptcy trustee or liquidating trustee, however denominated "**<u>Citicare</u>**" or the **"<u>Seller</u>"**) (the Buyer and the Seller being hereinafter individually referred to as a **"Party"** and collectively referred to as the **"Parties").**

WHEREAS, the Buyer is purchasing certain assets of Buyer; and upon the closing of the Asset Purchase Agreement ("Closing"), the Parties desire to facilitate continuity of care for Citicare's current and former patients by having the Buyer take custody of such patients' medical records, on the terms and conditions set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as set forth below.

1.    <u>Records.</u>    The term **"<u>Records</u>"** as used in this Agreement shall mean: (i) any paper medical records of patients of Citicare that are provided to Buyer, including electrocardiogram and echocardiogram results and similar or comparable test results; and (ii) electronic medical records of Citicare in [ECW].

2.    <u>Custodial Agreement.</u>    The Seller hereby appoints the Buyer, and the Buyer agrees to serve, as custodial agent of the Seller with respect to the maintenance and safekeeping of the Records and the provision of access to such records for partients and/or their new providers. Commencing on the Closing Date, the Buyer shall maintain the Records as custodian for the Seller for the minimum period required by law (the **"<u>Retention Period</u>").** During the Retention Period, the Buyer and Seller agree that:

(a)    Seller shall notify all of Seller's patients, by first-class mail, signage at its facility and notation on its website, at least thirty days in advance of Closing, that it will no longer be providing care to patients after a date agreed upon by the parties and subject to agreement by the NYS Department of Health. With the notice sent to patients, Seller shall also notify patients that Buyer is maintaining custody of the Seller's medical records, and provide instructions for patients to authorize transfer of their medical records to Buyer or to another provider. Should Seller receive any authorizations from patients for release or transfer of medical records, Seller shall send a copy of such to Buyer. Buyer shall comply with any authorization and only with respect to the specific records addressed in the authorization.

(b)    The Buyer shall retain copies of any Records transferred pursuant to <u>Section</u> 2(a) hereof. Buyer shall provide the Seller with information as to where Records were transferred upon request.

(c)    Prior to destroying or otherwise disposing of a Record or Records

upon expiration of the Retention Period,  the Buyer shall send to the Seller written notice (a **"Buyer's Destruction Notice"**) of its intent to destroy or dispose of Records.  Buyer's Destruction Notice shall provide the Seller with thirty (30) calendar days  to  respond (**"Sellers's Response Time"**) to the Buyer with the Seller's direction as to whether or not the Seller intends to take possession of all or any of the records in lieu of the destruction. Upon the expiration of the Seller's Response Time, the Seller shall either take possession of the records or direct the Buyer to go forward  with the destruction.  If the Buyer does not receive a response from the Seller within the Seller's Response Time, the Buyer may proceed with the contemplated destruction.

(d)     The Buyer shall maintain the confidentiality of all of the Records for which it serves as custodian hereunder in accordance with all applicable l aws and,  to the extent applicable,  the terms of the Asset Purchase Agreement;

(e)     Upon the reasonable written request of the Seller, the Buyer shall provide the Seller with access to the Records pursuant to the terms of the Asset Purchase Agreement.

(f)     Buyer shall provide timely access to, and photocopies of, the Records to patients and their legal representatives or designees upon request.

Upon the expiration of the Retention Period in relation to Records, the Buyer shall provide a Buyer's Destruction Notice to the Seller.

3.     <u>Buyer's Use and Access to Records</u>. If Records are transferred to Buyer pursuant to patient authorization, Buyer shall be entitled to access and use all Records for any legitimate business purpose of the Buyer, subject to applicable privacy or confidentiality laws and regulations and shall no longer be required to maintain a copy of such Records pursuant to paragraph 2(b) herein, until such time, Buyer shall access the Records only for payment or healthcare operations and only if necessary for such purposes.

4.     <u>Compliance with Process</u>. Notwithstanding any other provision of the Agreement, the Buyer shall not be required to seek a protective order or any other form of relief with respect to any administrative or judicial process seeking the production of Records and shall be entitled to rely upon the lawfulness of any such process.

5.     <u>Indemnification</u>.

(a)     <u>By the Buyer.</u>  The Buyer will indemnify and hold Seller and its employees, agents and affiliates harmless from any and all claims, actions, liabilities and expenses (including costs of judgments, settlements, court costs and reasonable attorneys' fees, regardless of the outcome of such claim or action) caused by, resulting from or alleging Buyer's negligence or intentional misconduct in the performance of its obligations under this Agreement causing damages to Seller.

(b)     <u>By the Seller</u>.  The Seller will indemnify and hold Buyer and its members, directors, officers, employees, agents and affiliates harmless from any and all claims, actions, liabilities and expenses (including costs of judgments, settlements, court costs and reasonable attorneys' fees, regardless of the outcome of such claim or action) caused by,

resulting from or alleging Seller's negligence or intentional misconduct causing damages to Buyer.

(c)    Any claim for indemnification under this Agreement shall be handled in accordance with the indemnification procedures set forth in the Asset Purchase Agreement. The indemnification obligations of the Parties set forth in this <u>Section 5</u> shall survive termination of this Agreement and continue for a period of six (6) years from the date of this Agreement.

6.    <u>Term and Termination.</u>

(a)    <u>Term.</u> This Agreement shall commence on the date first written above and shall continue until the expiration of the Retention Period for all Records or as sooner provided for herein.

(b)    <u>Termination by Consent</u>. This Agreement may be terminated at any time upon written consent by both Parties specifying the effective date of termination; or

(c)    <u>Termination for Breach</u>. Either Party may terminate this Agreement if the other Party is in default or breach of any material term or condition hereof which default, breach or failure has been duly noticed and has not been cured within thirty (30) days of the date of receipt of a notice of breach or default by the Party to be so noticed.

7.    <u>Effectiveness</u>. Notwithstanding anything to the contrary herein, the Parties hereby acknowledge and agree that this Agreement and its terms, conditions, obligations and responsibilities in all respects shall be (i) subject to approval by the United States Bankruptcy Court for the Southern District of New York in the Chapter 11 bankruptcy case of the Seller, and of no effect if not so approved, (ii) effective only upon and subject to the terms of the attached Asset Purchase Agreement between Seller and Purchaser (the "APA"), and (iii) effective only to the extent closing on the APA shall have occurred.
\

8.    <u>Miscellaneous</u>.

(a)    <u>Notice</u>. Any notice, demand or communication required, permitted, or desired to be given under this Agreement shall be communicated to the Party to receive the notice at the address for such Party specified in the first paragraph above.

(b)    <u>Assignability; Parties in Interest.</u>    This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns. Neither this Agreement nor the obligations of any party hereunder shall be assignable or transferable by such party without the prior written consent of the other parties hereto, which consent shall not be unreasonably withheld. This Agreement is for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns, and nothing in this Agreement is intended to confer, expressly or by implication, upon any other Person any legal or equitable rights, remedies or claims under or by reason of this Agreement.

(c)    Governing Law. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York; without giving effect to principles of conflicts of laws. Each party agrees to the in personam jurisdiction of the state and federal courts resident in New York.

(d)    Counterparts. This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement may be executed and delivered by exchange of facsimile, JPEG, TIF, or PDF copies showing the signatures of the parties hereto, and those signatures need not be affixed to the same copy. The facsimile, JPEG, TIF, or PDF copies showing the signatures of the parties will constitute originally signed copies of the same agreement requiring no further execution. This Agreement shall become effective when each party shall have received a counterpart signed by the other party.

(e)    Amendments and Waivers. The parties hereto may: (a) extend the time for the performance of any of the obligations or other acts of the parties hereto; (b) waive compliance with any of the covenants or agreements contained in this Agreement; or (c) amend this Agreement, if and only, in the case of an extension or amendment, if such action is set forth in a written agreement signed by all parties, or, in the case of a waiver, if such waiver is signed by the Party against whom the waiver is to be effective.

(f)    Severability. Any portion or provision of the Agreement that is determined to be invalid, illegal or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining portions or provisions hereof in such jurisdiction or, to the extent permitted by Law, rendering that or any other portion or provision of the Agreement invalid, illegal or unenforceable in any other jurisdiction. The Parties furthermore agree to execute and deliver such amendatory contractual provisions to accomplish lawfully as nearly as possible the goals and purposes of the provision so held to be invalid, illegal or unenforceable.

(i)    Complete Agreement. This Agreement and the documents delivered pursuant hereto or referred to herein contain the entire agreement between the Parties hereto with respect to the matters contemplated herein and supersede all previous negotiations, commitments and writings.

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed as of the date first above written.

URBAN HEALTH PLAN, INC.                           CITICARE, INC.


_____                   _____
By:  Paloma Hernandez                              By:  Silva Umukoro
Title:   President and CEO                          Title: President and CEO